# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| ALLAEDHIN QANDAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:20-cv-00053-JCH |
| | ) | |
| ST. CHARLES COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff submits this opposition to the Motion for Summary Judgment filed by Defendants St. Charles County, Missouri, Michael McKee, and Jeffery Cast (hereinafter "Defendants") (ECF No. 25). Defendants present an implausible story that is flatly contradicted by Mr. Qandah's testimony, Defendants' own documentation, third-party witnesses, and Defendant Cast's own statements. Mr. Qandah experienced months of religious and racial harassment. This culminated in an incident where, after St. Charles County Department of Corrections ("SCCDOC" or "SCCJ") employees spread a rumor that Mr. Qandah was a snitch, Defendant Cast intentionally unlocked Mr. Qandah's cell as he prayed so that an inmate could assault Qandah. Defendant McKee denied Mr. Qandah medical care following the assault. Mr. Qandah still deals with the fallout from the assault today. The record is replete with unresolved questions of fact that bar summary judgment. Further, St. Charles County attempts to escape liability despite its endorsement and ratification of Defendant Cast's actions and its failure to train and supervise corrections officers. For these reasons, this Court should deny Defendants' Motion for Summary Judgment.[1]

---

[1] Mr. Qandah incorporates by this reference his Statement of Additional Uncontroverted Facts as if fully set forth herein.

**ARGUMENT**

Summary judgment must be denied unless a defendant proves there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986).  In reaching its decision, the Court must consider the evidence and all reasonable inference that may be drawn therefrom in the light most favorable to the non-moving party.  *Johnson v. Hamilton*, 452 F.3d 967, 972 (8th Cir. 2006). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions," compelling denial of summary judgment where liability turns on such assessments. *Anderson*, 477 U.S. at 255; accord *Dick v. Dickinson State Univ.*, 836 F.3d 1054, 1061 (8th Cir. 2016).

## I.    DEFENDANT CAST IS NOT ENTITLED TO QUALIFIED IMMUNITY

Government officials are not entitled to summary judgment when the official's conduct violated a constitutional right and when that violated right was clearly established. *Manning v. Cotton,* 862 F.3d 663, 668 (8th Cir. 2017) (citations omitted).[2] Defendant Cast is not entitled to qualified immunity because he violated Mr. Qandah's right to be free from a corrections officer facilitating the beating of one inmate by another. Further, decades of Eighth Circuit case law demonstrate that this right has long been clearly established. Defendants ignore all of the evidence

---

[2] Defendants do not contest that Mr. Qandah's rights were clearly established, nor could they.  It has long been clearly established the Eighth Amendment requires prison officials to take reasonable measures to guarantee inmate safety by protecting them from attacks by other prisoners. *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007) ("[I]t was no doubt clearly established long before 2004, when Mr. Young was assaulted, that the Eighth Amendment required prison officials 'to protect prisoners from violence at the hands of other prisoners'") (internal quotations omitted). Further, as detailed below, the Eighth Circuit held in an almost identical case over twenty years ago that facilitating an attack on another inmate by opening cell doors to allow inmates access to each other in solitary confinement constituted deliberate indifference.  *Newman,* 122 F.3d at 652.

that supports Mr. Qandah's claims, including the narrative of events by Mr. Qandah and other witnesses.

### A.  Defendant Cast Deliberately Facilitated an Attack on Mr. Qandah

A prison official violates the Fourteenth Amendment and should be held liable if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates.  *Farmer v. Brennan*, 511 U.S. 825, 828, 833 (1994).[3] Given the duty that prison officials have to protect prisoners from violence at the hands of other prisoners, "[g]ratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective … [b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 833-84 (internal quotations and citations omitted).

"An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Nelson v. Schuffman*, 603 F.3d 439, 447 (8th Cir. 2010). Deliberate indifference requires something more than negligence but less than actual intent to harm. *See Newman v. Holmes*, 122 F.3d 650, 653 (8th Cir. 2007). The plaintiff must establish that "the official's failure to protect resulted in the inmate being incarcerated under conditions posing a substantial risk of serious harm." *Young v. Selk*, 508 F.3d 868, 872 (8th Cir.2007); *Nelson*, 603 F.3d at 447 ("It is enough that the official acted or failed to act despite his knowledge of a

---

[3] Because Mr. Qandah is a pretrial detainee, his claim is analyzed under the Fourteenth Amendment Due Process Clause—under this clause, he is entitled to at least the same protections as individuals imprisoned post-conviction receive under the Eighth Amendment. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). "The Constitution affords greater protection to a pretrial detainee compared to a convicted inmate in the sense that '[d]ue process requires that a pretrial detainee not be punished.'" *Walton v. Dawson*, 752 F.3d 1109 (8th Cir. 2014) *(citing Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979)). Defendant Cast's conduct is even more egregious given that Mr. Qandah was a pretrial detainee.

substantial risk of serious harm."). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citations omitted). Thus, the question of deliberate indifference is a factual determination best left to the jury.

### 1. Defendant Cast acted with deliberate indifference

Defendants argue that the evidence does not show Defendant Cast knew that Mr. Qandah faced substantial risk of serious harm and deliberately disregarded that risk. Not only does evidence show that Cast *did* know that there was a substantial risk of serious harm, but Defendant misstates Eighth Circuit law that holds the opposite in very similar circumstances.

A physical assault by one inmate against another constitutes "serious harm." *Jensen v. Clarke*, 94 F.3d 1191, 1198 (8th Cir. 1996). The Eighth Amendment "requires prison officials to 'take reasonable measures to guarantee inmate safety by protecting them from attacks by other prisoners.'" *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007).

