UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| ALLAEDHIN QANDAH | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 4:20-cv-00053-JCH |
| | ) | |
| ST. CHARLES COUNTY, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF ALLAEDHIN QANDAH'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Allaedhin Qandah makes the following Additional Statement of Uncontroverted Material Facts:

### *Allaedhin Qandah*

1.      Mr. Qandah is a naturalized citizen of Jordanian descent. Exh. 1, Qandah Declaration ¶¶ 1-2.

2.      He has lived in the St. Louis area for 32 years.  *Id.* ¶ 3.

3.      Mr. Qandah was, and continues to be, a devout Muslim. *Id.* ¶ 4.

4.      While in St. Charles County Jail (hereinafter SCCJ) he participated in Ramadan, prayed openly, and had a Qur'an. *Id.* ¶¶ 5-6.

5.      Mr. Qandah was jailed in SCCJ on charges of low level, non-violent felonies.  Exh. 2, Case.net Charge Information.

6.      Mr. Qandah eventually pled guilty to the charges to escape his mistreatment at SCCJ. Exh. 1, ¶ 10.

7.      The court suspended execution of Mr. Qandah's sentence pending his completion

of probation, which Mr. Qandah successfully completed in 2017. Exh. 2.

### *Months of Harassment at SCCJ*

8.      Mr. Qandah was booked on March 3, 2014, and released on February 6, 2015. Exh.

3, Release Report.

9.      Mr. Qandah was placed in solitary confinement in May 2014 and remained there

until his release. Exh. 1, ¶ 7.

10.     The entire time Mr. Qandah was in solitary confinement, Mr. Qandah only received

one hour of release a day and was otherwise alone in his cell for 23 hours per day. *Id.* ¶ 8.

11.     Mr. Qandah experienced more restrictive conditions of confinement than other

inmates on administrative segregation, who were often allowed out of their cells for two to four

hours per day. Exh. 4, Baumgartner I Dep. 81:2-20.

12.     Throughout his detention, SCCJ officers called Mr. Qandah "terrorist," "camel

jockey," and "ISIS" and told him "if you don't like the laws here, go back to where you came

from." Exh. 5, Qandah Dep. 129:19-25, 130:1-25, 131:1-25, 133:5-25, 134:1-19.

13.     Mr. Qandah submitted grievances on SCCJ's concern forms, but no one responded

to his complaints. *Id.* at 132:2-16.

14.     Former correctional officer Clinton Graebner heard more than one correctional

officer refer to Mr. Qandah as a "snitch" and more than one officer refer to him as a "terrorist."

Exh. 6, Graebner Dep. 103:5-12, 105:5-24, 106:1-16.

15.     Defendant Michael McKee acknowledged that Mr. Qandah submitted complaints

about officers calling him names, but Defendant McKee decided that those complaints "could

never be substantiated." Exh. 21, McKee II Dep. 231:14-17.

16.     Mr. Qandah was never informed that any correctional officers were disciplined or

reprimanded for their uses of force, racial slurs, demeanor, or other actions towards him.  Exh. 1, ¶ 9.

17.     At all times relevant to the Complaint, Defendant McKee was the operations lieutenant at the jail. Exh. 21 at 145:21-25.

18.     As the operations lieutenant, "the entire operations of the jail would flow through [Defendant McKee]," and everything was supposed to come across [his] desk." *Id.* at 15:18-19, 18:11-12.

19.     Defendant McKee sent information up to the assistant director, who in turn sent information up to the director. *Id.* at 15:22-25.

20.     Defendant Jeffery Cast testified that Mr. Qandah "liked getting under [Defendant McKee's] skin" because Defendant McKee put Mr. Qandah in solitary confinement. Exh. 8, Cast Dep. at 125:14-25.

21.     Former SCCJ Director Larry Crawford testified that Defendant McKee talked to him about Mr. Qandah more than he talked about other inmates because Mr. Qandah was a "problematic inmate." Exh. 9, Crawford Dep. at 37:19-24.

22.     Defendant McKee testified that he had special dislike for Mr. Qandah. Exh. 21 at 185:6-9, 186:2-6.

23.     Defendant McKee created a special segregation report that instructed correctional officers that Mr. Qandah only be allowed out of his cell by himself. *Id.* at 193:22-25, 194:1-8.

24.     On January 23, 2015, Defendant McKee sent an email requesting a "peace officer" to fill out a warrant charging Mr. Qandah with a crime because he found Mr. Qandah out of his cell. Exh. 10, McKee Emails, at Bates Label 1084.

25.     Defendant McKee reached out to the prosecutor asking to speak against Mr.

Qandah at his sentencing hearing. *Id.* at Bates Label 1065.

26.     Defendant McKee acknowledged that, in his 30-plus years at SCCJ, he could not think of any other inmate against whom he proactively asked to recommend jail time during sentencing. Exh. 21 at 192:2-17.

27.     On three separate occasions, correctional officers used physical force against Mr. Qandah. Exh. 11, AQ Use of Force August 30, 2014, Exh. 12, AQ Use of Force September 12, 2014; Exh. 13, AQ Use of Force January 29, 2015.

28.     On the review form for the August 30, 2014 use of force, the reviewing supervisor commented that officers should have left Mr. Qandah in his cell instead of using force to attempt to get him to make a movement. Exh. 11.

29.     That review form does not document any discipline or instructions to follow up with the offending officers. *Id.*

30.     Mr. Qandah was pepper sprayed by an officer on January 29, 2015 for allegedly refusing to move cells. Exh. 13.

31.     Although Captain Vince Vaughn noted that Mr. Qandah had offered to be handcuffed three times and none of the officers restrained him before using pepper spray, the review form does not document any discipline or instructions to follow up with the offending officers. *Id.*

### *Assault on Mr. Qandah*

32.     Starting in May 2014 and at the time of the assault, Mr. Qandah had been in solitary confinement in Unit J, where he was held in his cell for 23 hours a day. Exh. 1, ¶ 8.

33.     In August 2014, Mr. Qandah was briefly moved to a regular pod, but was moved back to Unit J after telling COs that he was worried other inmates in the unit were conspiring to

hurt him.  Exh. 14, Shift Supervisor Report (8/12/2014).

34.    SCCJ correctional officers referred to Mr. Qandah as a "snitch" to other inmates. Exh. 5 at 128:6-25, 129:1-7.

35.    Mr. Qandah knew other inmates had heard he was a "snitch" and suspected he was in physical danger because of that. *Id.* at 84:16, 89:16-91:4, 93:4-6.

36.    Defendant Cast testified that he knew that inmates identified as "snitches" were at risk of attacks by other inmates. Exh. 8 at 131:23-132:4.

37.    Defendant Cast also testified that he knew inmates regarded Mr. Qandah as a "snitch." *Id.* at 131:5-7, 265:2-5.

38.    In the fall of 2014, Defendant McKee issued special written directives that Mr. Qandah was only to be allowed out of his cell by himself. Exh. 7, McKee I Dep. 34:1-9; Exh. 3, Qandah Segregation Release Report Sept. 2014.

39.    On September 29, 2014, Defendant McKee reminded all supervisors of this directive.  Exh. 10 at Bates Label Def. 001071.

40.    SCCJ Policy 902 governs security conditions for inmates in administrative segregation and requires staff to keep cell doors locked when inmates are in or out of their cells. Exh. 40, Policy 902 at 2-3.

41.    Defendant Cast testified that he understood Mr. Qandah was in Unit J because Mr. Qandah felt threatened by other inmates, and, unlike others in administrative segregation, Mr. Qandah was not supposed to have contact with other inmates. Exh. 8 at 124:1-15, 148:11-13, 150:10-19.

42.    Mr. Ballinger was moved into Unit J a week before the attack. Exh. 15, Ballinger Dep. at 41:16-25, 42:1-8.

43.     Mr. Ballinger testified that he and Mr. Qandah talked "from time to time," "not a lot," during the week he and Mr. Qandah were housed in the same unit. *Id.* at 42:1-24, 43:2-4.

44.     Mr. Ballinger testified that during that week, Mr. Ballinger mostly kept to himself. *Id.* at 43:13-18.

45.     Mr. Ballinger testified that Mr. Ballinger decided to "beat him up" when officers told Mr. Ballenger that Mr. Qandah was a snitch. *Id.* at 17:8-16.