In *Newman v. Holmes,* 122 F.3d 650, 652 (1997), with evidence almost identical to Mr. Qandah's here, the Eighth Circuit upheld the jury's finding that there was deliberate indifference where a guard opened a cell door, facilitating an attack from one inmate on another. In *Newman,* the attacker was in solitary confinement on a disciplinary rule violation, and there was no history of conflict between the attacker and the victims. *Id*. *Id*. The defendant officer argued there was insufficient evidence of deliberate indifference as he maintained that he inadvertently hit an override button which would open all doors on the floor. *Id*. at 653.

4

The claim of the defendant officer in *Newman* is the exact claim Defendant Cast makes here: that the plaintiff had to show a prior conflict between the assailant and the victim. But the Eighth Circuit soundly rejected his contention, reasoning that jail policies made it clear that opening a cell door to allow inmates in solitary unrestricted access to one another clearly presented an obvious risk of harm. *Id*. In fact, in *Newman*, the Eighth Circuit seemingly anticipated this exact case, finding that if an officer were to intentionally open the cell door in order to help the assailant assault a person, it would constitute clear deliberate indifference:

> **[i]f [the guard] had** ignored the procedures for isolating Johnson and **intentionally opened Johnson's cell door for the purpose of assisting Johnson in assaulting others, that intent to cause harm would clearly constitute deliberate indifference** for Eighth Amendment purposes. Likewise, if [the guard] had opened Johnson's cell door knowing that harm to other inmates would almost certainly result, Holmes's conduct would constitute deliberate indifference.

*Id*. (emphasis added). As such, it was a matter for the jury as to which story was more credible. *Id*.

The facts in the instant case are more egregious that  those of *Newman*: Defendant Cast intentionally, not mistakenly, opened Mr. Qandah's cell door in solitary confinement in violation of policy[4] allowing the attacker, Mr. Ballinger, access. In opening Mr. Qandah's solitary confinement cell door to allow Mr. Ballinger in, Defendant Cast violated a general internal policy of the jail and a specific policy created by Defendant McKee regarding Mr. Qandah.  Pl. Add. Facts ¶¶ 40, 97.  Mr. Ballinger testified that this policy was well known to even the inmates. Pl. Add. Facts ¶ 47. Viewed in the light most favorable to Mr. Qandah, Defendant Cast made a deliberate decision to facilitate an attack on Mr. Qandah. Pl. Add. Facts ¶¶ 53-67. The attack would

---

[4] While not dispositive, it is highly probative for Eighth Amendment analysis when corrections officers deliberately disregard internal jail policies which represent the institution's choice of how to protect detainees such as when prison administrators conclude that locking the cell doors overnight is necessary to assure detainees' safety. *Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2014) (internal quotations omitted).

not have happened without these actions from Defendant Cast. Pl. Add. Facts ¶¶ 49-55, 72-83. Mr. Ballinger testified that he decided to fight Mr. Qandah after learning from corrections officers that Mr. Qandah was a snitch. Pl. Add. Facts ¶¶ 45-47. In order to attack Mr. Qandah, Mr. Ballinger went to Defendant Cast and asked to be let into Mr. Qandah's cell without Mr. Qandah's knowledge or permission. Pl. Add. Facts ¶¶ 49-53. Mr. Ballinger testified that Defendant Cast smiled and gave him "the ok" upon learning he wanted to go attack Mr. Qandah. Pl. Add. Facts ¶¶ 52-53.  This is consistent with the overwhelming evidence that Defendant Cast is an avid racist and bigot who wished harm to inmates, people of color, and Muslims specifically, and that he was motivated to cause Mr. Qandah harm because of these beliefs. Pl. Add Facts ¶¶ 275-326.

Finally, Defendant Cast's actions are even more egregious because Mr. Qandah was clearly at heightened risk from other inmates given that corrections officers had recently publicly accused him of snitching on other inmates. Pl. Add. Facts ¶¶ 33-37. Further, Cast testified that he knew that a reputation for snitching put inmates in unique danger. Pl. Add. Facts ¶¶ 33-37. In *Reeves v. King,* the Eighth Circuit noted that labeling an inmate a snitch would unreasonably subject the inmate to a substantial risk of harm from other inmates, because "an inmate who was labeled as a snitch [is] in danger of assault by other inmates. 774 F.3d 430, 432 (8th Cir. 2014) (*citing Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008)).

Taking the facts in the light most favorable to Mr. Qandah, a reasonable jury could find that Defendant Cast acted with deliberate indifference towards Mr. Qandah.

### 2.  Defendants placed Mr. Qandah at substantial risk of harm

Defendants argue that there was noa constitutional violation because the evidence does not show Defendant Cast knew that Mr. Qandah faced substantial risk of serious harm or that Defendant Cast deliberately disregarded that risk. Defendants further argue that Mr. Qandah was

the victim of a "surprise attack." The evidence does not support this theory.  "A plaintiff is *not* required to allege and prove that the defendant ... specifically knew about or anticipated the precise source of the harm." *Kahle v. Leonard*, 477 F.3d 544, 551 (8th Cir. 2007) (emphasis in original). A "prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Krein v. Norris*, 309 F.3d 487, 491-92 (8th Cir. 2002). Defendant Cast's intentional violation of a known policy specifically designed to protect inmates resulted in exactly what the policy was meant to avoid and thus created an obvious risk. *See Hickerson v. Dist. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1258 (8th Cir. 2006).  This is particularly true given that Mr. Qandah and Mr. Ballinger testified that days before the attack, corrections officers had publicly referred to Mr. Qandah as "a snitch." Pl. Add. Facts ¶¶ 34, 45-47.