46.     Specifically, Mr. Ballinger testified that an officer spoke to him and told Mr. Ballinger that Mr. Qandah is the type of person that will tell on other inmates and get them in trouble and that Mr. Ballinger should stay away from Mr. Qandah. *Id.* at 61:2-7.

47.     Mr. Ballinger testified that in his experience, a correctional officer would know that someone labeled a "snitch" to other inmates would endure physical harm. *Id.* at 15:6-11.

48.     Mr. Ballinger testified that he knew it was a "big rule" violation to access someone else's cell, and that it was a "zero tolerance not-allowed-at-all type of thing." *Id.* at 18:5-9, 21:18-24, 22:1-5.

49.     Mr. Ballinger testified that to get access to Mr. Qandah, he waited until he was able to talk to Defendant Cast about opening Mr. Qandah's cell. *Id.* at 19:1-5, 20:10-20.

50.     Mr. Ballinger stated that he waited for Defendant Cast because he had seen him violate the policies and protocols of SCCJ before. *Id.* at 20:4-9.

51.     Mr. Ballinger testified that he asked Defendant Cast to open Mr. Qandah's cell so that Mr. Ballinger could "get some info." *Id.* at 20:14-20.

52.     Mr. Ballinger testified that Defendant Cast smirked at Mr. Ballinger, leading Mr. Ballinger to believe that Defendant Cast knew "I was planning to take matters into my own hands about being a snitch." *Id.* at 22:6-23:9.

53.     After Defendant Cast gave him a smirk, Mr. Ballinger went in front of Mr. Qandah's cell. *Id.* at 23:3-7.

54.     Mr. Ballinger testified that Defendant Cast "waited no time, hit the button, opened the door." *Id.* at 23:3-10.

55.     Mr. Ballinger testified that he was in front of Mr. Qandah's door for about 10 seconds. *Id.* at. 23:14-18.

56.     As soon as the door opened, Mr. Ballinger charged at Mr. Qandah and attacked him. *Id.* at 25:5-13.

57.     When Mr. Ballinger charged into Mr. Qandah's cell, Mr. Qandah had just begun to pray. Exh. 5 at 82:5-24.

58.     Mr. Ballinger tackled Mr. Qandah to bring him to the ground, during which time Mr. Qandah's head and face hit the metal toilet in his cell. Exh. 15 at 25:5-13.

59.     Mr. Ballinger testified that he could hear "Qandah's head hitting the toilet because that – it sounded metallic. It sounded like something going bang against the metal." *Id.* at 26:19-23.

60.     After being slammed to the ground, Mr. Ballinger continued to hit and punch Mr. Qandah.  Exh. 1, ¶ 13.

61.     Mr. Ballinger landed several more punches on Mr. Qandah, including several to his face and jaw.  *Id.* at ¶¶ 14-15.

62.     Mr. Qandah wrestled Mr. Ballinger into a headlock to avoid the punches and blows. *Id.* at ¶ 16.

63.     Mr. Qandah testified that "a couple minutes" elapsed from the time Defendant Cast opened his cell door and the other officers ordered him and Mr. Ballinger to separate. Exh. 5 at

100:10-14.

64.     Mr. Qandah testified that other correctional officers had to order Defendant Cast to open Mr. Qandah's cell door to allow them to intervene in the fight. *Id.* at 99:19-23.

65.     Mr. Qandah testified that Defendant Cast was still smirking when other officers separated Mr. Qandah and Mr. Ballinger following the attack. *Id.* at 101:17-25.

66.     Immediately after the incident, Mr. Qandah heard Corporal Krankel, one of Defendant Cast's superiors, yell, "Inmates are not allowed to pass anything. Why would you open his door even if that was the case?" *Id.* at 103:22-104:1.

67.     Mr. Ballinger testified that after this incident, no SCCJ supervisors ever came to ask him what happened. Exh. 15 at 34:7-10, 16-19.

### *Immediately Following the Incident - Sheriff's Investigation*

68.     Director Crawford asked the St. Charles Sheriff's Department to investigate Mr. Qandah's assault. Exh. 16, Marshall Dep. 60:1-9; Exh. 17, Sheriff Report Qandah Incident.

69.     Sgt. Mike Marshall was the supervisor of the Crimes Against Persons Unit in the Sheriff's Department. Exh. 16, Marshall Dep. at 21:23-22:7; 78:6-9.

70.     Director Crawford told Sgt. Marshall that the inmates were in segregation and there was assault that occurred when only one inmate should be out at a time. *Id.* at 62:7-15, 63:1-5; Exh. 17, Sheriff Report Qandah Incident.

71.     Sgt. Marshall interviewed both Mr. Qandah and Mr. Ballinger. Exh. 17 p. 14.

72.     Sgt. Marshall testified that Mr. Ballinger said that he was out of his cell, he went to the control room, and he asked the person in the control room to pop the door so he could "holler at dude," by which Sgt. Marshall understood he meant talk to Mr. Qandah. Exh. 16 76:10-22.

73.     In a written statement given to Sgt. Marshall, Ballinger stated:

> Me and Quanda [*sic*] has an issue because I heard he was a "snitch" and likes to run his mouth. So when I was released from my cell 12-15-14 I went up to the bubble and asked C.O. Cast if I could go talk to Quanda because I know from other C.O.'s that he has a history of running his mouth. When I asked him that he hesitated, grinned and then gave me the OK. I turned around walked to cell 9 to grab my pencil and you should see on video surveillance then to cell 8 which is Quanda's cell and C.O. Cast actually opened it. I was a bit uneasy because I thought he wouldn't do it or that he might make a big deal out of it but, that was not the case.

Exh. 18, St. Charles County Sheriff's Statement Form –Ballinger.

74.     Mr. Ballinger testified that everything in his statement to Sgt. Marshall was accurate. Exh. 15 at 28:2-29:3.

75.     Sgt. Marshall testified that he believed Ballinger was very forthcoming and that Ballinger completely and without hesitation gave him a truthful statement, and he had no reason to doubt Mr. Ballinger's statement. Exh. 16 at 77:6-7, 24-25, 83:12-14.

76.     Sgt. Marshall also reviewed the incident report Defendant Cast wrote after the assault. Exh. 17.

77.     In this report, Defendant Cast wrote,

> At 1900 hours I let Mr. Ballinger out of his cell for his two hour out time. At 1915 hours Mr. Ballinger spoke to Mr. Qandah through his cell door then came to the transfer box and stated that Mr. Qandah was letting him borrow some soap. Upon the door to Mr. Qandah's cell opening I hit the maintain button to stop the door from opening more than six inches. The door did not respond and kept opening at which time Mr. Ballinger entered the cell to assault Mr. Qandah at which time I called a 10-10 over the radio.

Exh. 19, Cast Incident Report.

78.     Sgt. Marshall attempted to interview Defendant Cast, but he was unsuccessful. Exh. 16, Marshall Dep. 101:21-23; Exh. 17, Sheriff Report Qandah Incident.

79.     Sgt. Marshall testified that he was unaware of any efforts from SCCJ staff to make Defendant Cast available to speak with him. Exh. 16 at 103:23-104:1.

80.     Sgt. Marshall went to Unit J to see how the doors opened and closed and if the doors were functioning properly. *Id.* at 106:2-9; Exh. 17.

81.     He found there had been no maintenance performed on the doors and that the doors were functioning as designed. Exh. 16 at 106:13-18; Exh. 17.

82.     Sgt. Marshall testified that there is an opening in the door to pass items back and forth. Exh. 16 at 107:5-7.

83.     Sgt. Marshall stated that in his belief, had Defendant Cast not opened that door, this assault would not have occurred. *Id.* at 99:19-21.

84.     Sgt. Marshall further stated that Mr. Qandah had stated that he wanted to pursue charges, Sgt. Marshall would have then investigated Defendant Cast's conduct. *Id.* at 118:11-14.

85.     Defendant Cast testified that he believed at the time that Mr. Qandah and Mr. Ballinger conspired to trick him into opening the cell door. Exh. 8 at 207:8-21.

86.     Defendant Cast testified that he bases this on the fact that Mr. Qandah and Mr. Ballinger were talking for twenty minutes before Defendant Cast opened the door, and that Mr. Qandah called out to Defendant Cast to say it was fine. *Id.* at 209:5-22.

87.     Defendant Cast's incident report, written directly after the incident, contains no mention of this twenty-minute conversation and no mention of Mr. Qandah stating it was fine for him to open the door. Exh. 19.