Defendant Cast cites *Falls v. Nesbitt*, 966 F.2d 375, 379 (8th Cir. 1992), which itself relies almost solely on *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990). These cases are inapposite. They each discuss situations where the defendants were not physically present at the time of the attack, and therefore, the plaintiff admitted that there was nothing the defendants could have done to prevent the attack. *Nesbitt*, 966 F.2d at 379; *Smith*, 910 F.2d at 502. In the instant case, Defendant Cast was the literal gatekeeper: but for his affirmative action to allow Mr. Ballinger into Mr. Qandah's cell, the attack could not have happened. Pl. Add. Facts ¶¶ 49-55, 72-83. Both Mr. Qandah and Mr. Ballinger testify that Defendant Cast did so with the full knowledge Mr. Qandah would be harmed and in fact the intent to cause that harm. Pl. Add. Facts ¶¶ 49-55, 63-67. Defendant Cast could not be surprised by an attack that happened only with his help. A jury

7

could infer from this evidence that Cast knowingly placed Mr. Qandah at risk of substantial harm, and summary judgment should be barred.

### 3. Defendants' motion ignores evidence and relies almost solely on Defendant Cast's incredible version of the events

Defendants' Motion for Summary Judgment is completely reliant on one of Defendant Cast's explanation that "he opened Plaintiff's cell door so Ballinger could return some items he had borrowed from Plaintiff." Doc. 27 at 2. This testimony is contradicted by other facts in the case as well as Cast himself.

Denial of summary judgment is appropriate where the non-moving party's "evidence put the overall credibility of the [movant's] witnesses squarely a tissue." *United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.*, 480 F.3d 841, 845 (8th Cir. 2007). In assessing the evidence of a witness necessary to carry the movant's burden of proof, courts must "look carefully at whether the witness is unbiased and competent, and whether his testimony is positive, internally consistent, unequivocal, and in full accord with the documentary exhibits." *Id.*, (*citing Lundeen v. Cordner*, 354 F.2d 401, 408 (8th Cir. 1966)). Defendant Cast's testimony is biased, inconsistent, incoherent, and unsupported by documentary exhibits.

Defendant Cast's version of events is contradicted by Mr. Ballinger's testimony and written statement following the event. Mr. Ballinger testified that he asked Defendant Cast to open Mr. Qandah's cell knowing that he was "going to take matters into [his] own hands about Qandah being a snitch." Pl. Add. Facts ¶ 52. He testified that Defendant Cast smiled at Mr. Ballinger, further confirming that Defendant Cast knew he was going to assault Mr. Qandah. Pl. Add. Facts ¶ 52. Mr. Ballinger's testimony is consistent with his contemporaneous written statement and interview: "I went up to the bubble and asked C.O. Cast if I could go talk to Quanda [sic] because I know from other C.O.'s that he has a history of running his mouth. When I asked him that he

8

hesitated, grinned and then gave me the OK." Pl. Add. Facts ¶ 73.  Sgt. Marshall, a trained law enforcement investigator with St. Charles County who personally investigated the incident, testified he believed Mr. Ballinger and had no reason to doubt Mr. Ballinger's testimony. Pl. Add. Facts ¶ 75.

Defendant Cast's explanation does not stand up to the barest scrutiny. In his incident report, Defendant Cast described his actions thus:

> At 1900 hours I let Mr. Ballinger out of his cell for his two hour out time. At 1915 hours Mr. Ballinger spoke to Mr. Qandah through his cell door then came to the transfer box and stated that Mr. Qandah was letting him borrow some soap. Upon the door to Mr. Qandah's cell opening I hit the maintain button to stop the door from opening more than six inches. The door did not respond and kept opening at which time Mr. Ballinger entered the cell to assault Mr. Qandah at which time I called a 10-10 over the radio.

Pl. Add. Facts ¶ 77. However, Sgt. Marshall testified that the cell door had an opening to pass items. Pl. Add. Facts ¶ 82. Thus, there was no reason for Defendant Cast to open the cell door. Second, both Sgt. Marshall and Defendant McKee testified that there were no maintenance problems with the doors reported. Pl. Add. Facts ¶¶ 81, 98. Sgt. Marshall even tested the cell door and found no maintenance or malfunction issues. Pl. Add. Facts ¶ 80. Finally, Defendant Cast's explanation does not explain _why_ he was willing to engage in such an enormous rule violation for such a minor request.

When confronted with these discrepancies at his deposition, Defendant Cast advanced a wholly new theory that Mr. Qandah and Mr. Ballinger conspired to trick Defendant Cast into opening the cell door. Pl. Add. Facts ¶ 85. Defendant Cast stated that Mr. Qandah and Mr. Ballinger talked for 20 minutes at which point Mr. Qandah called out to Defendant Cast to open the door. Pl. Add. Facts ¶ 86.  Under this new theory, Defendant Cast opened the door because of Mr. Qandah's request rather than Mr. Ballinger's request. Defendant Cast had no explanation as

to why his incident report, written directly after the incident, contained no mention of this 20 conversation and no mention of Mr. Qandah stating it was fine for Cast to open the door. Pl. Add. Facts ¶¶ 87-88.  Defendant Cast also stated that an inmate passed Defendant Cast a note saying "it's all a set up, it's bull shit, he's just trying to get a lawsuit." Pl. Add. Facts ¶ 90. Defendant Cast stated he turned the note over to SCCJ supervisors. Pl. Add. Facts ¶ 91.  Yet, this newly mentioned note has never been produced or referred to before Defendant Cast's deposition. Pl. Add. Facts ¶ 92. Defendant Cast is certainly entitled to raise these dubious arguments and his theory that the attack was devised so that Mr. Qandah could spend years litigating this claim, or any others, before a jury at trial. However, at the summary judgment stage, they fail because they are contradicted by material facts.

Moreover, there is a much simpler explanation for Defendant Cast facilitating an attack on Mr. Qandah. Defendant Cast is a bigot who hates Muslims. Defendant Cast's social media presence shows years of him posting content which is virulently anti-Muslim and anti-immigrant including memes and comments reading:

▪ "THE QUR'AN IS A FAKE BOOK, A LIE AND IS NOT A PEACEFUL RELIGION"
▪ "EUROPEAN CHRISTIANS BUILD THIS NATION THEY DIDN'T COME TO BITCH, COLLECTIVE WELFARE, WAGE JIHAD, AND REPLACE THE AMERICAN CONSTITUTION WITH SHARIA LAW."