88.     Defendant Cast had no explanation as to why his incident report would not have mentioned this conversation or communication with Mr. Qandah. Exh. 8 at 210:8-22.

89.     When asked about Defendant Cast's allegation that he was there for 20 minutes, Mr. Ballinger testified that it was "very much so inaccurate." Exh. 15 at 23:19-24.

90.     Defendant Cast also stated that an inmate passed Defendant Cast a note saying "it's

all a set up, it's bull shit, he's just trying to get a lawsuit." Exh. 8 at 207:12-21.

91.     Defendant Cast stated he turned the note over to SCCJ supervisors, namely Corporal Krankel. *Id.* at 207:12-21.

92.     This note does not exist in SCCJ documentation produced to Mr. Qandah. Exh. 35, Declaration of Maureen Hanlon.

93.     Regardless, Defendant Cast testified that he violated SCCJ Policy 902, and this policy violation warranted discipline. Exh. 8 at 86:2-25, 87:1-7.

### SCCJ's Refusal to Discipline Defendant Cast

94.     Mr. Qandah submitted a concern form following the attack, stating that the actions of Defendant Cast made him fear for his life. Exh. 20, Ali Qandah Complaint Form Following Attack.

95.     Defendant McKee stated that he spoke with Defendant Cast in January, several weeks after the incident, after reading Defendant Cast's incident report. Exh. 7 at 21:15-22:4.

96.     Defendant McKee testified that SCCJ correctional officers need to prevent harm from one inmate to another and that, "if an employee knows that an inmate is wanting to harm another inmate and you don't act and prevent that, that's a problem." *Id.* at 79:5-7, 80:1-2.

97.     Defendant McKee testified that, by opening Mr. Qandah's cell door, Defendant Cast violated Defendant McKee's specific order that Mr. Qandah was only to be out by himself. *Id.* at 32:11-16.

98.     Defendant McKee testified he had not heard about any other officers having difficulties opening or closing doors in Unit J. *Id.* at 43:25-44:4.

99.     Defendant McKee did not speak with Mr. Ballinger or Mr. Qandah about the event during his internal investigation of the incident. *Id.* at 46:4.

100.     Defendant McKee stated that his own investigation was independent of the St. Charles County Sheriff's Department investigation and that, in fact, no one told him about the outside investigation at the time. *Id.* at 33:7-12.

101.     Defendant McKee acknowledged that Sgt. Marshall's report differs significantly from the explanation of events that he received from Defendant Cast. *Id.* at 63:10-14.

102.     Defendant McKee testified that he had no reason to doubt the accuracy of Mr. Ballinger's statements or Mr. Ballinger's interview with Sgt. Marshall. *Id.* at 69:23-70:4.

103.     Defendant McKee testified that, if he had read Mr. Ballinger's statement at the time, he "may have made a recommendation that the employee be placed on administrative leave." *Id.* at 81:1-17.

104.     During the SCCJ review process Corporal Krankel, Defendant Cast's direct supervisor signed off on his incident report, and Defendant McKee recommended Director Crawford impose some sort of discipline on Defendant Cast just for opening of the door in violation of policy and Defendant McKee's order. Exh. 19; Exh. 7 at 46:15-25, 47:7-48:7.

105.     Defendant Cast's personnel file contains the supervisory incident form in which Defendant McKee recommended discipline, but the form shows no actual discipline was imposed. Exh. 22, Cast Supervisory Incident Form Qandah.

106.     Defendant Cast testified that in his meeting with Director Crawford, Director Crawford was "displeased that I opened the door and relied on it to stop." Exh. 8 at 34:12-25.

107.     But, Director Crawford imposed no discipline on Defendant Cast for his role in the assault on Mr. Qandah. Exh. 22; Exh. 8 at 34:23-25; Exh. 7 at 55:25-56:1.

### *Lack of Medical Care Following Assault*

108.     When Mr. Qandah was taken to medical following the attack, staff in SCCJ's

12

medical department evaluated him but did not provide any treatment for his physical injuries. Exh. 5 at 114:13-21, 117:16-118:6, 119:24-120:25.

109.   Mr. Qandah asked the nurses to be taken to a hospital and to get an x-ray for the pain in his jaw, but the nurses did not write down his request.  Exh. 1, ¶¶ 17-19; Exh. 23, Qandah Health Progress Notes.

110.   Staff did not get him x-rayed or to take him to a hospital. Exh. 5 at 120:1-25; Exh. 23.

111.   SCCJ contracts with a Mobilex unit that comes on-site to do X-rays of inmates. Exh. 24, Echele Dep. 33:23-25.

112.   Prior to 2019, it was SCCJ policy to schedule an on-site appointment with a doctor for any inmate who had been in an altercation, the next clinic day.  *Id.* at 109:10-23.

113.   Mr. Qandah did not have an appointment with the doctor the next clinic day, nor was he x-rayed by a Mobilex unit. Exh. 23.

114.   Based on Defendant McKee's animosity and actions towards Mr. Qandah, Mr. Qandah believed Defendant McKee prevented him from being treated by a doctor. Exh. 1, ¶ 21.

115.   Defendant McKee testified that he reviewed photos of Mr. Qandah's injuries. Exh. 7 at 121:4-7.

116.   Defendant McKee has no medical training, but he wanted to review the photos to evaluate Mr. Qandah's injuries. *Id.* at 121:14-122:16.

117.   Defendant McKee stated that he could not see extensive exterior injuries in the photographs, and, as such, he believed Mr. Qandah's injuries were minor. *Id.* at 121:14-21.

118.   Defendant McKee testified that Mr. Qandah received no X-rays or other evaluation of internal injuries, bleeding, or contusions. *Id.* at 120:6-121:6.

13

119.    Following the attack, Mr. Qandah submitted between six and nine complaints related to his medical care to Defendant McKee but did not get anything back. Exh. 5 at 95:6-19, 116:19-24. *See* Exh. 25, Affidavit of Laurie Smit; Exh. 26, Affidavit of Ken Seghers; Exh. 27, Sanctions Order (ECF No. 47).

120.    Defendant McKee testified that he knew Mr. Qandah wrote "a number" of complaint forms, and he reviewed "some of" Mr. Qandah's complaint forms. Exh. 7 at 35:16-19.

121.    Defendant McKee further testified that he had some in-person conversations with Mr. Qandah when walking through units. *Id.* at 108:8-14.

122.    Mr. Qandah testified that, in response to an in-person request to go to the hospital, Defendant McKee said that Mr. Qandah "did not run his jail." Exh. 5 at 94:17-25.

123.    Mr. Qandah testified that, during the same conversation, Defendant McKee stated, "'You're not leaving her [sic] until you get sentenced or you're going back to society.'" *Id.* at 95:2-3.

124.    The pain in Mr. Qandah's jaw was so bad that he had to request liquid food in the weeks following the attack. Exh. 1, ¶ 23.

125.    Mr. Qandah still experiences pain in his jaw. *Id.* at ¶ 24.

### *Failure to Investigate or Track SCCJ Correctional Officers' Use of Force*

126.    SCCJ Policy 810 governs use of force by correctional officers and requires officers to use only necessary force. Exh. 31, Policy 810 at 1.

127.    SCCJ Policy 120 requires SCCJ to investigate inappropriate uses of force by correctional officers. Exh. 32, Policy 120 at 2.

128.    There are several pieces of required documentation when an officer is involved in a use of force: officers who witness or use force against an inmate are required to write incident

reports describing what they observed and their roles and officers who actually use force are also required to write use of force reports. Exh. 31 at 4; Exh. 21 at 26:19-25, Exh. 33, Baumgartner June 15, 2020 30(b)(6) Dep. at  36:2-37:7.

129.    The supervisor on duty reviews the forms completed by the officers and puts together a use of force review form, which is then reviewed by a higher-level supervisor and then the assistant director of security. Exh. 31 at 4; Exh. 21 at 55:17-20; Exh. 33 at 36:2-37:7.

130.    Captain Vaughn is the assistant director of security. Exh. 34, Keen Dep. 21:1-7.

131.    Lieutenant Thomas Lewis was a training instructor for SCCJ on proper use of force. Exh. 36, Lewis Dep. 13:16-25, 14:8-16.

132.    When a use of force review showed that an officer used more force than was necessary to effect a lawful objective, there should have been an investigation and discipline. Exh. 21 at 26:2-14.