Pl. Add. Facts ¶¶ 278, 290.

These are in keeping with Defendant Cast's general pattern of regularly posting memes or other comments about problems with non-white races and white superiority. Pl. Add Facts ¶¶ 275-326.  The months before Mr. Qandah's attack, Defendant Cast made many public posts using racial slurs to describe President Obama, criticizing the Black Lives Matter movement, and using words like "coon." Pl. Add. Facts ¶ 296.  On November 13, 2014, Defendant Cast posted: "Way beyond sick and fucking tired. A white life in this country is worthless. … More gangstas need to die in a

hurry." Pl. Add. Facts ¶ 298. Defendant Cast was a member of a private Facebook group called "Shit Show" where members (some of whom were other law enforcement officers), would regularly post appallingly racist memes including the following:

- A photo of a white man looking at a black man with the caption, "When you watch how slow they work and you wonder why anyone would want one as a slave."
- A drawing of a white mother holding her daughter's head down in a bathtub with the caption, "When your daughters first crush is a little negro boy"
- A photo of a woman in a hijab with the caption, "I'd hit this shit harder than her brother hit the world trade center."

Pl. Add. Facts ¶ 307-312.

In their memorandum in support of Defendants' Motion for Summary Judgment, Defendants accused Mr. Qandah of "wild speculation" that Defendant Cast's white supremacist and anti-Muslim views could have impacted his behavior. Yet, Defendants also ask this Court to rely solely on Defendant Cast's shifting and improbable explanations. While the nature of Mr. Cast's prejudices may be in dispute, there is clear evidence by which a jury could find that he unlocked Mr. Qandah's cell for the purpose of facilitating his assault. Summary judgment should not be granted where there is a genuine dispute of material fact as to causation and a basis for a reasonable jury to find that the Defendant acted with improper motives. *Clary v. City of Cape Girardeau*, 165 F.Supp.3d 808, 829 (E.D. Mo. 2016) (*citing Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007). In their memorandum, Defendants, "concede if Officer Cast intentionally opened Plaintiff's cell door for the purpose of assisting Ballinger in assaulting Plaintiff, then that intent to cause harm would constitute deliberate indifference for Eighth Amendment purposes." ECF No. 27 at 8. The direct conflict between Defendant Cast and Mr. Ballinger's consistent testimony, the investigation by Sergeant Marshall, the shifting and improbable explanations from Defendant Cast, and the overwhelming evidence of Defendant Cast's bigoted and racist motives create a genuine

issue of material fact, and a basis for a reasonable jury to find that Defendant Cast acted with improper motive.

Defendant Cast is not entitled to qualified immunity. As such, this Court should deny Defendants' Motion for Summary Judgment on Count I.

## II.    THERE IS A MATERIAL ISSUE OF FACT AS TO WHETHER DEFENDANT MCKEE DEPRIVED MR. QANDAH OF MEDICAL CARE

"Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009).[5] "Deliberate indifference has both an objective and a subjective component." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009). Plaintiffs can show deliberate indifference to medical needs through showing, "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004).

First, "[a] serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).[6] A factfinder may

---

[5] Although the Eighth Circuit has not "establish[ed] a clear standard for pretrial detainees, it repeatedly [has] applied the deliberate indifference standard as is applied to Eighth Amendment claims made by convicted inmates." *Vaughn v. Greene County, Ark.,* 438 F.3d 845, 850 (8th Cir. 2006) (internal citation omitted); *Spencer v. Knapheide Truck Equip. Co*., 183 F.3d 902, 906 (8th Cir. 1999) ("Pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment.")

[6] Defendants suggest Mr. Qandah's failure to have a medical diagnosis at the time of the fight as a reason to find he did not have a serious medical need. First, a previously existing medical diagnosis is not required for a finding of a serious medical need given that an obvious medical need can suffice. *Fields v. Gander*, 734 F.2d 1313, 1314 (8th Cir. 1984) (holding an inmate who has recently suffered an injury complaining of serious pain, and asking for follow-up treatment is sufficient notice of a serious need). But, more importantly, Mr. Qandah wanted a medical diagnosis and was blocked from receiving one. Pl. Add. Facts. ¶¶ 108-125. Defendants cannot have it both ways.

determine that a defendant was actually aware of a serious medical need, but deliberately disregarded it, "from the very fact that the [medical need] was obvious." *Vaughn*, 557. F.3d at 909. Particularly when an inmate has recently suffered an injury, consistent complaints of pain and need for follow-up treatment can suffice as notice of a serious need. *Fields v. Gander*, 734 F.2d 1313, 1314 (8th Cir. 1984).

During the attack, Mr. Qandah's head painfully struck the metal toilet loud enough to make a sound. Pl. Add. Facts ¶¶ 58-59. Mr. Ballinger continued to land punches on Mr. Qandah, including on his face and jaw. Pl. Add. Facts ¶ 61. Medical employees only briefly examined Mr. Qandah. Pl. Add. Facts ¶¶ 108-125. Mr. Qandah suffered jaw pain and bruising on his back, forehead, eye and jaw. ECF 26-2, 110:2-25, 111:1-5; Pl. Add. Facts ¶¶ 109, 124-25. Despite pain and trauma to his head, SCCJ staff refused Mr. Qandah's multiple requests to be seen by a doctor. Pl. Add. Facts ¶¶ 108-125.  These complaints of pain, and requests for actual testing all convey a serious medical need given Mr. Qandah's blow to the face and visible injuries. *Vaughn*, 558 F.3d at 909 ("[Defendant's] knowledge of Blount's medical symptoms, **coupled with his request for medical assistance**, a reasonable jury could determine that Appellants were actually aware that Blount needed medical attention … Appellants' self-serving contention that they did not have the requisite knowledge does not provide an automatic bar to liability in light of the objective evidence to the contrary." (emphasis added)); *Dadd v. Anoka County,* 827 F.3d 749, 755-57 (8th Cir. 2016) (ignoring legitimate complaints of extreme pain for no medical reason, but rather just indifference, constituted an Eighth Amendment violation).