133.    The Director of SCCJ ultimately then makes the determination to discipline an officer. Exh. 9, Crawford Dep. at 88:12-20.

134.    No part of the use of force review process or its forms requires statements from or interviews with inmates or other witnesses.  Exh. 36, Lewis Dep. at 83:8-12.

135.    Director Crawford testified, "The use of force happened pretty regularly. Investigations, not so much." Exh. 9, Crawford Dep. at 83:25-84:1.

136.    Director Crawford testified that he preferred investigations to proceed through the chain of command and avoid outside agencies when possible. *Id.* at 4 80:18-21.

137.    Director Crawford further testified that discipline was "never supposed to come to [him]" if his subordinates recommended oral counseling, verbal warnings, or written reprimands, rather than referrals to the director. *Id.* at 149:10-19.

138.    Director Crawford testified that he did not intervene to talk to officers about their uses of force, positively or negatively, until he had discipline prescribed by his subordinates in hand. *Id.* at 157:1-23.

139.    Lt. Mckee testified that, in his 30 plus years with St. Charles County, he could only remember four investigations into uses of force. Exh. 21 at 69:2-5, 192:6-7.

140.    Lt. Mckee stated that, between 2006 and 2017, he did not conduct a single investigation into an employee's use of force against an inmate. *Id.* at 107:14-20.

141.    Director Crawford testified that there were situations where discipline was referred to him, but he only handled those situations through informal conversations where nothing was recorded. Exh. 9 at 104:23-105:3.

142.    Director Crawford testified that he "made good use of [his] time" by giving employees less severe discipline, like oral counseling, because he knew his superiors with St. Charles County were likely to overturn harsher punishment during the appeal process. *Id.* at141:18-25, 142:1-21.

143.    Director Crawford stated that, even when officers were technically in disciplinary proceedings, sometimes these informal conversations were just him encouraging or congratulating the officers to "give [the officers] an attaboy." *Id.* at 157:22-24.

144.    In fact, Director Crawford testified that there were times he simply neglected to follow up on disciplinary referrals at all and that he would sometimes unearth old, unaddressed referrals for discipline that had been lost in other paperwork. *Id.* at 106:9-12.

145.    Even if a correctional officer used force on an inmate of such severity that the inmate went to the hospital, Director Crawford testified there would not necessarily be a written record of what the facility did to look into the use of force by the officer. *Id.* at 169:1-9.

146.     Defendant McKee testified that, instead of declaring that a use of force was unnecessary, he and other supervisors would write "coaching" feedback stating that better decision making would have resulted in the need for lower level uses of force or no force. Exh. 21 at 37:5-18.

147.     Defendant Mckee testified that he rarely has suggestions for what could be done better when reviewing uses of force. *Id.* at 44:4-14.

148.     Officers are not given copies of the reviews of their uses of force. Exh. 36 at 78:13-25.

149.     Defendant McKee testified supervisors were expected to talk with officers about the deficiencies in their uses of force. Exh. 21 at 37:20-38:25.

150.     There is no follow up done with supervisors to make sure these conversations happened. *Id.* at 38:20-25.

151.     SCCJ gave supervisors no specific expectations of how this coaching should be done. *Id.* at 38:20-25.

152.     Defendant McKee testified that there is no system of tracking how many times supervisors talked to certain officers about identified deficiencies in the officers' use of force. *Id.* at 39:1-6.

153.     Defendant McKee testified, "If you're asking is there a log or data place that I keep track that Mike McKee has five uses of force, Billy Joe has 12 and their brother Billy Bob has 100, no, there is not." Exh. 21 at 139:2-5.

154.     Officers' use of force reviews are not kept in their personnel files. *Id.* at 44:23-25.

155.     Even if the use of force reviews noted ways the officers' uses of force should be improved, Defendant Mckee testified that it would not necessarily be factored into their performance evaluations. *Id.* at 132:19-24.

156.     As the operations lieutenant, Lt. McKee generated statistical reports related to his use of force reviews, but he merely stored them and did not provide them to anyone else. Exh. 7 at 29:14-25, 30:1-16.

157.     Director Daniel Keen, the current jail director, testified that SCCJ did not begin to do data collection of the uses of force against inmates until 2018. Ex 34 at 32:17-22.

158.     SCCJ produced records of 56 uses of force on inmates other than Mr. Qandah between the years 2012 to 2017. *See* Exh. 37, Use of Force Reports 2012-2017.

159.     Of those records produced by SCCJ, 13 documented use of force incidents occurred prior to Mr. Qandah's December 15, 2014 incident. *See id.*

160.     10 of the 13 documented uses of force that occurred prior to Mr. Qandah's December 15, 2014 assault involved SCCJ officers using hands-on force. *Id.*

161.     In 35 of 57 total documented uses of force from 2012 to 2017, the supervisors deem the force appropriate with cursory notes and analysis. *Id.*

162.     For 14 of the uses of force (25% of the total documented instances), there is no use of force review form containing supervisor review of the incident on file. *Id.*

163.     In nine documented uses of force (15.8% of the total documented instances), the supervisors noted criticisms that the officers used a higher level of force inappropriate or unnecessary for the situation. *Id.*

164.     For seven of the nine incidents, these criticisms contain no follow up steps to address this with the officers. *See*, e.g., *id.*, pp. 16-24, (Officer Jake Gillet pushed inmate Frillman,

18

grabbed him and handcuffed him, and Assistant Director Vaughn found the force could have been avoided but fails to direct any specific follow up steps to address use of force with Gillet, and no record of Gillet's discipline or counseling following the incident exists).

165.     In all of the use of force records produced by SCCJ, the reviewing supervisors only require follow up with the officers in two specific instances. Exh. 37, pp. 354-360 (Officer Clinton Graebner performed a takedown and restraint of an inmate, which the reviewing supervisor found inappropriate, yet Grabener's personnel file (Exh. 38) contains no record of this written warning); Exh. 37, pp. 127-147 (Defendant Cast pepper-sprayed and physically restrained Gilliam, the reviewing supervisor faulted Cast for not using other strategies before escalation, and directed a Sergeant to discuss the use of force, yet Defendant Cast's personnel file (Exh. 30) contains no record of this warning.).

166.     On July 28, 2017, Defendant Cast wrote the following comment on Facebook: "I have asked an officer 'need help' when he replied, yes, I put the offender on the ground and the officer had to tell me to stop choking him out, lol. I was a lil excited." Exh. 44, p. 46; *See also* Exh. 8 at 171:21-25, 172:1-2.

167.     Defendant Cast stated he was referring to an incident in Unit D, where a group of officers was trying to restrain an inmate. Exh. 8 at 172:2-23.

168.     Defendant Cast testified that he choked the inmate and further elaborated that the incident involved a group of officers getting the inmate on the ground and a 450-pound officer sitting on top of all of them, creating a pile of officers and inmates. *Id.* at 172:2-23, 173:11-25.

169.     Defendant Cast stated he completed a use of force report on this incident. *Id.* at 175:3-7.

170.     However, no use of force report or use of force review exists.  Exh. 39, Smit August

2020 30(b)(6) Dep. at 104:3-12, 118:1-22, 1203-21; *See* Exh. 27.

171.   Director Crawford testified that "chok[ing] an inmate out" is an inappropriate use of force. Exh. 9 at 123:9-13.

172.   Still, Defendant Cast faced no discipline for this incident in which he bragged about "choking out" a detainee. Exh. 30, Cast Personnel File.

173.   Defendant McKee testified that there was at least one officer who he noticed and discussed with others that "ha[s] more use of force events than other people." Exh. 7 at 8:19-22.

174.   To Defendant McKee's knowledge, nothing had been done to address use of force with this officer, and the officer is still employed at the jail. *Id.* at 9:17-21.

175.   Defendant McKee testified that, although SCCJ uses "action plans," or written expectations for employees to improve performance, he has never seen action plans used to help COs improve their treatment of inmates. *Id.* at 97:19-21, 102:18-22.

176.   Sgt. Lewis testified that he has never done or been requested to do supplemental training for officers when there is an issue involving the use of force. Exh. 36 at 81:2-19.

177.   Over the 30 years that he has worked for SCCJ, Defendant McKee has never heard of a change to the use of force policies or procedures. Exh. 21 at 23:24-24:4.