Defendant McKee disregarded Mr. Qandah's serious medical need by personally directing that limitations be placed on Mr. Qandah's medical care.  Pl. Add. Facts ¶¶ 114-125. Based on Defendant McKee's animosity and actions towards Mr. Qandah, Mr. Qandah believed Defendant

McKee prevented him from being treated by a doctor. Pl. Add. Facts ¶ 114. Defendant McKee confirmed in his deposition that he personally reviewed Mr. Qandah's injuries and decided that the injuries were minor. Pl. Add. Facts ¶¶ 115-117. Mr. Qandah lodged a number of complaints related to his lack of medical care with Defendant McKee, none of which McKee responded to. Pl. Add. Facts ¶¶ 119-121. Defendant McKee had a history of issuing special directives limiting Mr. Qandah's interaction with others, and taking punitive action against Mr. Qandah which Defendant McKee admits he has never done for any other inmate. Pl. Add. Facts ¶¶ 24-26, 38. This is enough to create a material issue of fact as to whether Defendant McKee violated Mr. Qandah's constitutional rights by denying Mr. Qandah access to medical care.

Finally, Defendants do not appear to seriously contest whether these rights were clearly established. Nor could they. When an official denies a person needed medical treatment, constitutional liability may follow. *Patrick v. Lewis*, 397 F. Supp. 2d 1134, 1142 (D. Minn. 2005) ("The right of a detainee to medical care when it is known that failing to provide care would put the detainee at risk of serious harm is a clearly established right."). Indeed, it has been clear in the Eighth Circuit that when a correctional official denies a person needed medical care, constitutional liability may follow. *Gordon ex. rel. Gordon v. Frank*, 454 F.3d 858, 863 (8th Cir. 2006) ("A reasonable officer would know that it is unlawful for officers to delay medical treatment for an inmate with obvious signs of medical distress, especially one who communicates this distress directly to officers.").

Defendant McKee is not entitled to qualified immunity, and this Court should deny Defendants Motion for Summary Judgment on Count II.

## III.   EVIDENCE SUPPORTS THE CLAIM THAT DEFENDANT ST. CHARLES COUNTY FAILED TO PROPERLY SUPERVISE, INVESTIGATE, AND TRAIN ITS OFFICERS

A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law." *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 691 (1978). An entity has "custom liability" under *Monell* when a plaintiff establishes:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct;                                         and
>
> (3) The plaintiff['s] injury by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson Cty.*, Mo., 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990)). "[I]naction or laxness can constitute government custom if it is permanent and well settled." *Tilson v. Forrest City Police Dept.*, 28 F.3d 802, 807 (8th Cir. 1994).

There are two ways to evidence notice. "Notice may be implied where failure to train officers or employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious," or a pattern of constitutional violations could put the municipality on notice that its employees' responses to a regularly recurring situation are insufficient to protect the constitutional rights of its citizens. *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 934-35 (8th Cir. 1991) (*citing City of Canton v. Harris*, 489 U.S. 378, 390, 397 & n. 10 (1989)).

In the present case, St. Charles County failed to both train and supervise its corrections officers and in doing so, created or acquiesced in a custom of misconduct resulting in excessive

15

force and indifference to inmates' medical needs. A reasonable jury could find that St. Charles

County's customs led to the attack on Mr. Qandah and the subsequent deprivation of medical care.

**A. St. Charles County's Failure to Supervise Corrections Officers Shows a Custom of Deliberate Indifference to the Rights of Inmates, and Mr. Qandah's Rights were Violated as a Result**

An entity is liable for a failure to supervise its employees when its failure evidences a

deliberate indifference to or tacit authorization of violations of the plaintiff's rights, and the

plaintiff's constitutional rights are violated as a result.[7] *Liebe v. Norton*, 157 F.3d 574, 579 (8th

Cir. 1998) (*citing White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994)). "To establish a city's liability

based on its failure to prevent misconduct by employees, the plaintiff must show that city officials

had knowledge of prior incidents of police misconduct and deliberately failed to take remedial

action." *Parrish v. Luckie*, 963 F.2d 201, 204 (8th Cir. 1992).

Here, St. Charles County has two independent practices which contribute to its failure to

supervise its employees. First, it failed to track, respond to, or investigate inmate complaints of

animus towards inmates and abusive mistreatment from corrections officers. Second, it failed to

review use of force and other incidents and guaranteed officers would not face consequences for

misbehavior. Both of these failures constitute deliberate indifference that caused the constitutional

violations to Mr. Qandah, and should preclude summary judgment.

---

[7] Defendants argue that Mr. Smith must show that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff" to prove his failure to train and supervise claims. Doc. No. 124 at 15 (quoting *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 412 (1997)) (emphasis in original). However, the Court in *Brown* was analyzing a failure to screen claim, not claims of failure to train or supervise. Mr. Qandah must show that St. Charles County caused his particular injury; he is not required to establish that the individual Defendants, specifically, were highly likely to cause his injuries. *See Ware,* 150 F.3d at 882 (finding sufficient evidence of deliberate indifference where pattern of misconduct by several different county employees).

1. **St. Charles County is liable for a custom of employee animus and targeted mistreatment of individual inmates due to its failure to meaningfully investigate inmate complaints and take responsive action.**

St. Charles County's officers have a persistent pattern of ignoring complaints of particular inmates and engaging in antagonistic relationships with particular inmates, due to animus. St. Charles County created a culture of disparate treatment unrelated to legitimate jail operations and security functions and willful, punitive apathy to inmate medical needs.