### Failure to Investigate or Respond to Inmate Complaints of Animus and Apathy to Inmate Wellbeing from COs

178.   No policy or procedures instruct correctional officers on how to report racist comments from staff. Exh. 6 at 104:2-6

179.   Officer Graebner testified, "Some people made it their personal I can't really say for sure -- but it appeared in my opinion that some officers made it their personal endeavor just to tick off as many people as they could and go badge heavy." *Id.* at 119:12-24, 120:1-5.

180.   Lt. Mckee has been verbally abusive to inmates. *Id.* at 122:23-24, 123:1-14.

181.     Defendant Graebner testified that other COs are verbally abusive to inmates. *Id.* at 120:15-18.

182.     In her capacity as St. Charles County's Rule 30(b)(6) designee, Laurie Smit testified that COs do not receive formal instruction on the inmate complaint process. Exh. 39 at 42:25, 43:1-4.

183.     Ms. Smit testified that all instruction is done through informal, field training, yet, as St. Charles County's designee, Ms. Smit could not state the content or nature of this complaint and medical request training. *Id.* at 43:4-25, 44:1-22.

184.     At the time of Mr. Qandah's incarceration, inmates submitted grievances or complaints about officers on a paper form entitled "Inmate Concern/Request Form." Exh. 33 at 41:2-17.

185.     Inmates had to request this paper form from a correctional officer and return it to a correctional officer for submission to the appropriate person or department. *Id.* at 48:1-14.

186.     Correctional officers then reviewed the paper forms to determine where to direct them. *Id.* at 56:1-25, 57:1-2, 58:11-21.

187.     The process relied on the cooperation of correctional staff in giving inmates the forms and then turning the forms in. *Id.* at 55:11-25.

*Lack of Complete Records of Inmate Complaints made Against Correctional Officers*

188.     From 2010 through 2017, St. Charles County did not have policies, protocols, and practices in place to fully retain or record inmate complaints made against correctional staff. Exh. 27.

189.     St. Charles County had no written procedures or formal training on saving inmate complaints in inmates files. Exh. 39 at 69:13-25, 70:1-17.

190.     St. Charles County had no procedure or practice of discipline or consequences for supervisors who would not keep or regularly put concern forms in inmate files. *Id.* at 69:13-25, 70:1-17.

191.     Inmate complaints were not put into the inmate files 100% of the time. Exh. 33 at 69:2-12.

192.     Some inmate concern forms, which should have been put in paper inmate files, could have been lost or destroyed. Exh. 39 at 134:16-25, 135:1.

193.     Under St. Charles County policy, all inmate complaints about correctional officers were supposed to be responded to in writing. *Id.* at 42:11-15.

194.     But, Defendant Cast testified that it "wasn't unusual" for supervisors to just go speak to inmates in person because they could "get it across better in person than in writing." Exh. 8 at 48:20-25, 49:1.

195.     Officer Graebner testified that he was aware of instances where other officers did not give inmates complaint forms when requested. Exh. 6 at 47:13-23.

196.     Director Crawford testified that inmates would complain they turned in complaint forms and never received any responses. Exh. 9 at 24:17-20.

197.     Director Crawford attributed these allegations about lost complaint forms primarily to inmates lying, stating, "And so we had no way of knowing whether they turned it in. They coulda just said I turned it in, because inmates don't always tell the truth." *Id.* at 24, 22-24.

*Available Complaint Forms Show a Culture of Animus from COs towards Inmates with No Investigation or Concern from SCCJ*

198.     Under St. Charles County policy or practice, if an inmate submits a complaint about a correctional officer, a supervisor should investigate the complaint by talking to the officer and the inmate. Exh. 33 at 122:3-25, 123:1-10.

199.     Under St. Charles County procedure from 2010 to 2017, any inmate complaints about correctional officers would be investigated or the investigation would be reviewed by either Lt. Mckee or Captain Vaughn. Exh. 39 at 133:9-23, 137:3-22, 140:18-25, 141:1-5.

200.     Director Crawford testified that, depending on the specifics of the complaints, St. Charles County would decide not to formally investigate. Exh. 9 at 28:8-20.

201.     Director Crawford stated that he would get lots of complaints about officers using racial and ethnic slurs, including "an N word used somewhere." *Id.* at 114:3-4.

202.     Lt. McKee testified that inmates have brought the use of racially derogatory terms by correctional officers to his attention a number of times but that he never substantiated a finding that a correctional officer used such terms. Exh. 21 at 112:5-15.

203.     In inmate complaints produced by Defendants, there are 20 examples of other complaints raising allegations of mistreatment and abuse from correctional officers that were dismissed by facility supervisors without investigation.  Exh. 42, Inmate Complaints.

204.     In one such complaint, submitted in March 2014, an inmate named Goodson asked to speak with someone about a March 21, 2014 incident when he "got jumped on by several inmates without the correctional officers following the right procedures," and SCCJ's response merely states, "There is no need for a statement from you about the incident." *Id.* at 1-8.

205.     In May and July 2014, an inmate named Mendez-Carranco submitted a complaint about being hit in the face by officers and asked to receive a liquid diet and medical treatment for

23

a broken jaw, but the response deals only with his medical treatment and does not inquire as to which officers hit him or set up emergency medical treatment.  *Id.* at 10-11.

206.    In April 2012, an inmate named Rice complained that he was unfairly punished for a fight in which the correctional officers provoked another inmate into attacking him, but the response denies his request for review with no investigation. *Id.* at 19.

207.    In November 2010, an inmate named Thomlinson stated that he felt unsafe being forced to wear a colored wristband showing the nature of his charged offense; the response denies his request and tells him the policy will stay in place. *Id.* at 18.

*Lack of Objective Review*

208.    SCCJ has no policies or procedures in place to ensure that COs do not handle complaints made about them. Exh. 33 at 57:3-22; Exh. 6 at 111:2-18.

209.    Instead, if the offending officer is on duty in the inmate's housing unit, the inmate must wait to find a different staff member to arrive and accept the complaint. Exh. 33 at 57:3-22.

210.    Under St. Charles County policy, the person reviewing an inmate complaint needs to be fair, objective, and unbiased. Exh. 39 at 33:14-20.

211.    Yet, St. Charles County's policy that the person reviewing an inmate complaint needs to be fair and objective is not written or encoded anywhere. *Id.* at 32:11-25, 33:1-13.

212.    St. Charles County has no procedural safeguards in place to ensure that someone other than the subject of the complaint is reviewing the complaint. *Id.* at 34:11-18.

213.    Even if Defendant McKee generally reviewed and investigated complaints against correctional officers, it violates St. Charles County policy requiring objective review for Defendant McKee to review complaints made about him. *Id.* at 141:6-24, 142:4-10.

214.    Defendant McKee routinely reviews complaints about his disciplinary decisions and his conduct towards inmates.  *See* Exh. 42.

215.    Records beginning in 2012 and continuing for years show inmates have complained about a lack of objectivity at the facility in reviewing inmate complaints and specifically raised concerns about why Defendant McKee responded to and dismissed complaints raised about him. *Id.*

216.    On January 10, 2012, inmate Michael Rice wrote that "I had a grievance written about being put on ad. seg. by Defendant McKee I addressed it to CPT. Vaughn yet Defendant McKee responded to a grievance about himself . . . SCCDOC has no sense of accountability for its staff."  The only staff member to respond was McKee, who told Mr. Rice that the decision will stand. *Id.* at 19-20.

217.    On March 11, 2013, an inmate named Clarence Holmes asked for a way to file grievances to send outside of SCCJ. On March 14, 2013, McKee responded and stated that grievances were internal actions that did not extend beyond the facility. *Id.* at 24-25.

218.    On April 2, 2013, an inmate named Cody Davis complained that he should not have received lockdown without having an opportunity to talk to a "white shirt." *Id.* at 26. McKee rejected his request outright without dealing with his request to speak to a  higher up. *Id*.

219.    On May 1, 2014, an inmate named Jason Shell complained that SCCJ did not have a way for inmates to complain up the chain of command and that there was no true grievance process. *Id.* at 27. Defendant McKee responded, stating that the concern form Mr. Snell submitted was sufficient. *Id.*

220.    On January 23, 2017, an inmate named Dwane Taylor accused Defendant McKee of racist treatment of black inmates. *Id.* at 100. Defendant McKee rejected his appeal, saying that

he had never acted in a racist manner and telling Taylor, "your own written word is racist towards me." *Id*.