This Court has already deemed as admitted that "(f)rom 2010 through 2017, St. Charles County did not have policies, protocols, and practices in place to fully retain, record or track inmate complaints made against correctional staff." ECF No. 47, Sanctions Order. St. Charles County's own witnesses admit that inmate complaints were not saved, were lost, and were destroyed. Pl. Add. Facts ¶¶ 188-197. Despite a policy mandating a written response to inmate complaints, multiple correctional employees testified that supervisors routinely held informal conversations with those involved and made no record of the outcome. Pl. Add. Facts ¶¶ 188-197. Further, St. Charles County's own employees admit that corrections officers did not always give inmates complaint forms when requested. Pl. Add. Facts ¶¶ 195-197, 262-274. Both Director Crawford and Nurse Echele testified that they were aware that inmates routinely attempted to file complaints about corrections officers or lack of medical treatment with no response, but that neither took action. Pl. Add. Facts ¶¶ 195-197, 262-274. In summary, Mr. Qandah has no way to know how many inmates complained of, or attempted to complain of, treatment similar to his.

This Court has also deemed it admitted that from 2010 through 2017, St. Charles County failed to implement policies which tracked allegations of misconduct against its correctional staff. ECF 47, Sanctions Order. Because copies of the inmate complaint forms were kept in individual inmates' paper files, there was no system of way for jail supervisors to realize one officer had more

complaints lodged against him than others. Pl. Add. Facts ¶¶ 229-235. As a result, there was no way for jail supervisors to learn which officers were accruing high numbers of complaints. Pl. Add. Facts ¶¶ 229-235. Although, as shown *infra*, even when St. Charles did investigate complaints, they completely failed to discipline officers. Even if the complaints did make it to a supervisor's attention, St. Charles lacked a policy requiring review of an employee, and there was no policy, practice, or procedure for consequences or notation in their personnel file. Pl. Add. Facts ¶¶ 229-235.

These failures alone are sufficient for the jury to find deliberate indifference, such that summary judgment should be denied. St. Charles County deliberately set up a system wherein the leaders of the facility turned a blind eye to inmates' complaints, with no way of tracking officers repeatedly accused of misconduct. *See S.L. ex rel. Lenderman v. St. Louis Metro. Police Dept. Bd. of Com'rs,* 4:10-CV-2163 CEJ, 2012 WL 3564030, at \*10 (E.D. Mo. Aug. 17, 2012), aff'd in part, appeal dismissed in part sub nom. *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dept. Bd. of Police Com'rs*, 725 F.3d 843 (8th Cir. 2013) (finding deliberate indifference in an "insulating barrier which prevents notice of complaints from reaching the [c]ommissioner [d]efendants" because supervisors did not inform the commissioners of employee wrongdoing "even in summary form of the number and subject of [internal affairs] investigations.") (internal citation omitted); *see also Rohrbough v. Hall,* 4:07CV00996 ERW, 2008 WL 4722742, at \*13 (E.D. Mo. Oct. 23, 2008), aff'd in part, appeal dismissed in part, 586 F.3d 582 (8th Cir. 2009) (holding that a reasonable jury could find that employee misconduct was an "obvious consequence of" the commissioners' inaction—turning a "blind eye" rather than inquiring into complaints).

Even the partial and incomplete retention of inmate complaints shows a custom or pattern of corrections officers demonstrating animus towards inmates, coupled with a persistent failure to

investigate or rectify this targeted mistreatment. For example, these complaints contain instances where inmates asked to speak with supervisors about corrections officers allowing or encouraging fights between inmates (Pl. Add. Facts ¶ 206), talk about being put in danger by policies allowing inmates to know each other's charges (Pl. Add. Facts ¶ 207), and even reference being physically hit by officers (Pl. Add. Facts ¶ 205).  But rather than investigate, St. Charles County denied the complainants' requests for review out of hand or ignored the complainants' allegations about officer misconduct in their response. Pl. Add. Facts ¶¶ 132-151, 203-207, 228-235. This demonstrates deliberate indifference. *See Forrest v. Parry*, 930 F.3d 93, 102 (3d Cir. 2019), cert. denied sub nom. *City of Camden, New Jersey v. Forrest*, 140 S. Ct. 902, 205 L. Ed. 2d 465 (2020) (finding that a lack of witness interviews and a reliance on the perceived infallibility of employees is evidence of "seriously deficient" investigation of complaints.)

This failure to investigate complaints is further characterized by a system in which St. Charles assigned supervisors with obvious bias to dismiss inmate complaints without any objective review. In fact, in the distorted system at St. Charles County, it was common for an officer to review inmate allegations of *his own misconduct*. Records beginning in 2012 and continuing for years show inmates have complained about a lack of objectivity in reviewing grievances, specifically that Defendant McKee routinely reviews and dismisses inmate complaints about his own misconduct. Pl. Add. Facts ¶¶ 208-227. For instance, one inmate wrote a complaint stating, "I had a grievance written about being put [in solitary confinement] by Lt. McKee I addressed it to CPT. Vaughn yet Lt. McKee responded to a grievance about himself. … SCCDOC has no sense of accountability for its staff."  Pl. Add. Facts ¶ 216. But Defendant McKee (and only Defendant McKee) responds, and predictably, rejects the complaints against himself. Pl. Add. Facts ¶ 216.