221.    On October 27, 2017, an inmate named Lydell Moore complained that Defendant McKee was unjustly keeping him in administrative segregation based on untrue information about Mr. Moore's threat level and asked for "McKee's reasons for having me in permanent ADSEG INVESTIGATED." *Id*. at 139. Mr. Moore's complaint was assigned to Defendant McKee, who closed the complaint. *Id*.

222.    On December 8, 2017, an inmate named Terrance Wilson also complained that Defendant McKee had unjustly placed him in administrative segregation because he had filed other grievances against Defendant McKee, but that he was not provided with any way to be heard about his complaint. *Id*. at 148. Mr. Wilson's complaint was assigned to McKee who closed the complaint, writing, "Due Process does not apply to administrative segregation." *Id*.

223.    On July 22, 2017 and August 3, 2017, inmates named Kevin Williams and Stacy Bonds both wrote grievances to Defendant McKee about his treatment of inmates and about unconstitutional SCCJ conditions. *Id*. at 150, 151. McKee summarily rejected and closed both. *Id*.

224.    An inmate named Bryan Swiney submitted more than six complaints about Defendant McKee's decision to put him in administrative segregation and Defendant McKee's continued review of his case. *Id*. at 86-90. On August 28, 2018, Swiney filed a grievance form stating, "im asking for someone besides lt mckee to look into my situation." *Id*. This grievance was assigned to Defendant McKee, who rejected and closed the grievance form. *Id*.

225.    Earlier in August 2018, Defendant McKee was verbally warned after having a "heated conversation" with Mr. Swiney about his housing assignments in which Defendant McKee

allegedly stated that he would tell other inmates about Mr. Swiney's charges, putting Mr. Swiney at risk of harm. *Id.* at 152-155.

226.    On January 23, 2019, an inmate named Jessica Reed complained that her grievances were being rejected by Defendant McKee and not being allowed to progress. *Id.* at 52. This complaint is assigned to McKee, and he responds by rejecting her complaint and closing the grievance form. *Id.*

227.    There is no record that Defendant McKee was ever disciplined, counseled, or instructed to cease reviewing inmate complaints about his own treatment of inmates. Exh. 43, McKee Personnel File.

### *St. Charles County Failed to Use Inmate Complaints to Discipline, Counsel, or Coach Correctional Officers*

228.    Director Crawford testified that discipline was "never supposed to come to [him]" if his subordinates recommended oral counseling, verbal warnings, or written reprimands, rather than referrals to the director. Exh. 9 at 149:10-19.

229.    From 2010 through 2017, St. Charles County did not have policies, protocols, and practices in place to track inmate complaints made against correctional staff. Exh. 27.

230.    St. Charles County made no effort to track the topics or content of all inmate concerns forms. Exh. 33 at 65:12-14, 66:12-16; Exh. 39 at 45:22-25, 46:1-17.

231.    St. Charles County had no system to track these inmate complaints to see if one officer had multiple complaints filed against him or her. Exh. 9 at 173:15-23; Exh. 39 at 47:3-13.

232.    Because copies of the inmate complaint forms were kept in individual inmates' paper files (Exh. 39 at 38:19-20), there was no system of way for jail supervisors to realize one officer had more complaints lodged against him than others. *Id.* at 48:18-25, 49:1-3.

233.    There was no policy requiring supervisory review of employees if a certain number of inmate complaints were filed against them. *Id.* at 47:3-121.

234.    There was no practice of supervisors intervening if there were high numbers of complaints made against employees. *Id.* at 47:22-25, 48:1.

235.    Even if a CO had a high number of inmate complaints filed against him, there was no policy, practice, or procedure for consequences or notation in his personnel file. *Id.* at 49:17-25, 49:1-2.

### COs Failed to Respond to Inmate Medical Needs

236.    At the time of Mr. Qandah's incarceration, if an inmate in a housing unit at SCCJ believed he needed medical assistance, the inmate had to ask the correctional officer on duty for a medical request form. Exh. 24 at 43:19-25, 50:8-10.

237.    There was no other way for inmates to access the medical unit besides by asking a correctional officer for a medical request form or telling the correctional officer they needed to see a nurse. *Id.* at 43:19-25, 53:20-25, 54:1-5.

### Inadequate training

238.    Nurse Echele testified that the burden is not on the inmate to explicitly request the form – if an inmate verbally shares that they have medical symptoms, the officer should give them the form and explain how to access medical assistance. *Id.* at 69:12-25, 70-1-2.

239.    Nurse Echele testified that even though completing the forms is preferred, once an inmate complains of medical symptoms, it is an obligation of the officer to help the inmate complete the process of being connected with medical help. *Id.* at 70:21-25, 71:1-4.

240. Nurse Echele testified that if an inmate had not gotten medication they were supposed to get, the only recourse for this was for the inmate to ask the officer to call and check on their medication. *Id.* at 81:12-25, 82:1-7.

241. After the inmate hands the medical request form back, the correctional officers read the medical request. *Id.* at 51:2-9.

242. Nurse Echele testified that Officers are supposed to look for "emergency comments" from inmates. *Id.* at 46:12-23.

243. St. Charles County practice and policy also creates an expectation that correctional officers listen to inmates' verbal requests or description of symptoms. Exh. 33 at 87:23-25, 88:1-8.

244. St. Charles County practice and policy is that if correctional officers see an inmate who is in need of medical attention, correctional officers should get the correct medical and emergency attention to that inmate whether or not the inmate completed a form. Exh. 39 at 86:3-13.

245. Under St. Charles County policy and practice, correctional officers are expected to call medical directly on behalf of an inmate in certain situations, such as when an inmate has chest pains, is bleeding, has injured himself in the recreation yard, if an inmate appears to be so sick that he is not leaving his cell, or if an inmate is experiencing severe and debilitating pain. *Id.* at 31:10-25, 32:1-10; Exh. 33 at 104:5-25, 105:1-18, 106:11-18.

246. Nurse Echele testified that officers are supposed to identify emergency symptoms, such as an inmate who has passed out, appears unresponsive, is vomiting uncontrollably, is weak, has seizure activity, or slips and falls. Exh. 24 at 62:25, 63:1-10.

247.    Nurse Echele testified that if an inmate is stuck in bed, not eating or drinking, vomiting, a correctional officer should notify someone that the inmate was in need of medical help. *Id.* at 86:7-14.

248.    The post orders given to officers in the housing unit do not instruct correctional officers to monitor inmates for concerning symptoms and then notify medical. Exh. 46, Post Order: Housing Unit, Def. 001270 - Def. 001274.

249.    Officer Graebner testified that he believed even an inmate in persistent pain would still have to ask for and fill out a medical form. Exh. 6 at 86:8-13.

250.    Correctional officers have had inadequate, if any, training on how to recognize emergency or concerning health symptoms. Exh. 24 at 47:15-25, 48:1; Exh. 33 at 21:21-25, 22:1; Exh. 39 at 76:18-24.

251.    Nurse Echele testified she does not know who would have told the correctional officers that recognizing emergency or concerning health symptoms and notifying medical was an expectation. Exh. 24 at 82:15-19.

252.    Nurse Echele testified that the non-mental health-related medical training COs receive is first aid. *Id.* at 20:22-25, 21:1-3.

253.    Defendant Cast testified he has received no training beyond first aid, CPR, or blood borne pathogens related to identifying when he should help an inmate contact the medical department immediately for care. Exh. 8 at 25:21-24, 28:16-18.

254.    Officer Gillet testified that the only non-mental health-related medical training he received was CPR and first aid instruction. Exh. 45, Gillet Dep. at 15:8-11.

255.    Officer Graebner testified that he received no training on discerning whether inmates had the capacity to fill out medical request forms. Exh.6 at 143:24, 144:1-4.

256. Nurse Echele testified that officers do not receive training on spotting symptoms that should prompt referrals to medical; officers are expected to use "common sense" to discern if inmates are experiencing serious symptoms or "something that can wait." Exh. 24 at 46:24-25, 47:1-11, 48:9-12.

257. No one has ever asked Nurse Echele to provide training for officers on how correctional officers can recognize emergency or concerning health symptoms. *Id.* at 48:6-8.

258. Defendant McKee testified that he tells correctional officers, "You're not trained medical personnel. If an inmate comes up to you and says there's something going on, notify a nurse and let the medical staff make the determination of whether something is or is not wrong with them, that then you pushed it up and you've done your due responsibility. Exh. 21 at 228:25, 229:1-13.