**2. St. Charles County ratifies and approves the misconduct of its corrections officers by refusing to discipline, retrain, or supervise employees after inappropriate uses of force or instances allowing harm to inmates**

St. Charles County policy mandates that all incidents where officers use force on inmates or in which inmates are hurt by other inmates need to be thoroughly documented and reviewed. Pl. Add. Facts ¶¶ 126-129.  But even when SCCJ supervisors do note that officers used unreasonable force or took unacceptable actions, SCCJ supervisors did not discipline the officers, recommend discipline for the officers, or even reference uses of force in officers' performance reviews. Pl. Add. Facts ¶¶ 130-177. This illusory review allows officers to act with impunity.

The SCCJ Director's deposition testimony demonstrates SCCJ's lack of commitment to effectuating any accountability for officers. Director Crawford (the person ultimately responsible for making disciplinary decisions) testified that there were situations where discipline was referred to him and he handled it only through an informal conversation where nothing was recorded. Pl. Add. Facts ¶ 141. Director Crawford stated that even when officers were technically in a disciplinary proceeding, he would instead encourage or congratulate the officers and "give [the officer] an attaboy." Pl. Add. Facts ¶ 143. In fact, Director Crawford testified that there were times he simply neglected to follow up on disciplinary referrals at all, and that he would sometimes find referrals for discipline that he never addressed because they were lost in other paperwork. Pl. Add. Facts ¶ 144.

Despite the County policies clearly describing a review and investigation process for uses of force, Director Crawford said in his deposition, "The use of force happened pretty regularly. Investigations, not so much." Pl. Add. Facts ¶ 135. Defendant Mckee testified that, in his 30 plus years with St. Charles County, he could only remember four investigations into uses of force. Pl. Add. Facts ¶ 139. In fact, Defendant McKee, the operations lieutenant of the jail, stated that in

between 2006 and 2017, he did not conduct a single investigation into an employee's use of force against an inmate. Pl. Add. Facts ¶ 140.

Consistent with this lack of accountability for officer misconduct, St. Charles County does not take affirmative steps to decrease officers' improper use of force. Pl. Add. Facts ¶¶ 130-177. Defendant McKee testified that although SCCJ uses 'action plans,' or notifications that an employee has expectations to improve performance, he has never in his twenty years at the jail seen an action plan used to help a C.O. improve their treatment of inmates or their uses of force. Pl. Add. Facts ¶ 175. Sgt. Lewis, who leads training for SCCJ, testified that he has never done or been requested to do supplemental training for officers when there is an issue involving the use of force. Pl. Add. Facts ¶ 176. Over the 30 years that he worked there, Defendant McKee does not recall any change to the use of force policies or procedures. Pl. Add. Facts ¶ 177.

In fact, St. Charles County does not even have a system to track uses of force for training or disciplinary purposes. Pl. Add. Facts ¶ 152; ECF No. 47. Defendant McKee testified that, "If you're asking is there a log or data place that I keep track that Mike McKee has five uses of force, Billy Joe has 12 and their brother Billy Bob has 5 100, no, there is not." Pl. Add. Facts ¶ 153. Officers' use of force reviews are not kept in the officer's personnel files. Pl. Add. Facts ¶ 154. Thus, there is no way for St. Charles County to track the quantity and quality of uses of force by individual officers or its collective staff. *See Beck v. City of Pittsburgh,* 89 F.3d 966, 976 (3d Cir. 1996) ("Because there is no formalized tracking of complaints for individual officers, a jury could find that officers are guaranteed repeated impunity."). Even when the use of force reviews noted ways an officer's use of force against inmates should be improved, Defendant McKee testified that these critiques would not necessarily be factored into her job performance. Pl. Add. Facts ¶ 155.

21

Defendant Cast's personnel file demonstrates St. Charles County's acquiescence to Officer misconduct. On October 30, 2013, Defendant Cast used pepper spray and physically restrained an inmate. Pl. Add. Facts ¶ 165. The reviewing supervisor faulted Defendant Cast for not using other strategies to handle the situation before it escalated and directed a Sergeant to discuss the use of force with Defendant Cast. Pl. Add. Facts ¶ 165. However, Defendant Cast's file contains no record of this warning and there is no evidence this conversation ever happened. Pl. Add. Facts ¶ 165. Defendant Cast also engaged in uses of force that went completely undocumented. Pl. Add. Facts ¶ 166. He wrote the following comment on Facebook: "I have asked an officer 'need help' when he replied, yes, I put the offender on the ground and the officer had to tell me to stop choking him out, lol. I was a lil excited." Pl. Add. Facts ¶ 166.[8] In his deposition, Defendant Cast stated he was referring to an incident in Unit D where a group of officers were trying to restrain an inmate. Pl. Add. Facts ¶ 167. Defendant Cast confirmed that he choked the inmate, and further elaborated that this situation involved a group of officers who had gotten the inmate on the ground, and then a 450-pound officer sat on top of all of them, creating a pile of guards and inmates. Pl. Add. Facts ¶ 168. Despite Cast's boasting of "choking out" an inmate, no use of force report exists for this incident, or, subsequently, any supervisor review. Pl. Add. Facts ¶ 170. Defendant Cast's personnel files shows that not only was he not disciplined for "choking out" a detainee, the use of force was not neither documented or investigated. Pl. Add. Facts ¶¶ 169-172. Additionally, as discussed *supra*, Cast's supervisors had no way to track—in his personnel file or elsewhere—Cast's history of use of force. While allegations of misconduct by inmates were ignored or not investigated, Defendant Cast's personnel file *does* show evidence of discipline, however. Tellingly, each prior

---

[8] At deposition, Cast admitted that he was "friends" on Facebook with several St. Charles supervisors who could see his abhorrent posts (including the claim of "choking out" an inmate). However, there is no record of any discipline or intervention of any kind resulting from these posts.

instance of misconduct and subsequent discipline involved an employment problem, such as misuse of PTO or other attendance issues. Pl. Add. Facts ¶ 332. While missing work could earn an employee punishment at St. Charles, "choking out" an inmate and bragging about does not even merit a mention or investigation.