259. However, Defendant McKee testified, "Whether an employee does that or not, that would be a question for the individual employee." Exh. 21 at 228:25, 229:1-13.

260. Mr. Baumgartner testified that correctional officers would likely not intervene if an inmate seemed unresponsive:

> Q: "Outside of usual sleep hours, is there a particular amount of time where an officer should note that an inmate has not moved and perhaps raise some alarm."
> A: "Typically not through a typical shift, no. Sometimes people sleep all day. As long as you can tell they're breathing and there isn't any, you know, any physical thing that you notice that's happening at that time. Now, if they haven't eaten or anything like that, all three meals or two meals, that's something that you would pass on to the next shift or the next supervisor so that they can keep an eye on it as well. If they haven't come out of their cell for two days or if they haven't moved for two full shifts, that would be something that would be passed down to have somebody take a look at."

Exh. 33 at 99:10-24.

*COs refusing to help inmates access medical care*

261. From 2010 through 2017, St. Charles County did not have policies, protocols, and

31

practices in place to fully retain, record and track inmate complaints of being denied medical care. Exh. 27.

262.     Officer Graebner and Nurse Echele both testified they have heard inmates complain that officers refused to give them a medical request form. Exh. 24 at 44:25-45:1-3; Exh. 6 at 47:14-19.

263.     Mr. Baumgartner testified:

> Q. Have you ever heard complaints from inmates that they asked for a concern form and they weren't given a concern form?
> A. I have. I specifically know that I have heard an inmate say that before.
> Q. Do you know what was done about -- to remedy that situation?
> A. No, I do not.
> Q. Have you ever heard of an officer getting, you know, any kind of discipline, reprimand, talking, counseling for not giving inmates concern forms or medical request forms when asked?
> A. No.

Exh. 33 at 59:25, 60:1-13.

264.     Mr. Baumgartner testified that inmates can seek out more helpful officers if others refuse to provide medical request forms. *Id.* at 83:8-14.

265.     Because St. Charles County treats the medical department as an entity separate from its security function, supervisors on the security side do not regularly investigate complaints related to medical care or include such complaints in inmates' paper files. *Id.* at 91:20-25, 92:1-18, 93:21-25, 94:1-23, 95:3-14.

266.     Nurse Echele testified she is aware of times that inmates went to medical reporting that they had been submitting concerns and needed to have been seen by a doctor sooner.  Exh. 24 at 61:22-5, 62:1-2.

267.     Defendant McKee testified that the most frequent complaint he hears from inmates' loved ones and attorneys is that inmates are not able to get medical attention. Exh. 21 at 68:1-11.

268.     Nurse Echele testified that in her understanding, officers are not allowed to refuse to give medical request forms to inmates. Exh. 24 at 44:15-19.

269.     Nurse Echele testified that she is unaware of any time an officer has been disciplined by the facility for not bringing an inmate down for medical care. *Id.* at 89:17-25, 90:1-11.

270.     Nurse Echele testified she is aware of at least one case where a security supervisor decided that an inmate should not go down to medical even after the inmate made a request. *Id.* at 131:18-22.

271.     Nurse Echele testified that in her knowledge, there is no written policy preventing a correctional supervisor from doing so. *Id.* at 132:4-25, 133:1-6.

272.     Nurse Echele testified inmates complained to her about being able to access medical care. *Id.* at 141:17-20.

273.     Nurse Echele also testified that, in the 10 years she has been working at SCCJ, she cannot think of a complaint from an inmate that she thought was well-founded. *Id.* at 136:10-25, 137:1-4.

274.     Nurse Echele further testified that, because of this, she has never identified any issues with the protocol for how inmates request or access medical care. *Id.* at 136:10-25, 137:1-4.

### *Defendant Cast's Animosity Towards Muslims and People of Color*

275.     Defendant Cast regularly posted content on Facebook indicating a bias against Muslims and a bizarre obsession with Islam. *See* Exh. 44.

276.     On March 24, 2013, Defendant Cast shared a meme criticizing Muslim prayer. *See id.* at 1

277.    On April 11, 2013, Defendant Cast shared a meme comparing judging all Muslims for 9/11 and condemning all gun owners because of mass shooters. *See id.* at 2.

278.    On April 12, 2013, Defendant Cast shared a cartoon that read, "The Qur'an says that Jesus was a Muslim. And that's funny, because I don't recall Jesus raping, hating, or killing anyone" with another comment reading, "THE QUR'AN IS A FAKE BOOK, A LIE AND IS NOT A PEACEFUL RELIGION." *See id.* at 3.

279.    On September 11, 2013, Defendant Cast posted a meme showing a crowd of bikers with the caption, "800,000 BIKERS ARE ON THE ROAD TO CONFRONT ONE MILLION MUSLIMS IN WASHINGTON 'LIKE' AND 'SHARE' IF YOU BACK THE BIKERS." *See id.* at 4.

280.    On December 10, 2013, Defendant Cast shared a meme with a photo of an angry rabid dog, reading, "I am sick and tired of answering questions about my dog! Yes he mauled 6 people wearing Obama t-shirts, 4 people wearing Pelosi t-shirts, 2 other democrats, 9 teenagers with pants hanging past their crack, 3 flag burners, and a Pakistani taxi driver. For the last time … the dog is not for sale !!! No, I do not approve of his licking his ass, but he says it helps get "the bad taste" out of his mouth." *See id.* at 5.

281.    On December 12, 2013, Defendant Cast shared a meme suggesting that all Muslims "cling to guns and religion." *See id.* at 6.

282.    On July 1, 2014, Defendant Cast shared an inflammatory video about mosques. *See id.* at 7.

283.    On September 2, 2014,  Defendant Cast shared a video about Islamic Jihadists purportedly wanting to "take over the world." *See id.* at 8.

284.    On December 16 and 17, 2014, the two days after the attack on Mr. Qandah,

Defendant Cast posted articles about Taliban gunmen and the person who took down Bin Laden. *See id.* at 9.

285.    On January 13, 2015, he shared a post from Judge Jeanine Pirro discussing a "reverse crusade" and a "Christian genocide."  *See id.* at 10.

286.    On May 31, 2016, Defendant Cast shared an inflammatory meme objecting to purported American relief for "200,000 muslims." *See id.* at 11.

287.    On July 15, 2016, Defendant Cast wrote a post condemning the entirety of Islam for a terrorist attack in the United Kingdom. *See id.* at 12.

288.    On December 1, 2016, Defendant Cast shared a post warning of the death of "a billion infidels." *See id.* at 13.

289.    On February 11, 2017, Defendant Cast shared a meme reading, "A Muslim can murder 50 homosexuals, and Liberals still defend the religion, but a Christian who refuses to bake a homosexual's wedding cake endures nationwide shaming on behalf of their religion" and a meme reading, "Muslims: Death to America!  American Liberals: Let them in!" *See id.* at 14.

290.    On January 20, 2018, Defendant Cast shared a meme reading, "EUROPEAN CHRISTIANS BUILD THIS NATION THEY DIDN'T COME TO BITCH, COLLECTIVE WELFARE, WAGE JIHAD, AND REPLACE THE AMERICAN CONSTITUTION WITH SHARIA LAW." *See id.* at 15.

291.    On May 11, 2019, Defendant Cast wrote a post suggesting that Muslim refugees were "the enemy." *See id.* at 16.

292.    On June 22, 2019, Defendant Cast shared a Facebook post about Muslims enslaving "white Europeans" between the 1500s and 1800s. *See id.* at 17.

293.    On an unknown date, Defendant Cast shared a Facebook post with a long,

incoherent rant claiming that Islam is not a religion and that Muslims advocate the overthrow of the United States government. *See id.* at 18.

294.   On an unknown date, Defendant Cast shared a Facebook post with a picture implying that all Muslims want "Death to America." *See id.* at 19.

### Defendant Cast's Animosity Towards People of Color

295.   Defendant Cast also regularly posted memes or other comments about problems with other races and white superiority. *See* Exh. 44.

296.   On August 17, 2014, Defendant Cast shared an article with the title "Former NBA Star: Why Al Sharpton is a coon'"*See id.* at 20.

297.   On November 24, 2014, Defendant Cast shared an article titled "Former Marine Brutally Beaten as Revenge for Ferguson; Told Waffle House 'Not Safe for Whites.'" *See id.* at 21.