Like the investigatory process in *Beck* and *Luckie*, the use of force investigative process at St. Charles is a sham. The "review" of dangerous incidents with inmates does nothing to hold officers accountable or ensure that their actions comport with policy or the Constitution going forward. *See Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) (citing *Brandon v. Holt*, 469 U.S. 464 (1985)) ("It is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future.").

### 3. St. Charles County's Failures to Investigate Complaints and Past Incidents of Misconduct was The Moving Force Behind Mr. Qandah's Injuries.

Plaintiff must show that the police officials had notice of a pattern of unconstitutional acts, demonstrated deliberate indifference to the acts, failed to take sufficient remedial action, and that such failure proximately caused the injury. *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000). When an entity has failed to investigate previous problems similar to the one in question, it supports the existence of municipal custom "and that such a custom encourages or allows officers to engage in [unconstitutional conduct] without concern for punishment." *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999).

The record above is replete with evidence upon which a jury could find that an officer of the St. Charles County Jail could facilitate an assault on an inmate or could leave an inmate to suffer without medical care with no concern that he would face discipline for his actions due to the deliberate indifference of the County. As already deemed admitted, Defendant St. Charles County failed to implement adequate retention and review policies for inmate complaints and

requests for medical care. ECF No. 47. This failure sent a message to Defendant Cast and McKee that they were not only allowed to continue mistreating inmates, but that even if the inmates attempted to complain, there would be no response from the facility supervisors to investigate or hold the officers accountable. In fact, as a facility supervisor, Defendant McKee has for years reviewed and systematically rejected inmate complaints about his own behavior.  Pl. Add. Facts ¶¶ 208-227. Inmates have been quite literally told they have nowhere to go to raise legitimate concerns about his behavior.  Pl. Add. Facts ¶¶ 214-226.  Without St. Charles County's tacit authorization of Defendant McKee's behavior, Mr. Qandah could have raised and been heard on his concerns that he was suffering physically following his attack. Instead, Defendant McKee continued to carry out a personal vendetta against Mr. Qandah with no concern that he would face any discipline or accountability for doing so.

In addition to evidence of a total lack of discipline for officers across the department, Defendant Cast's own history at the facility shows multiple incidents where there should have been supervisory intervention, yet none resulted. Given this, it is unsurprising that Defendant Cast was not disciplined for enabling the assault of Mr. Qandah. Pl. Add. Facts ¶ 107. Despite an investigation showing that Defendant Cast's actions were plainly malicious, Director Crawford did not discipline him whatsoever. Pl. Add. Facts ¶ 107.  *See Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) (citing *Brandon v. Holt*, 469 U.S. 464 (1985)) ("It is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future."). Not only was Defendant Cast never been disciplined for his social media posts or his policy violation that resulted in Mr. Qandah's beating, St. Charles ratified and accepted his malfeasance by promoting him. Pl. Add. Facts ¶ 328. *See Medina v. Cty. of San Diego*, No. 08CV1252 BAS RBB, 2014 WL 4793026, at *3 (S.D. Cal. Sept. 25, 2014) ("[P]erformance

24

evaluation records proving the police department had notice or ratified the officers' actions may be relevant to show unlawful policies, customs, or habits as part of Plaintiffs' *Monell* claim.").

Before Defendant Cast facilitated the assault of Mr. Qandah, St. Charles employees had created an environment of inhumane mistreatment and abuse toward Mr. Qandah in which they were insulated from any punishment. Mr. Qandah testified that he was routinely called a "terrorist," "camel jockey", and "ISIS" and was told "if you don't like the laws here, go back to where you came from." Pl. Add. Facts ¶ 12. While even Defendants admitted that being labeled a snitch would put an individual in harm's way in a jail (Pl. Add. Facts ¶ 36), Qandah's complaints about this mistreatment were routinely ignored. Pl. Add. Facts ¶¶ 13-16. Defendant McKee admitted to ignoring complaints about officer verbal abuse of inmates, claiming he could never "substantiate" the complaints.  Pl. Add. Facts ¶ 16. Despite Defendant McKee's claims, in discovery in this case a St. Charles corrections officer quickly confirmed that *multiple* officers had labeled Qandah a snitch and called him racial slurs. Pl. Add. Facts ¶ 15. Thus, when Cast facilitated Mr. Qandah's assault, he did so knowing full well that he worked in an environment that would not punish him for placing Mr. Qandah in great danger.

Defendant County's policies, practices, and customs of failing to supervise, train, and discipline its officers enabled, emboldened, and empowered Defendant Cast to facilitate an attack on Mr. Qandah, and for Defendant McKee to deny him medical care. St. Charles County has deliberately stuck its head in the sand regarding patterns of harm its officers inflict on inmates for whom St. Charles County has a constitutional duty to ensure health and safety. The evidence Plaintiff presents herewith is sufficient for a jury to find that St. Charles is liable for the Defendant's unconstitutional conduct under *Monell*.

25

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendants' Motion for Summary Judgment should be

denied.

Dated:  September 11, 2020                              Respectfully submitted,

**ArchCity Defenders, Inc.**

By:/s/ *Maureen Hanlon*
Blake A. Strode (MBE #68422MO)
John M. Waldron (MBE #70401MO)
Maureen Hanlon (MBE #70990MO)
Nathaniel R. Carroll (MBE #67988MO)
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
855-724-2489 ext. 1006
314-925-1307 (fax)
bstrode@archcitydefenders.org
jwaldron@archcitydefenders.org
mhanlon@archcitydefenders.org
ncarroll@archcitydefenders.org

and

**Khazaeli Wyrsch, LLC**

James R. Wyrsch, #53197
Javad M. Khazaeli, #53735
Kiara N. Drake, #67129MO
911 Washington Ave. #211
Saint Louis, MO 63101
314-288-0777
314-400-7701 (fax)
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com
kiara.drake@kwlawstl.com