298.   On November 13, 2014, Defendant Cast wrote, "Way beyond sick and fucking tired. A white life in this country is worthless. Is that piece of shit Obama is speaking to her family today? Didn't think so. Where is Jesse and all the other assholes at. Hell, at the very least, announce what they are doing.  But, no, you won't hear a thing. More gangstas need to die in a hurry." *See id.* at 22.

299.   On November 18, 2014, Defendant Cast shared a blog post that lauded the Ku Klux Klan for arriving in Ferguson to support "Their 'Hero' Cop Who Shot Brown." *See id.* at 23.

300.   On November 23, 2014, Defendant Cast shared an article headlined "Black Woman Brutality Attacks White Woman For Being a 'White Bitch in the Hood.'" *See id.* at 24.

301.   In comments to that post, a friend of his asked, "Why do you only seem to share stories involving black criminals? Just curious." *See id.* at 25.

302.    Cast responded to the comment, claiming that the media refuses to report "black on white crime." *See id.* at 25-26.

303.    On December 1, 2014, Defendant Cast shared two articles headlined "Media Blackout: 12-Year Old Unarmed White Boy Shot to Death by Black Suspect" and "Have you heard the mainstream media screaming about the white cop killed by a black career criminal a few days ago?" *See id.* at 27.

304.    On July 9, 2016, Defendant Cast shared a Facebook meme, stating "There is no 'War on Blacks.' There is only pushback against the violent criminal culture of people who have no respect for others and believe that they should be able to act however and do whatever they want without consequences." *See id.* at 28.

305.    On August 29, 2016, Defendant Cast commented on a Chicago news article stating "Headlines should read 3 black males murder white great grandmother by beating and burning her to death!" *See id.* at 29.

306.    On April 8, 2019, Defendant Cast posted a meme of a smiling man in a sombrero with the word "Mexico" on it with the caption "I knew I was in love with her as soon as I SODOMIZE!" *See id.* at 30.

307.    Defendant Cast joined a private Facebook group called "Shit Show" where members regularly posted virulently racist memes. *See id.* at 31-36.

308.    A post on the "Shit Show" group included a photo of Bill Cosby with the caption, "I thought I was going to Cancun … but my lawyer said you're going to the Can, Coon." *See id.* at 31.

309.    A post on the "Shit Show" group included a photo of a white man looking at a black man with the caption, "When you watch how slow they work and you wonder why anyone would

want one as a slave." *See id.* at 32.

310.    A post on the "Shit Show" group included a drawing of a white mother holding her daughter's head down in a bathtub with the caption, "When your daughters first crush is a little negro boy." *See id.* at 33.

311.    A post on the "Shit Show" group included a photo of a woman in a hijab with the caption, "I'd hit this shit harder than her brother hit the world trade center." *See id.* at 34.

312.    A post on the "Shit Show" group included a photo of a mock book entitled "Chilton's Tractor Repair Manual" with a photo of a white man whipping a black man in what appears to be a field. *See id.* at 36.

313.    Defendant Cast only left the group in February 2019, long after viewing most of these posts. Exh. 8 at 218:9-11.

### Defendant Cast's Animosity Towards Inmates at SCCJ

314.    Defendant Cast also referenced his job at SCCJ in several public Facebook posts. *See* Exh. 44.

315.    On December 14, 2012, he described inmates at SCCJ as "sick assholes." *See id.* at 37.

316.    On January 10, 2017, Defendant Cast wrote on Facebook, "Being right next to Ferguson, I have talked to a bunch of BLM idiots and they all think Michael Brown should not been shot and Officer Wilson was as wrong even though there's a mountain of evidence that says Wilson was in the right.  Don't forget I work at the St. Charles County jail and I deal with idiots on a regular basis." *See id.* at 38.

### Defendant Cast's Endorsement of Extrajudicial Murder and Police Abusing Citizens

317.    Even though he is a corrections officer and aspires to be a policeman, Defendant

Cast also routinely glorified extrajudicial murder and physical abuse, showing that he has no regard for justice or the constitutional rights of citizens. *See* Exh. 44.

318.    On November 16, 2011, Defendant Cast offered his services to "put a bullet in the face" of an accused murderer. *See id.* at 39.

319.    On October 21, 2012, Defendant Cast posted a picture of a revolver pointed at the reader with the caption "The last thing a child molester should see." *See id.* at 40.

320.    On December 18, 2012, Defendant Cast posted a picture of a police officer using a TASER with the caption "I prefer to think of it as 'helping someone express themselves creatively through modern electric interpretative dance.'" *See id.* at 41.

321.    On December 9, 2013, Defendant Cast shared a meme stating "How many cops does it take to throw a pedophile down the stairs? None. He Fell." *See id.* at 42.

322.    On March 31, 2015, Defendant Cast commented on a post, stating that the post's author should "call me and I Will [sic] come up there and kick the Shit [sic] out of the dad. They don't know me and I Will [sic] tell him that this will happen every time I'm in town." *See id.* at 43.

323.    On March 23, 2016, Defendant Cast shared a picture of the World Trade Center exploding with the caption "DONT [sic] GIVE A SHIT HOW TERRORISTS ARE INTERROGATED!" *See id.* at 44.

324.    On December 8, 2016, Defendant Cast commented on a post stating, "Took a man down in the middle of the street in front of the bar I owned after he assaulted the Chief of Police. Almost had him choked out when the calvary showed up. Exciting New Years Eve." *See id.* at 45.

325.    On July 28, 2017, Defendant Cast commented on his own post stating "I have asked a [sic] officer 'need help' when he replied yes I put the offender on the ground and the officer had

to tell me to stop from choking him out lol. I was a lil excited." *See id.* at 46.

### Defendant Cast's Animosity Towards Undocumented Persons

326.   Defendant Cast has also made numerous posts indicating an unhealthy obsession with "illegal aliens," including his mistaken belief that undocumented persons are entitled to "a job, a driver's license, food stamps, a place to live, health care, child benefits, education and tax free business income." *See id.* at 47-50.

327.   At the beginning of his employment, Defendant Cast signed his agreement to an Electronic Information Policy that states, "Any information available to the public generally, whether through blogs or social networking websites, etc., may prevent an employee from receiving promotion or subject an employee to disciplinary action."  Exh. 29, Cast Electronic Information Policy Certification.

328.   Defendant Cast was promoted on December 19, 2018. Exh. 30.

329.   Defendant Cast testified that he has had SCCJ supervisors as friends on Facebook since 2011 and that they would have known what was on his Facebook. Exh. 8, Cast Dep. Def. 003920.

330.   Defendant Cast further testified that until this lawsuit was filed, "[n]o one ever said anything to me." Exh. 8 at 298:15-22.

331.   Defendant Cast testified he has never received any discipline based on his social media posts. *Id.* at 298:8-10.

332.   Defendant Cast's personnel file shows he was disciplined multiple times for conduct not involving inmates, such as misuse of PTO or other attendance issues. Exh. 30.

333.   Mr. Qandah's file contains complaint forms referencing that he has submitted many other concern forms on a similar topic, which were not responded to or saved in his DCN file. Exh.

41, Qandah Complaint Form Referencing Gaps.


Dated:  September 11, 2020                    Respectfully submitted,

                                             **ArchCity Defenders, Inc.**

                                             By:/s/ *Maureen Hanlon*
                                             Blake A. Strode (MBE #68422MO)
                                             Michael-John Voss (MBE #61742MO)
                                             John M. Waldron (MBE #70401MO)
                                             Nathaniel Carroll (MBE #67988MO)
                                             Maureen Hanlon (MBE #70990MO)
                                             440 N. 4th Street, Suite 390
                                             Saint Louis, MO 63102
                                             855-724-2489 ext. 1006
                                             314-925-1307 (fax)
                                             bstrode@archcitydefenders.org
                                             mjvoss@archcitydefenders.org
                                             jwaldron@archcitydefenders.org
                                             ncarroll@archcitydefender.org
                                             mhanlon@archcitydefenders.org

                                             and

                                             **Khazaeli Wyrsch, LLC**

                                             James R. Wyrsch, #53197
                                             Javad M. Khazaeli, #53735
                                             Kiara N. Drake, #67129MO
                                             911 Washington Ave. #211
                                             Saint Louis, MO 63101
                                             314-288-0777
                                             314-400-7701 (fax)
                                             james.wyrsch@kwlawstl.com
                                             javad.khazaeli@kwlawstl.com
                                             kiara.drake@kwlawstl.com