**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| ALLAEDHIN QANDAH | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 4:20-cv-00053-JCH |
| | ) | |
| ST. CHARLES COUNTY, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSES TO PLAINTIFF ALLAEDHIN QANDAH'S**
**STATEMENT OF ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants hereby respond to Plaintiff's Additional Statement of Uncontroverted Material

Facts as follows:

*Allaedhin Qandah*

1.      Mr. Qandah is a naturalized citizen of Jordanian descent. Exh. 1, Qandah

Declaration ¶¶ 1-2.

**Response: Admit.**

2.      He has lived in the St. Louis area for 32 years.  *Id.* ¶ 3.

**Response: Admit.**

3.      Mr. Qandah was, and continues to be, a devout Muslim. *Id.* ¶ 4.

**Response: Admit.**

4.      While in St. Charles County Jail (hereinafter SCCJ) he participated in Ramadan,

prayed openly, and had a Qur'an. *Id.* ¶¶ 5-6.

**Response: Admit.**

5.      Mr. Qandah was jailed in SCCJ on charges of low level, non-violent felonies.  Exh. 2, Case.net Charge Information.

**Response: Defendants object to the characterization and conclusion that Mr. Qandah's felony charges were "low-level" and such should be struck, accordingly. Defendants admit that Mr. Qandah was jailed on charges of non-violent felonies.**

6.      Mr. Qandah eventually pled guilty to the charges to escape his mistreatment at SCCJ. Exh. 1, ¶ 10.

**Response: Defendants admit that Mr. Qandah plead guilty to the charges against him and object to the use of "mistreatment at SCCJ" as it calls for a conclusion.**

7.      The court suspended execution of Mr. Qandah's sentence pending his completion of probation, which Mr. Qandah successfully completed in 2017. Exh. 2.

**Response: Admit.**

### *Alleged Months of Harassment at SCCJ*

8.      Mr. Qandah was booked on March 3, 2014, and released on February 6, 2015. Exh. 3, Release Report.

**Response: Admit.**

9.      Mr. Qandah was placed in solitary confinement in May 2014 and remained there until his release. Exh. 1, ¶ 7.

**Response: Defendants object to the designation of "solitary confinement," as Mr. Qandah mischaracterizes and fails to make a distinction between disciplinary segregation and administrative segregation. Defendants further deny the statement, as Mr. Qandah notes in Statement 33 below that he was moved to general population in August 2014, but was moved back to administrative segregation for his own protection after he told Correctional Officers**

that he was worried that other inmates were conspiring to hurt him. **Exh. 14, Shift Supervisor Report (8/12/2014).**

10.     The entire time Mr. Qandah was in solitary confinement, Mr. Qandah only received one hour of release a day and was otherwise alone in his cell for 23 hours per day. *Id.* ¶ 8.

**Response: Deny, and Defendants object to the designation of "solitary confinement," as Mr. Qandah mischaracterizes and fails to make a distinction between disciplinary segregation and administrative segregation.**

11.     Mr. Qandah experienced more restrictive conditions of confinement than other inmates on administrative segregation, who were often allowed out of their cells for two to four hours per day. Exh. 4, Baumgartner I Dep. 81:2-20.

**Response: Defendants object to the designation of "solitary confinement," as Mr. Qandah mischaracterizes and fails to make a distinction between disciplinary segregation and administrative segregation and selectively omits that those on disciplinary segregations have more restrictive conditions than those on administrative segregation. Inmates on disciplinary segregation experience more restrictive conditions than inmates on administrative segregation.**

12.     Throughout his detention, SCCJ officers called Mr. Qandah "terrorist," "camel jockey," and "ISIS" and told him "if you don't like the laws here, go back to where you came from." Exh. 5, Qandah Dep. 129:19-25, 130:1-25, 131:1-25, 133:5-25, 134:1-19.

**Response: Deny. These claims could be substantiated. Exh. 21 McKee II Dep. 231:14-17**

13.     Mr. Qandah submitted grievances on SCCJ's concern forms, but no one responded to his complaints. *Id.* at 132:2-16.

**Response: County admits that Mr. Qandah submitted Inmate Complaint Forms, but denies**

**that no one responded to his complaints. Exh. A, Inmate Concern/Request Forms.**

14.    Former correctional officer Clinton Graebner heard more than one correctional officer refer to Mr. Qandah as a "snitch" and more than one officer refer to him as a "terrorist." Exh. 6, Graebner Dep. 103:5-12, 105:5-24, 106:1-16.

**Response: Defendants object as to Plaintiff's selective testimony, as Mr. Graebner also testified that he did not hear any of these correctional officers use these terms in the presence of any inmate. Id.**

15.    Defendant Michael McKee acknowledged that Mr. Qandah submitted complaints about officers calling him names, but Defendant McKee decided that those complaints "could never be substantiated." Exh. 21, McKee II Dep. 231:14-17.

**Response: Admit.**

16.    Mr. Qandah was never informed that any correctional officers were disciplined or reprimanded for their uses of force, racial slurs, demeanor, or other actions towards him.  Exh. 1, ¶ 9.

**Response: Defendants admit that Mr. Qandah was never informed by Defendants of any discipline or reprimands of correctional officers. Defendants object to and deny the characterization and assumptions in Statement 16 regarding any alleged use of force, racial slurs, demeanor, or other actions toward Mr. Qandah.**

17.    At all times relevant to the Complaint, Defendant McKee was the operations lieutenant at the jail. Exh. 21 at 145:21-25.

**Response: Admit.**

18.     As the operations lieutenant, "the entire operations of the jail would flow through [Defendant McKee]," and everything was supposed to come across [his] desk." *Id.* at 15:18-19, 18:11-12.

**Response: Admit.**

19.     Defendant McKee sent information up to the assistant director, who in turn sent information up to the director. *Id.* at 15:22-25.

**Response: Admit.**

20.     Defendant Jeffery Cast testified that Mr. Qandah "liked getting under [Defendant McKee's] skin" because Defendant McKee put Mr. Qandah in solitary confinement. Exh. 8, Cast Dep. at 125:14-25.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

21.     Former SCCJ Director Larry Crawford testified that Defendant McKee talked to him about Mr. Qandah more than he talked about other inmates because Mr. Qandah was a "problematic inmate." Exh. 9, Crawford Dep. at 37:19-24.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

22.     Defendant McKee testified that he had special dislike for Mr. Qandah. Exh. 21 at 185:6-9, 186:2-6.

**Response: Defendants admit that Lt. McKee did not like Mr. Qandah, based on Mr. Qandah's threats to kill staff and blow up officers' cars, and Lt. McKee notes that he still has a job to do to protect Mr. Qandah regardless of his feelings for him. Exh. 21 at 185:6-186:6. Defendants object to use of "special dislike" as it calls for conclusion.**

23.     Defendant McKee created a special segregation report that instructed correctional officers that Mr. Qandah only be allowed out of his cell by himself. *Id.* at 193:22-25, 194:1-8.

**Response: Admit, object to the term "special segregation report" to the extent that it implies that such a direction is unusual.**

24.     On January 23, 2015, Defendant McKee sent an email requesting a "peace officer" to fill out a warrant charging Mr. Qandah with a crime because he found Mr. Qandah out of his cell. Exh. 10, McKee Emails, at Bates Label 1084.

**Response: Defendants object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken. Defendants further object as the Mr. Qandah's mischaracterization of the e-mail, and as the e-mail references multiple incidents and other reports, not simply that Mr. Qandah was out of his cell, as Mr. Qandah purports.**

25.     Defendant McKee reached out to the prosecutor asking to speak against Mr. Qandah at his sentencing hearing. *Id.* at Bates Label 1065.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

26.     Defendant McKee acknowledged that, in his 30-plus years at SCCJ, he could not think of any other inmate against whom he proactively asked to recommend jail time during sentencing. Exh. 21 at 192:2-17.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

27.     On three separate occasions, correctional officers used physical force against Mr. Qandah. Exh. 11, AQ Use of Force August 30, 2014, Exh. 12, AQ Use of Force September 12, 2014; Exh. 13, AQ Use of Force January 29, 2015.

**Response: Defendants object to Mr. Qandah's selective use of the Use of Force Review Forms as their exhibits for the first two incidents and not the Use of Force Report Forms which provide proper context and details regarding the Use of Force incidents. Subject to the objections, Defendant admits that there were three Use of Force incidents involving Mr. Qandah.**

28.     On the review form for the August 30, 2014 use of force, the reviewing supervisor commented that officers should have left Mr. Qandah in his cell instead of using force to attempt to get him to make a movement. Exh. 11.

**Response: Defendants object to Mr. Qandah's selective use of the Use of Force Review Form as its Exhibit and not the Use of Force Report Forms which provide proper context and details regarding the Use of Force incident. Exh. 1 Def.000172-Def.000177 Defendants further object to the mischaracterizations and use of selective facts in this statement. Subject to the objections, Defendants admit that the reviewing supervisor stated only that the officers "should have left inmate Qandah in his cell," but that this comment was made mistakenly,**

as it was clearly noted above, in the same form, that the officers were "instructed…to escort inmate Qandah back to his cell;" that "inmate Qandah said he was not going back to his cell and sat down on the floor refusing to get up;" and that a restraint hair was use to escort Mr. Qandah back to his cell. Referencing the Use of Force Reports, Mr. Qandah was removed from his cell because he intentionally flooded it.

29.     That review form does not document any discipline or instructions to follow up with the offending officers. *Id.*

**Response: Admit.**

30.     Mr. Qandah was pepper sprayed by an officer on January 29, 2015 for allegedly refusing to move cells. Exh. 13.

**Response: Deny, as Exhibit 13 states, Mr. Qandah refused to go to his cell, balled up his fist, and ripped a shower curtain down. An officer took Mr. Qandah's actions to be an act of aggression and OC sprayed him in response.**

31.     Although Captain Vince Vaughn noted that Mr. Qandah had offered to be handcuffed three times and none of the officers restrained him before using pepper spray, the review form does not document any discipline or instructions to follow up with the offending officers. *Id.*

**Response: Defendants object to the mischaracterizations and use of selective facts in this statement. Defendants admit that Captain Vaughn noted that it appeared that Mr. Qandah did offer to be cuffed three time and no one secured him. However, Captain Vaughn further noted that "Once the inmate became destructive, the use of OC Spray was appropriate." Defendants denies that the form does not document any discipline or instructions to follow up with the offending officers, and in the form, Captain Vaughn plainly states, "Cpl. Maxwell**

is to discuss this incident with the Officers that were on the scene."

### *Alleged Assault on Mr. Qandah*

32.     Starting in May 2014 and at the time of the assault, Mr. Qandah had been in solitary confinement in Unit J, where he was held in his cell for 23 hours a day. Exh. 1, ¶ 8.

**Response: Defendants object to the designation of "solitary confinement," as Mr. Qandah mischaracterizes and fails to make a distinction between disciplinary segregation and administrative segregation. Defendants further deny the statement, as Mr. Qandah notes in the very next statement, Statement 33 below, that he was moved to general population in August 2014, but was moved back to administrative segregation for his own protection after he told COs that he was worried that other inmates were conspiring to hurt him. Exh. 14, Shift Supervisor Report (8/12/2014).**

33.     In August 2014, Mr. Qandah was briefly moved to a regular pod, but was moved back to Unit J after telling COs that he was worried other inmates in the unit were conspiring to hurt him.  Exh. 14, Shift Supervisor Report (8/12/2014).

**Response: Admit.**

34.     SCCJ correctional officers referred to Mr. Qandah as a "snitch" to other inmates. Exh. 5 at 128:6-25, 129:1-7.

**Response: Deny, Exh. 6, Graebner Dep. 105:5-15 (never heard officers refer to Qandah as a "snitch" to other inmates); Exh. 8, Cast Dep. 131:5-7 (only heard "other inmates" refer to Qandah as a "snitch") and 131:20-22 (never heard any jail staffer refer to Qandah as a "snitch").**

35.     Mr. Qandah knew other inmates had heard he was a "snitch" and suspected he was

in physical danger because of that. *Id.* at 84:16, 89:16-91:4, 93:4-6.

**Response: Admit.**

36.     Defendant Cast testified that he knew that inmates identified as "snitches" were at risk of attacks by other inmates. Exh. 8 at 131:23-132:4.

**Response: Admit.**

37.     Defendant Cast also testified that he knew inmates regarded Mr. Qandah as a "snitch." *Id.* at 131:5-7, 265:2-5.

**Response: Admit.**

38.     In the fall of 2014, Defendant McKee issued special written directives that Mr. Qandah was only to be allowed out of his cell by himself. Exh. 7, McKee I Dep. 34:1-9; Exh. 3, Qandah Segregation Release Report Sept. 2014.

**Response: Deny, the Segregation Report states that Mr. Qandah "may not be in dayroom with any other inmate at any time." Exh. 3, Qandah Segregation Release Report Sept. 2014.**

39.     On September 29, 2014, Defendant McKee reminded all supervisors of this directive.  Exh. 10 at Bates Label Def. 001071.

**Response: Deny, Mr. McKee's e-mail merely states that he "was under the impression that [Qandah] was only allowed out of his cell by himself." Exhibit 10 also notes that Mr. Qandah "has a lengthy history of threatening staff, to include threatening to have them killed."**

40.     SCCJ Policy 902 governs security conditions for inmates in administrative segregation and requires staff to keep cell doors locked when inmates are in or out of their cells. Exh. 40, Policy 902 at 2-3.

**Response: Deny, Policy 902 states that "When there is more than one (1) inmate out of their cell, the cell doors shall be kept locked while the inmates are in or out of the cell during their**

**scheduled time."**

41. Defendant Cast testified that he understood Mr. Qandah was in Unit J because Mr. Qandah felt threatened by other inmates, and, unlike others in administrative segregation, Mr. Qandah was not supposed to have contact with other inmates. Exh. 8 at 124:1-15, 148:11-13, 150:10-19.

**Response: Defendants object to Mr. Qandah's characterization of the cited testimony. With regard to the reasons why Mr. Qandah was in Unit J, Defendant Cast testified that he had believed Mr. Qandah did some gambling and could not pay the inmates to whom he was indebted, and then would leave the unit by saying he had enemies or he felt threatened so as not to pay those debts. Exh.8 at 124:1-15. With regard to his status in administrative segregation, Mr. Cast testified that that he understood Mr. Qandah was to be out by himself when let out into the day room. Exh. 8 at 148:11-13, 150:10-19.**

42. Mr. Ballinger was moved into Unit J a week before the attack. Exh. 15, Ballinger Dep. at 41:16-25, 42:1-8.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

43. Mr. Ballinger testified that he and Mr. Qandah talked "from time to time," "not a lot," during the week he and Mr. Qandah were housed in the same unit. *Id.* at 42:1-24, 43:2-4.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

44.     Mr. Ballinger testified that during that week, Mr. Ballinger mostly kept to himself. *Id.* at 43:13-18.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

45.     Mr. Ballinger testified that Mr. Ballinger decided to "beat him up" when officers told Mr. Ballenger that Mr. Qandah was a snitch. *Id.* at 17:8-16.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

46.     Specifically, Mr. Ballinger testified that an officer spoke to him and told Mr. Ballinger that Mr. Qandah is the type of person that will tell on other inmates and get them in trouble and that Mr. Ballinger should stay away from Mr. Qandah. *Id.* at 61:2-7.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

47.     Mr. Ballinger testified that in his experience, a correctional officer would know that someone labeled a "snitch" to other inmates would endure physical harm. *Id.* at 15:6-11.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

48.     Mr. Ballinger testified that he knew it was a "big rule" violation to access someone else's cell, and that it was a "zero tolerance not-allowed-at-all type of thing." *Id.* at 18:5-9, 21:18-

24, 22:1-5.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

49.     Mr. Ballinger testified that to get access to Mr. Qandah, he waited until he was able to talk to Defendant Cast about opening Mr. Qandah's cell. *Id.* at 19:1-5, 20:10-20.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

50.     Mr. Ballinger stated that he waited for Defendant Cast because he had seen him violate the policies and protocols of SCCJ before. *Id.* at 20:4-9.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

51.     Mr. Ballinger testified that he asked Defendant Cast to open Mr. Qandah's cell so that Mr. Ballinger could "get some info." *Id.* at 20:14-20.

**Response: Deny, Officer Cast testified he opened Qandah's cell door so Ballinger could return some items he had borrowed from Qandah. *Exh. E.,* page 244, lines 20-23. When questioned, Officer Cast testified: "Q: Okay. And what did you think Mr. Ballinger's intentions were at that time? A: Just to get his stuff back. Q: Okay. A: Being that him and Qandah were friendly all the time and hanging out in front of each other's cell all the time during their hours out, I didn't think there would be any harm done to Mr. Qandah." *Id.*, pages 244, lines 20-25, page 245, lines 1-2. When questioned, Officer Cast testified: "Q: Okay.**

So did you believe when Mr. Ballinger approached you, that he intended to assault Mr. Qandah? A: Not at all. Q: Did he say anything to you that would lead you to be suspicious of his intentions? A: No." *Id.*, page 245, lines 18-24.

52.     Mr. Ballinger testified that Defendant Cast smirked at Mr. Ballinger, leading Mr. Ballinger to believe that Defendant Cast knew "I was planning to take matters into my own hands about being a snitch." *Id.* at 22:6-23:9.

**Response: Deny, Officer Cast testified he opened Qandah's cell door so Ballinger could return some items he had borrowed from Qandah. *Exh. E.,* page 244, lines 20-23. When questioned, Officer Cast testified: "Q: Okay. And what did you think Mr. Ballinger's intentions were at that time? A: Just to get his stuff back. Q: Okay. A: Being that him and Qandah were friendly all the time and hanging out in front of each other's cell all the time during their hours out, I didn't think there would be any harm done to Mr. Qandah." *Id.*, pages 244, lines 20-25, page 245, lines 1-2. When questioned, Officer Cast testified: "Q: Okay. So did you believe when Mr. Ballinger approached you, that he intended to assault Mr. Qandah? A: Not at all. Q: Did he say anything to you that would lead you to be suspicious of his intentions? A: No." *Id.*, page 245, lines 18-24.**

53.     After Defendant Cast gave him a smirk, Mr. Ballinger went in front of Mr. Qandah's cell. *Id.* at 23:3-7.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

54.     Mr. Ballinger testified that Defendant Cast "waited no time, hit the button, opened the door." *Id.* at 23:3-10.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

55.     Mr. Ballinger testified that he was in front of Mr. Qandah's door for about 10 seconds. *Id.* at 23:14-18.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

56.     As soon as the door opened, Mr. Ballinger charged at Mr. Qandah and attacked him. *Id.* at 25:5-13.

**Response: Admit.**

57.     When Mr. Ballinger charged into Mr. Qandah's cell, Mr. Qandah had just begun to pray. Exh. 5 at 82:5-24.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

58.     Mr. Ballinger tackled Mr. Qandah to bring him to the ground, during which time Mr. Qandah's head and face hit the metal toilet in his cell. Exh. 15 at 25:5-13.

**Response: Deny that Mr. Qandah's face hit the toilet in his cell. Mr. Qandah testified "…I was facing in the opposite direction of the door. And I remember just being picked up from the waist and slammed, hitting my head on the toilet stool and being attacked." *Exh. B,* page 81, lines 17-20.**

59.     Mr. Ballinger testified that he could hear "Qandah's head hitting the toilet because that – it sounded metallic. It sounded like something going bang against the metal." *Id.* at 26:19-23.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

60.     After being slammed to the ground, Mr. Ballinger continued to hit and punch Mr. Qandah.  Exh. 1, ¶ 13.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

61.     Mr. Ballinger landed several more punches on Mr. Qandah, including several to his face and jaw.  *Id.* at ¶¶ 14-15.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

62.     Mr. Qandah wrestled Mr. Ballinger into a headlock to avoid the punches and blows. *Id.* at ¶ 16.

**Response: Admit.**

63.     Mr. Qandah testified that "a couple minutes" elapsed from the time Defendant Cast opened his cell door and the other officers ordered him and Mr. Ballinger to separate. Exh. 5 at 100:10-14.

**Response: Admit.**

64.     Mr. Qandah testified that other correctional officers had to order Defendant Cast to open Mr. Qandah's cell door to allow them to intervene in the fight. *Id.* at 99:19-23.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken**

65.     Mr. Qandah testified that Defendant Cast was still smirking when other officers separated Mr. Qandah and Mr. Ballinger following the attack. *Id.* at 101:17-25.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

66.     Immediately after the incident, Mr. Qandah heard Corporal Krankel, one of Defendant Cast's superiors, yell, "Inmates are not allowed to pass anything. Why would you open his door even if that was the case?" *Id.* at 103:22-104:1.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

67.     Mr. Ballinger testified that after this incident, no SCCJ supervisors ever came to ask him what happened. Exh. 15 at 34:7-10, 16-19.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken. Defendants further object to the mischaracterization and implication of this statement, as Director**

**Crawford requested that an investigation be performed by the St. Charles County Sheriff's Department, and that such investigation was in fact performed.**

### *Immediately Following the Incident - Sheriff's Investigation*

68.     Director Crawford asked the St. Charles Sheriff's Department to investigate Mr. Qandah's assault. Exh. 16, Marshall Dep. 60:1-9; Exh. 17, Sheriff Report Qandah Incident.

**Response: Admit**

69.     Sgt. Mike Marshall was the supervisor of the Crimes Against Persons Unit in the Sheriff's Department. Exh. 16, Marshall Dep. at 21:23-22:7; 78:6-9.

**Response: Admit**

70.     Director Crawford told Sgt. Marshall that the inmates were in segregation and there was assault that occurred when only one inmate should be out at a time. *Id.* at 62:7-15, 63:1-5; Exh. 17, Sheriff Report Qandah Incident.

71.     Sgt. Marshall interviewed both Mr. Qandah and Mr. Ballinger. Exh. 17 p. 14.

**Response: Admit**

72.     Sgt. Marshall testified that Mr. Ballinger said that he was out of his cell, he went to the control room, and he asked the person in the control room to pop the door so he could "holler at dude," by which Sgt. Marshall understood he meant talk to Mr. Qandah. Exh. 16 76:10-22.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

73.     In a written statement given to Sgt. Marshall, Ballinger stated:

Me and Quanda [*sic*] has an issue because I heard he was a "snitch" and likes to run his mouth. So when I was released from my cell 12-15-14 I went up to the

bubble and asked C.O. Cast if I could go talk to Quanda because I know from other C.O.'s that he has a history of running his mouth. When I asked him that he hesitated, grinned and then gave me the OK. I turned around walked to cell 9 to grab my pencil and you should see on video surveillance then to cell 8 which is Quanda's cell and C.O. Cast actually opened it. I was a bit uneasy because I thought he wouldn't do it or that he might make a big deal out of it but, that was not the case.

Exh. 18, St. Charles County Sheriff's Statement Form –Ballinger.

**Response: Defendants object to the use of this statement as evidence as inadmissible hearsay and such evidence should be struck.**

74.     Mr. Ballinger testified that everything in his statement to Sgt. Marshall was accurate. Exh. 15 at 28:2-29:3.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

75.     Sgt. Marshall testified that he believed Ballinger was very forthcoming and that Ballinger completely and without hesitation gave him a truthful statement, and he had no reason to doubt Mr. Ballinger's statement. Exh. 16 at 77:6-7, 24-25, 83:12-14.

76.     Sgt. Marshall also reviewed the incident report Defendant Cast wrote after the assault. Exh. 17.

**Response: Defendants object to the use of this statement as evidence as inadmissible hearsay and such evidence should be struck.**

77.     In this report, Defendant Cast wrote,

At 1900 hours I let Mr. Ballinger out of his cell for his two hour out time. At 1915

hours Mr. Ballinger spoke to Mr. Qandah through his cell door then came to the

transfer box and stated that Mr. Qandah was letting him borrow some soap. Upon

the door to Mr. Qandah's cell opening I hit the maintain button to stop the door

from opening more than six inches. The door did not respond and kept opening at

which time Mr. Ballinger entered the cell to assault Mr. Qandah at which time I

called a 10-10 over the radio.

Exh. 19, Cast Incident Report.

**Response: Defendants object to the use of this statement as evidence as inadmissible hearsay**
**and such evidence should be struck.**

78.     Sgt. Marshall attempted to interview Defendant Cast, but he was unsuccessful. Exh.

16, Marshall Dep. 101:21-23; Exh. 17, Sheriff Report Qandah Incident.

**Response: Defendants object to the use of this statement as evidence as inadmissible hearsay**
**and such evidence should be struck.  Defendants further object as this statement of fact is**
**irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter**
**of law and is therefore immaterial to the Court's resolution of Defendants' Motion and**
**therefore should be stricken.**

79.     Sgt. Marshall testified that he was unaware of any efforts from SCCJ staff to make

Defendant Cast available to speak with him. Exh. 16 at 103:23-104:1.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether**
**Defendants are entitled to judgment as a matter of law and is therefore immaterial to the**
**Court's resolution of Defendants' Motion and therefore should be stricken.**

20

80. Sgt. Marshall went to Unit J to see how the doors opened and closed and if the doors were functioning properly. *Id.* at 106:2-9; Exh. 17.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

81. He found there had been no maintenance performed on the doors and that the doors were functioning as designed. Exh. 16 at 106:13-18; Exh. 17.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

82. Sgt. Marshall testified that there is an opening in the door to pass items back and forth. Exh. 16 at 107:5-7.

**Response: Admit.**

83. Sgt. Marshall stated that in his belief, had Defendant Cast not opened that door, this assault would not have occurred. *Id.* at 99:19-21.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken. Further, Defendants objects as this is not a statement of fact but the unsupported conclusions of Sgt. Marshall and should be stricken.**

84. Sgt. Marshall further stated that Mr. Qandah had stated that he wanted to pursue charges, Sgt. Marshall would have then investigated Defendant Cast's conduct. *Id.* at 118:11-14.

85. **Response: Defendants object to the use of this statement as evidence as**

**inadmissible hearsay and such evidence should be struck.  Defendants further object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

86.     Defendant Cast testified that he believed at the time that Mr. Qandah and Mr. Ballinger conspired to trick him into opening the cell door. Exh. 8 at 207:8-21.

**Response: Admit**

87.     Defendant Cast testified that he bases this on the fact that Mr. Qandah and Mr. Ballinger were talking for twenty minutes before Defendant Cast opened the door, and that Mr. Qandah called out to Defendant Cast to say it was fine. *Id.* at 209:5-22.

**Response: Admit.**

88.     Defendant Cast's incident report, written directly after the incident, contains no mention of this twenty-minute conversation and no mention of Mr. Qandah stating it was fine for him to open the door. Exh. 19.

**Response: Admit.**

89.     Defendant Cast had no explanation as to why his incident report would not have mentioned this conversation or communication with Mr. Qandah. Exh. 8 at 210:8-22.

**Response: Admit.**

90.     When asked about Defendant Cast's allegation that he was there for 20 minutes, Mr. Ballinger testified that it was "very much so inaccurate." Exh. 15 at 23:19-24.

**Response: Admit.**

91.     Defendant Cast also stated that an inmate passed Defendant Cast a note saying "it's all a set up, it's bull shit, he's just trying to get a lawsuit." Exh. 8 at 207:12-21.

**Response: Admit.**

92.     Defendant Cast stated he turned the note over to SCCJ supervisors, namely Corporal Krankel. *Id.* at 207:12-21.

**Response: Admit.**

93.     This note does not exist in SCCJ documentation produced to Mr. Qandah. Exh. 35, Declaration of Maureen Hanlon.

**Response: Admit.**

94.     Regardless, Defendant Cast testified that he violated SCCJ Policy 902, and this policy violation warranted discipline. Exh. 8 at 86:2-25, 87:1-7.

**Response: Admit.**

### *SCCJ's Alleged Refusal to Discipline Defendant Cast*

95.     Mr. Qandah submitted a concern form following the attack, stating that the actions of Defendant Cast made him fear for his life. Exh. 20, Ali Qandah Complaint Form Following Attack.

**Response: Admit.**

96.     Defendant McKee stated that he spoke with Defendant Cast in January, several weeks after the incident, after reading Defendant Cast's incident report. Exh. 7 at 21:15-22:4.

**Response: Defendants object to the mischaracterization of the cited testimony. Nowhere in the cited testimony does it mention Cast's incident report. Further, the incident occurred on December 15, 2014, and McKee testified that he spoke with cast "either at the end of December or around the first of January," not "several weeks after the incident," as Mr. Qandah stated above.**

97.     Defendant McKee testified that SCCJ correctional officers need to prevent harm from one inmate to another and that, "if an employee knows that an inmate is wanting to harm another inmate and you don't act and prevent that, that's a problem." *Id.* at 79:5-7, 80:1-2.

**Response: Defendants object to the mischaracterization of the cited testimony. Defendants admit to the cited testimony, but note that McKee agreed only that CO's "should act" to prevent such harm.**

98.     Defendant McKee testified that, by opening Mr. Qandah's cell door, Defendant Cast violated Defendant McKee's specific order that Mr. Qandah was only to be out by himself. *Id.* at 32:11-16.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah has indicated in this statement.**

99.     Defendant McKee testified he had not heard about any other officers having difficulties opening or closing doors in Unit J. *Id.* at 43:25-44:4.

**Response: Admit.**

100.     Defendant McKee did not speak with Mr. Ballinger or Mr. Qandah about the event during his internal investigation of the incident. *Id.* at 46:4.

**Response: Admit.**

101.     Defendant McKee stated that his own investigation was independent of the St. Charles County Sheriff's Department investigation and that, in fact, no one told him about the outside investigation at the time. *Id.* at 33:7-12.

**Response: Defendants object to the mischaracterization of the cited testimony. The cited testimony states only that he does not recall having any prior knowledge of a police investigation regarding the incident.**

24

102.   Defendant McKee acknowledged that Sgt. Marshall's report differs significantly from the explanation of events that he received from Defendant Cast. *Id.* at 63:10-14.

**Response: Defendants object to the mischaracterization of the cited testimony that Sgt. Marshall's report "differs significantly from the explanation of events that [Lt. McKee] received from Defendant Cast." The cited testimony from Lt. McKee states only that Sgt. Marshall's report "differs from the explanation of events that I have."**

103.   Defendant McKee testified that he had no reason to doubt the accuracy of Mr. Ballinger's statements or Mr. Ballinger's interview with Sgt. Marshall. *Id.* at 69:23-70:4.

**Response: Defendants object to the mischaracterization of the cited testimony. Defendants' admit that Lt. McKee testified that he had no reason to doubt the accuracy of Mr. Ballinger's statements, but in the latter part of the citation, Lt. McKee states that he has no reason to doubt "Sgt. Marshall's depiction of his conversation with Mr. Ballinger."**

104.   Defendant McKee testified that, if he had read Mr. Ballinger's statement at the time, he "may have made a recommendation that the employee be placed on administrative leave." *Id.* at 81:1-17.

**Response: Defendants object to this evidence as inadmissible speculation.**

105.   During the SCCJ review process Corporal Krankel, Defendant Cast's direct supervisor signed off on his incident report, and Defendant McKee recommended Director Crawford impose some sort of discipline on Defendant Cast just for opening of the door in violation of policy and Defendant McKee's order. Exh. 19; Exh. 7 at 46:15-25, 47:7-48:7.

**Response: Admit.**

106.   Defendant Cast's personnel file contains the supervisory incident form in which Defendant McKee recommended discipline, but the form shows no actual discipline was imposed. Exh. 22, Cast Supervisory Incident Form Qandah.

**Response: Deny, the form does not state anything as to whether any discipline was imposed; it does not state that no discipline was imposed.**

107.   Defendant Cast testified that in his meeting with Director Crawford, Director Crawford was "displeased that I opened the door and relied on it to stop." Exh. 8 at 34:12-25.

**Response: Admit.**

108.   But, Director Crawford imposed no discipline on Defendant Cast for his role in the assault on Mr. Qandah. Exh. 22; Exh. 8 at 34:23-25; Exh. 7 at 55:25-56:1.

**Response: Admit.**

### *Alleged Lack of Medical Care Following Assault*

109.   When Mr. Qandah was taken to medical following the attack, staff in SCCJ's medical department evaluated him but did not provide any treatment for his physical injuries. Exh. 5 at 114:13-21, 117:16-118:6, 119:24-120:25.

**Response: Deny, Qandah was treated for his physical injuries he testified he suffered as a result of the assault on December 15, 2014, by medical staff of the St. Charles County Department of Corrections. *Exh. H,* Qandah's St. Charles County Detention Facility Inmate Health Progress Notes. Qandah was treated for back pain related to the assault on December 15, 2014, by the Jail Medical Department on December 17, 2014. *Id.* Qandah testified he was prescribed ibuprofen and Tylenol when he complained of pain secondary to the jaw injury, he testified he had suffered. *Exh. B,* page 121, lines 1-3. A review of Qandah's medical records following the December 15, 2014, assault show Qandah was treated by the Jail**

**Medical Department on December 17, 2014, December 26, 2014, December 27, 2014, December 29, 2014, January 5, 2015, January 9, 2015, January 11, 2015, January 12, 2015, January 23, 2015, and January 29, 2015. *Exh. H.* Assistant Director of the St. Charles County Department of Corrections, Medical, believes the care provided to and received by Qandah while confined in the Jail to be adequate. *Exh. F.***

110.    Mr. Qandah asked the nurses to be taken to a hospital and to get an x-ray for the pain in his jaw, but the nurses did not write down his request.  Exh. 1, ¶¶ 17-19; Exh. 23, Qandah Health Progress Notes.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

111.    Staff did not get him x-rayed or to take him to a hospital. Exh. 5 at 120:1-25; Exh. 23.

**Response: Admit.**

112.    SCCJ contracts with a Mobilex unit that comes on-site to do X-rays of inmates. Exh. 24, Echele Dep. 33:23-25.

**Response: Defendants object as this cited testimony plainly does not state what Mr. Qandah purports it to state.**

113.    Prior to 2019, it was SCCJ policy to schedule an on-site appointment with a doctor for any inmate who had been in an altercation, the next clinic day.  *Id.* at 109:10-23.

**Response: Deny, the cited testimony states that it was the policy of "the other company" (not the SCCJ) to schedule an appointment with the doctor for any inmate who had been in an altercation, and that inmates had the right to refuse such an appointment.**

114.     Mr. Qandah did not have an appointment with the doctor the next clinic day, nor was he x-rayed by a Mobilex unit. Exh. 23.

**Response: Admit.**

115.     Based on Defendant McKee's animosity and actions towards Mr. Qandah, Mr. Qandah believed Defendant McKee prevented him from being treated by a doctor. Exh. 1, ¶ 21.

**Response: Objection, this statement is pure speculation and conjecture, inadmissible, and irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

116.     Defendant McKee testified that he reviewed photos of Mr. Qandah's injuries. Exh. 7 at 121:4-7.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**


117.     Defendant McKee has no medical training, but he wanted to review the photos to evaluate Mr. Qandah's injuries. *Id.* at 121:14-122:16.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**


118.     Defendant McKee stated that he could not see extensive exterior injuries in the photographs, and, as such, he believed Mr. Qandah's injuries were minor. *Id.* at 121:14-21.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

119.    Defendant McKee testified that Mr. Qandah received no X-rays or other evaluation of internal injuries, bleeding, or contusions. *Id.* at 120:6-121:6.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state. Defendant McKee very clearly testified multiple times within the citied testimony that he did not know whether any X-rays or other evaluation of internal injuries, bleeding, or contusions was performed. Defendant McKee very clearly did not testify that Mr. Qandah received no X-rays nor did he testify that Mr. Qandah received no other evaluation of internal injuries, bleeding, or contusions.**

120.    Following the attack, Mr. Qandah submitted between six and nine complaints related to his medical care to Defendant McKee but did not get anything back. Exh. 5 at 95:6-19, 116:19-24. *See* Exh. 25, Affidavit of Laurie Smit; Exh. 26, Affidavit of Ken Seghers; Exh. 27, Sanctions Order (ECF No. 47).

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

121.    Defendant McKee testified that he knew Mr. Qandah wrote "a number" of complaint forms, and he reviewed "some of" Mr. Qandah's complaint forms. Exh. 7 at 35:16-19.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

122.    Defendant McKee further testified that he had some in-person conversations with Mr. Qandah when walking through units. *Id.* at 108:8-14.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

123.    Mr. Qandah testified that, in response to an in-person request to go to the hospital, Defendant McKee said that Mr. Qandah "did not run his jail." Exh. 5 at 94:17-25.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

124.    Mr. Qandah testified that, during the same conversation, Defendant McKee stated, "'You're not leaving her [sic] until you get sentenced or you're going back to society.'" *Id.* at 95:2-3.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

125.    The pain in Mr. Qandah's jaw was so bad that he had to request liquid food in the weeks following the attack. Exh. 1, ¶ 23.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

126.    Mr. Qandah still experiences pain in his jaw. *Id.* at ¶ 24.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

*Alleged Failure to Investigate or Track SCCJ Correctional Officers' Use of Force*

127.    SCCJ Policy 810 governs use of force by correctional officers and requires officers to use only necessary force. Exh. 31, Policy 810 at 1.

**Response: Deny, St. Charles County Policy and Procedure 810 Section IV. A. meanly contains the definition of "Necessary force." Ex. 31.**

128.    SCCJ Policy 120 requires SCCJ to investigate inappropriate uses of force by correctional officers. Exh. 32, Policy 120 at 2.

**Response: Deny, St. Charles County Policy and Procedure 120 Section 120.IV.4. sets forth grounds in which investigations may be conducted by St. Charles County of Corrections Staff.  Ex. 32.**

129.    There are several pieces of required documentation when an officer is involved in a use of force: officers who witness or use force against an inmate are required to write incident reports describing what they observed and their roles and officers who actually use force are also required to write use of force reports. Exh. 31 at 4; Exh. 21 at 26:19-25, Exh. 33, Baumgartner June 15, 2020 30(b)(6) Dep. at  36:2-37:7.

**Response: Admit**

130.    The supervisor on duty reviews the forms completed by the officers and puts together a use of force review form, which is then reviewed by a higher-level supervisor and then the assistant director of security. Exh. 31 at 4; Exh. 21 at 55:17-20; Exh. 33 at 36:2-37:7.

**Response: Admit**

131.    Captain Vaughn is the assistant director of security. Exh. 34, Keen Dep. 21:1-7.

**Response: Admit**

132.    Lieutenant Thomas Lewis was a training instructor for SCCJ on proper use of force. Exh. 36, Lewis Dep. 13:16-25, 14:8-16.

**Response: Admit**

133.    When a use of force review showed that an officer used more force than was necessary to effect a lawful objective, there should have been an investigation and discipline. Exh. 21 at 26:2-14.

**Response: Admit**

134.    The Director of SCCJ ultimately then makes the determination to discipline an officer. Exh. 9, Crawford Dep. at 88:12-20.

**Response: Admit**

135.    No part of the use of force review process or its forms requires statements from or interviews with inmates or other witnesses.  Exh. 36, Lewis Dep. at 83:8-12.

**Response: Admit**

136.    Director Crawford testified, "The use of force happened pretty regularly. Investigations, not so much." Exh. 9, Crawford Dep. at 83:25-84:1.

**Response: Admit**

137.    Director Crawford testified that he preferred investigations to proceed through the chain of command and avoid outside agencies when possible. *Id.* at 4 80:18-21.

**Response: Defendants object to the mischaracterization of the cited testimony. Nowhere in the cited testimony does Director Crawford state he "avoids outside agencies when possible."**

138.    Director Crawford further testified that discipline was "never supposed to come to [him]" if his subordinates recommended oral counseling, verbal warnings, or written reprimands, rather than referrals to the director. *Id.* at 149:10-19.

**Response: Admit**

139.    Director Crawford testified that he did not intervene to talk to officers about their uses of force, positively or negatively, until he had discipline prescribed by his subordinates in hand. *Id.* at 157:1-23.

**Response: Admit**

140.    Lt. Mckee testified that, in his 30 plus years with St. Charles County, he could only remember four investigations into uses of force. Exh. 21 at 69:2-5, 192:6-7.

**Response: Admit**

141.    Lt. Mckee stated that, between 2006 and 2017, he did not conduct a single investigation into an employee's use of force against an inmate. *Id.* at 107:14-20.

**Response: Admit**

142.    Director Crawford testified that there were situations where discipline was referred to him, but he only handled those situations through informal conversations where nothing was recorded. Exh. 9 at 104:23-105:3.

**Response: Admit**

143.     Director Crawford testified that he "made good use of [his] time" by giving employees less severe discipline, like oral counseling, because he knew his superiors with St. Charles County were likely to overturn harsher punishment during the appeal process. *Id.* at 141:18-25, 142:1-21.

**Response: Defendants object as the cited testimony is not included or submitted to the Court in Exhibit 9.**

144.     Director Crawford stated that, even when officers were technically in disciplinary proceedings, sometimes these informal conversations were just him encouraging or congratulating the officers to "give [the officers] an attaboy." *Id.* at 157:22-24.

**Response: Defendants object as the statement mischaracterizes and takes the quoted testimony out of context, and that the cited testimony plainly does not state nor even address what Mr. Qandah has indicated in this statement.**

145.     In fact, Director Crawford testified that there were times he simply neglected to follow up on disciplinary referrals at all and that he would sometimes unearth old, unaddressed referrals for discipline that had been lost in other paperwork. *Id.* at 106:9-12.

**Response: Defendants object as the statement mischaracterizes Director Crawford's testimony.**

146.     Even if a correctional officer used force on an inmate of such severity that the inmate went to the hospital, Director Crawford testified there would not necessarily be a written record of what the facility did to look into the use of force by the officer. *Id.* at 169:1-9.

**Response: Defendant objects to mischaracterization of the testimony as Director Crawford immediately clarified that Lt. McKee would be the one to address that, as Lt. McKee was the one handling these matters. *Id. 169:9-16.***

147.    Defendant McKee testified that, instead of declaring that a use of force was unnecessary, he and other supervisors would write "coaching" feedback stating that better decision making would have resulted in the need for lower level uses of force or no force. Exh. 21 at 37:5-18.

**Response: Defendant objects to mischaracterization of the testimony as Director Crawford immediately clarified that Lt. McKee would be the one to address that, as Lt. McKee was the one handling these matters.** *Id. 169:9-16.*

148.    Defendant Mckee testified that he rarely has suggestions for what could be done better when reviewing uses of force. *Id.* at 44:4-14.

**Response: Defendants object as the statement mischaracterizes Lt. McKee's testimony as McKee testified suggestions related to approximately ten percent of use of force incidents he reviews.** *Id.* **at 44:4-14.**

149.    Officers are not given copies of the reviews of their uses of force. Exh. 36 at 78:13-25.

**Response: Admit.**

150.    Defendant McKee testified supervisors were expected to talk with officers about the deficiencies in their uses of force. Exh. 21 at 37:20-38:25.

**Response: Admit.**

151.    There is no follow up done with supervisors to make sure these conversations happened. *Id.* at 38:20-25.

**Response: Defendants object as the statement mischaracterizes Lieutenant McKee's testimony.**

152.    SCCJ gave supervisors no specific expectations of how this coaching should be done. *Id.* at 38:20-25.

**Response: Defendants object as the statement mischaracterizes Lieutenant McKee's testimony.**

153.    Defendant McKee testified that there is no system of tracking how many times supervisors talked to certain officers about identified deficiencies in the officers' use of force. *Id.* at 39:1-6.

**Response: Admit.**

154.    Defendant McKee testified, "If you're asking is there a log or data place that I keep track that Mike McKee has five uses of force, Billy Joe has 12 and their brother Billy Bob has 5 100, no, there is not." Exh. 21 at 139:2-5.

**Response: Admit.**

155.    Officers' use of force reviews are not kept in their personnel files. *Id.* at 44:23-25.

**Response: Admit.**

156.    Even if the use of force reviews noted ways the officers' uses of force should be improved, Defendant Mckee testified that it would not necessarily be factored into their performance evaluations. *Id.* at 132:19-24.

**Response: Admit.**

157.    As the operations lieutenant, Lt. McKee generated statistical reports related to his use of force reviews, but he merely stored them and did not provide them to anyone else. Exh. 7 at 29:14-25, 30:1-16.

**Response: Admit.**

158.    Director Daniel Keen, the current jail director, testified that SCCJ did not begin to do data collection of the uses of force against inmates until 2018. Ex 34 at 32:17-22.

**Response: Admit.**

159.    SCCJ produced records of 56 uses of force on inmates other than Mr. Qandah between the years 2012 to 2017. *See* Exh. 37, Use of Force Reports 2012-2017.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

160.    Of those records produced by SCCJ, 13 documented use of force incidents occurred prior to Mr. Qandah's December 15, 2014 incident. *See id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

161.    10 of the 13 documented uses of force that occurred prior to Mr. Qandah's December 15, 2014 assault involved SCCJ officers using hands-on force. *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

162.    In 35 of 57 total documented uses of force from 2012 to 2017, the supervisors deem the force appropriate with cursory notes and analysis. *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

163.   For 14 of the uses of force (25% of the total documented instances), there is no use of force review form containing supervisor review of the incident on file. *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

164.   In nine documented uses of force (15.8% of the total documented instances), the supervisors noted criticisms that the officers used a higher level of force inappropriate or unnecessary for the situation. *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

165.   For seven of the nine incidents, these criticisms contain no follow up steps to address this with the officers. *See, e.g., id.*, pp. 16-24, (Officer Jake Gillet pushed inmate Frillman, grabbed him and handcuffed him, and Assistant Director Vaughn found the force could have been avoided but fails to direct any specific follow up steps to address use of force with Gillet, and no record of Gillet's discipline or counseling following the incident exists).

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

166.    In all of the use of force records produced by SCCJ, the reviewing supervisors only require follow up with the officers in two specific instances. Exh. 37, pp. 354-360 (Officer Clinton Graebner performed a takedown and restraint of an inmate, which the reviewing supervisor found inappropriate, yet Grabener's personnel file (Exh. 38) contains no record of this written warning); Exh. 37, pp. 127-147 (Defendant Cast pepper-sprayed and physically restrained Gilliam, the reviewing supervisor faulted Cast for not using other strategies before escalation, and directed a Sergeant to discuss the use of force, yet Defendant Cast's personnel file (Exh. 30) contains no record of this warning.).

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

167.    On July 28, 2017, Defendant Cast wrote the following comment on Facebook: "I have asked an officer 'need help' when he replied, yes, I put the offender on the ground and the officer had to tell me to stop choking him out, lol. I was a lil excited." Exh. 44, p. 46; *See also* Exh. 8 at 171:21-25, 172:1-2.

**Response: Admit.**

168.    Defendant Cast stated he was referring to an incident in Unit D, where a group of officers was trying to restrain an inmate. Exh. 8 at 172:2-23.

**Response: Admit.**

169.     Defendant Cast testified that he choked the inmate and further elaborated that the incident involved a group of officers getting the inmate on the ground and a 450-pound officer sitting on top of all of them, creating a pile of officers and inmates. *Id.* at 172:2-23, 173:11-25.

**Response: Defendants object to the mischaracterization of the testimony as Defendant Cast explained that he did not realize that he choking the inmate among the scuffle and was not intentionally choking the inmate.**

170.     Defendant Cast stated he completed a use of force report on this incident. *Id.* at 175:3-7.

**Response: Admit.**

171.     However, no use of force report or use of force review exists.  Exh. 39, Smit August 2020 30(b)(6) Dep. at 104:3-12, 118:1-22, 1203-21; *See* Exh. 27.

**Response: Defendants admit that no Use of Force report or Use of Force review has been found regarding the incident described in Statements 168-169.**

172.     Director Crawford testified that "chok[ing] an inmate out" is an inappropriate use of force. Exh. 9 at 123:9-13.

**Response: Objection, Defendants object as the cited testimony is not included or submitted to the Court in Exhibit 9.**

173.     Still, Defendant Cast faced no discipline for this incident in which he bragged about "choking out" a detainee. Exh. 30, Cast Personnel File.

**Response: Admit that Cast faced no discipline for the incident, object to the use of "bragged" as it calls for a conclusion.**

174.     Defendant McKee testified that there was at least one officer who he noticed and discussed with others that "ha[s] more use of force events than other people." Exh. 7 at 8:19-22.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

175.    To Defendant McKee's knowledge, nothing had been done to address use of force with this officer, and the officer is still employed at the jail. *Id.* at 9:17-21.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

176.    Defendant McKee testified that, although SCCJ uses "action plans," or written expectations for employees to improve performance, he has never seen action plans used to help COs improve their treatment of inmates. *Id.* at 97:19-21, 102:18-22.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

177.    Sgt. Lewis testified that he has never done or been requested to do supplemental training for officers when there is an issue involving the use of force. Exh. 36 at 81:2-19.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

178.    Over the 30 years that he has worked for SCCJ, Defendant McKee has never heard of a change to the use of force policies or procedures. Exh. 21 at 23:24-24:4.

**Response: Defendant objects to the mischaracterization of the testimony, as it very clearly and plainly does not state that Lt. McKee that he has never heard of a change to the use of force policies or procedures, as Mr. Qandah purports it to state.**

*Alleged Failure to Investigate or Respond to Inmate Complaints of Animus and*
*Apathy to Inmate Wellbeing from COs*

179.    No policy or procedures instruct correctional officers on how to report racist comments from staff. Exh. 6 at 104:2-6

**Response: Objection, Defendants object as the cited testimony is not included or submitted to the Court in Exhibit 6. Defendants further object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

180.    Officer Graebner testified, "Some people made it their personal I can't really say for sure -- but it appeared in my opinion that some officers made it their personal endeavor just to tick off as many people as they could and go badge heavy." *Id.* at 119:12-24, 120:1-5.

**Response: Objection, Defendants object as the cited testimony is not included or submitted to the Court in Exhibit 6. Defendants further object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.  Defendants also object to paragraph 180 as it does not set forth a fact but rather constitutes the unsupported opinion of Officer Graebner.**

181.    Lt. Mckee has been verbally abusive to inmates. *Id.* at 122:23-24, 123:1-14.

**Response: Objection, Defendants object as the cited testimony is not included or submitted to the Court in Exhibit 6. Defendants further object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

182.    Defendant Graebner testified that other COs are verbally abusive to inmates. *Id.* at 120:15-18.

**Response: Objection, Defendants object as the cited testimony is not included or submitted to the Court in Exhibit 6. Defendants further object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

183.    In her capacity as St. Charles County's Rule 30(b)(6) designee, Laurie Smit testified that COs do not receive formal instruction on the inmate complaint process. Exh. 39 at 42:25, 43:1-4.

**Response: Objection, Defendants object as the cited testimony is not included or submitted to the Court in Exhibit 39. Defendants further object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

184.    Ms. Smit testified that all instruction is done through informal, field training, yet, as St. Charles County's designee, Ms. Smit could not state the content or nature of this complaint and medical request training. *Id.* at 43:4-25, 44:1-22.

**Response: Deny and objection, Defendants object as the cited testimony is not included or submitted to the Court in Exhibit 39. Defendants further, St. Charles County Department of Corrections ("SCCDOC") staff receive use of force training.  Sergeant Thomas Lewis testified all Corrections officers receive sixteen (16) hours of defensive tactics when first hired by the by the St. Charles County Department of Corrections and addition eight (8) hours of training annual as part of their in-service training.  Exh. B, Deposition of Thomas Lewis, 26:7-12.   Further, the record demonstrates that St. Charles County Department of Corrections, Policy 303, requires one hundred and sixty hours (160) of classroom training and education upon being hired as a Corrections Officer.  Exh. C, St. Charles County Department of Corrections Policy and Procedure 303 at 2.  The Department of Corrections Policy 303 also requires and provides for twenty (20) hours continuing education and training annually in areas including, but not limited to, security procedures, use of force, rules and regulations, rights and responsibilities of offender, and interpersonal relations.  *Id.* Defendants further object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

185.    At the time of Mr. Qandah's incarceration, inmates submitted grievances or complaints about officers on a paper form entitled "Inmate Concern/Request Form." Exh. 33 at 41:2-17.

**Response: Admit.**

186.    Inmates had to request this paper form from a correctional officer and return it to a correctional officer for submission to the appropriate person or department. *Id.* at 48:1-14.

**Response: Admit**

187.    Correctional officers then reviewed the paper forms to determine where to direct them. *Id.* at 56:1-25, 57:1-2, 58:11-21.

**Response: Admit**

188.    The process relied on the cooperation of correctional staff in giving inmates the forms and then turning the forms in. *Id.* at 55:11-25.

**Response: Admit**

*Lack of Complete Records of Inmate Complaints made Against Correctional Officers*

189.    From 2010 through 2017, St. Charles County did not have policies, protocols, and practices in place to fully retain or record inmate complaints made against correctional staff. Exh. 27.

**Response: Admit.**

190.    St. Charles County had no written procedures or formal training on saving inmate complaints in inmates files. Exh. 39 at 69:13-25, 70:1-17.

**Response: Admit.**

191.    St. Charles County had no procedure or practice of discipline or consequences for supervisors who would not keep or regularly put concern forms in inmate files. *Id.* at 69:13-25, 70:1-17.

**Response: Objection, the cited testimony plainly does not state what Mr. Qandah purports it to state.**

192.    Inmate complaints were not put into the inmate files 100% of the time. Exh. 33 at 69:2-12.

**Response: Admit.**

193.    Some inmate concern forms, which should have been put in paper inmate files, could have been lost or destroyed. Exh. 39 at 134:16-25, 135:1.

**Response: Admit.**

194.    Under St. Charles County policy, all inmate complaints about correctional officers were supposed to be responded to in writing. *Id.* at 42:11-15.

**Response: Admit.**


195.    But, Defendant Cast testified that it "wasn't unusual" for supervisors to just go speak to inmates in person because they could "get it across better in person than in writing." Exh. 8 at 48:20-25, 49:1.

**Response: Admit.**

196.    Officer Graebner testified that he was aware of instances where other officers did not give inmates complaint forms when requested. Exh. 6 at 47:13-23.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony and that the testimony is inadmissible hearsay. Office Graebner testified that inmates stated to him that they told another officer they needed a complaint form and that the inmate had not received a complaint form.**

197.    Director Crawford testified that inmates would complain they turned in complaint forms and never received any responses. Exh. 9 at 24:17-20.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony and that the testimony is inadmissible hearsay. In the cited testimony, Director Crawford testified that "there were sometimes complaints that the inmates would say they turned in a form and nothing happened to it."**

198.    Director Crawford attributed these allegations about lost complaint forms primarily to inmates lying, stating, "And so we had no way of knowing whether they turned it in. They coulda just said I turned it in, because inmates don't always tell the truth." *Id.* at 24, 22-24.

**Response: Admit.**

*Available Complaint Forms Allegedly Show a Culture of Animus from COs towards Inmates with*
*No Investigation or Concern from SCCJ*

199.    Under St. Charles County policy or practice, if an inmate submits a complaint about a correctional officer, a supervisor should investigate the complaint by talking to the officer and the inmate. Exh. 33 at 122:3-25, 123:1-10.

**Response: Admit**

200.    Under St. Charles County procedure from 2010 to 2017, any inmate complaints about correctional officers would be investigated or the investigation would be reviewed by either Lt. Mckee or Captain Vaughn. Exh. 39 at 133:9-23, 137:3-22, 140:18-25, 141:1-5.

**Response: Admit**

201.    Director Crawford testified that, depending on the specifics of the complaints, St. Charles County would decide not to formally investigate. Exh. 9 at 28:8-20.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony and the use of "formally investigate" as it calls for a conclusion. First, though not included in Mr. Qandah's citation, the line of questioning referred to complaints directly mailed to Director Crawford from inmates. Exh. 9 at 28:1-7. Second, with regard to those specific complaints, Director Crawford states plainly that "We investigated it and responded." Exh. 9 at 28:11-12. Third, when responding to the question "So is that, like, a formal investigation or just you would kind of ask around to see what was going on with this complaint?", Director Crawford "It would depend on – it would depend on the complaint.," again clearly indicating that some form of investigation was performed. Exh. 9, 28:16-20. Finally, as was clarified immediately after, and also not included in Mr. Qandah's citation, some investigations were more serious than others, depending on the type of issue. Exh. 9, 28:21-25.**

202.    Director Crawford stated that he would get lots of complaints about officers using racial and ethnic slurs, including "an N word used somewhere." *Id.* at 114:3-4.

**Response: Defendants object that the cited testimony plainly does not state what Mr. Qandah purports it to state. While Director Crawford remembered getting "some [complaints], and one's too many," not "lots," as Mr. Qandah purports. Exh. 9 at 114:1. Further, he could not recall any specific instance and stated, "There has to [sic] an N word used somewhere, I think."**

203.    Lt. McKee testified that inmates have brought the use of racially derogatory terms by correctional officers to his attention a number of times but that he never substantiated a finding that a correctional officer used such terms. Exh. 21 at 112:5-15.

**Response: Admit.**

204.    In inmate complaints produced by Defendants, there are 20 examples of other complaints raising allegations of mistreatment and abuse from correctional officers that were dismissed by facility supervisors without investigation.  Exh. 42, Inmate Complaints.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.  Further, Statement 217 does not set forth a fact but rather constitutes the legal conclusions of Plaintiff.**

205.    In one such complaint, submitted in March 2014, an inmate named Goodson asked to speak with someone about a March 21, 2014 incident when he "got jumped on by several inmates without the correctional officers following the right procedures," and SCCJ's response merely states, "There is no need for a statement from you about the incident." *Id.* at 1-8.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**


206.    In May and July 2014, an inmate named Mendez-Carranco submitted a complaint about being hit in the face by officers and asked to receive a liquid diet and medical treatment for a broken jaw, but the response deals only with his medical treatment and does not inquire as to which officers hit him or set up emergency medical treatment.  *Id.* at 10-11.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

207.    In April 2012, an inmate named Rice complained that he was unfairly punished for a fight in which the correctional officers provoked another inmate into attacking him, but the response denies his request for review with no investigation. *Id.* at 19.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

208.    In November 2010, an inmate named Thomlinson stated that he felt unsafe being forced to wear a colored wristband showing the nature of his charged offense; the response denies his request and tells him the policy will stay in place. *Id.* at 18.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

*Alleged Lack of Objective Review*

209.    SCCJ has no policies or procedures in place to ensure that COs do not handle complaints made about them. Exh. 33 at 57:3-22; Exh. 6 at 111:2-18.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

210.    Instead, if the offending officer is on duty in the inmate's housing unit, the inmate must wait to find a different staff member to arrive and accept the complaint. Exh. 33 at 57:3-22.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

211.     Under St. Charles County policy, the person reviewing an inmate complaint needs to be fair, objective, and unbiased. Exh. 39 at 33:14-20.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

212.     Yet, St. Charles County's policy that the person reviewing an inmate complaint needs to be fair and objective is not written or encoded anywhere. *Id.* at 32:11-25, 33:1-13.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

213.     St. Charles County has no procedural safeguards in place to ensure that someone other than the subject of the complaint is reviewing the complaint. *Id.* at 34:11-18.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

214.     Even if Defendant McKee generally reviewed and investigated complaints against correctional officers, it violates St. Charles County policy requiring objective review for Defendant McKee to review complaints made about him. *Id.* at 141:6-24, 142:4-10.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

215.     Defendant McKee routinely reviews complaints about his disciplinary decisions and his conduct towards inmates.  *See* Exh. 42.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

216.     Records beginning in 2012 and continuing for years show inmates have complained about a lack of objectivity at the facility in reviewing inmate complaints and specifically raised concerns about why Defendant McKee responded to and dismissed complaints raised about him. *Id.*

**Response: Defendants object to the use of this statement as evidence as inadmissible hearsay and that this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

217.     On January 10, 2012, inmate Michael Rice wrote that "I had a grievance written about being put on ad. seg. by Defendant McKee I addressed it to CPT. Vaughn yet Defendant

McKee responded to a grievance about himself . . . SCCDOC has no sense of accountability for its staff." The only staff member to respond was McKee, who told Mr. Rice that the decision will stand. *Id.* at 19-20.

**Response: Defendants object to the use of this statement as evidence as inadmissible hearsay and that this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

218.    On March 11, 2013, an inmate named Clarence Holmes asked for a way to file grievances to send outside of SCCJ. On March 14, 2013, McKee responded and stated that grievances were internal actions that did not extend beyond the facility. *Id.* at 24-25.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

219.    On April 2, 2013, an inmate named Cody Davis complained that he should not have received lockdown without having an opportunity to talk to a "white shirt." *Id.* at 26. McKee rejected his request outright without dealing with his request to speak to a  higher up. *Id*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**


220.    On May 1, 2014, an inmate named Jason Shell complained that SCCJ did not have a way for inmates to complain up the chain of command and that there was no true grievance

process. *Id.* at 27. Defendant McKee responded, stating that the concern form Mr. Snell submitted was sufficient. *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

221.    On January 23, 2017, an inmate named Dwane Taylor accused Defendant McKee of racist treatment of black inmates. *Id.* at 100. Defendant McKee rejected his appeal, saying that he had never acted in a racist manner and telling Taylor, "your own written word is racist towards me." *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

222.    On October 27, 2017, an inmate named Lydell Moore complained that Defendant McKee was unjustly keeping him in administrative segregation based on untrue information about Mr. Moore's threat level and asked for "McKee's reasons for having me in permanent ADSEG INVESTIGATED." *Id.* at 139. Mr. Moore's complaint was assigned to Defendant McKee, who closed the complaint. *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

223.    On December 8, 2017, an inmate named Terrance Wilson also complained that Defendant McKee had unjustly placed him in administrative segregation because he had filed other

grievances against Defendant McKee, but that he was not provided with any way to be heard about his complaint. *Id.* at 148. Mr. Wilson's complaint was assigned to McKee who closed the complaint, writing, "Due Process does not apply to administrative segregation." *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

224.    On July 22, 2017 and August 3, 2017, inmates named Kevin Williams and Stacy Bonds both wrote grievances to Defendant McKee about his treatment of inmates and about unconstitutional SCCJ conditions. *Id.* at 150, 151. McKee summarily rejected and closed both. *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

225.    An inmate named Bryan Swiney submitted more than six complaints about Defendant McKee's decision to put him in administrative segregation and Defendant McKee's continued review of his case. *Id.* at 86-90. On August 28, 2018, Swiney filed a grievance form stating, "im asking for someone besides lt mckee to look into my situation." *Id.* This grievance was assigned to Defendant McKee, who rejected and closed the grievance form. *Id.*

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

226.    Earlier in August 2018, Defendant McKee was verbally warned after having a "heated conversation" with Mr. Swiney about his housing assignments in which Defendant McKee

allegedly stated that he would tell other inmates about Mr. Swiney's charges, putting Mr. Swiney at risk of harm. *Id.* at 152-155.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

227.    On January 23, 2019, an inmate named Jessica Reed complained that her grievances were being rejected by Defendant McKee and not being allowed to progress. *Id.* at 52. This complaint is assigned to McKee, and he responds by rejecting her complaint and closing the grievance form. *Id*.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

228.    There is no record that Defendant McKee was ever disciplined, counseled, or instructed to cease reviewing inmate complaints about his own treatment of inmates. Exh. 43, McKee Personnel File.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendant's Motion and therefore should be stricken.**

*St. Charles County Allegedly Failed to Use Inmate Complaints to Discipline, Counsel, or Coach*

*Correctional Officers*

229.    Director Crawford testified that discipline was "never supposed to come to [him]" if his subordinates recommended oral counseling, verbal warnings, or written reprimands, rather than referrals to the director. Exh. 9 at 149:10-19.

**Response: Admit with clarification, and Mr. Qandah's phrasing is unclear. Director Crawford testified that if discipline was referred to the director, it would come to him. If it was lower levels of discipline, "it was never supposed to come to [him]."**

230.    From 2010 through 2017, St. Charles County did not have policies, protocols, and practices in place to track inmate complaints made against correctional staff. Exh. 27.

**Response: Admit.**

231.    St. Charles County made no effort to track the topics or content of all inmate concerns forms. Exh. 33 at 65:12-14, 66:12-16; Exh. 39 at 45:22-25, 46:1-17.

**Response: Admit.**

232.    St. Charles County had no system to track these inmate complaints to see if one officer had multiple complaints filed against him or her. Exh. 9 at 173:15-23; Exh. 39 at 47:3-13.

**Response: Admit.**

233.    Because copies of the inmate complaint forms were kept in individual inmates' paper files (Exh. 39 at 38:19-20), there was no system of way for jail supervisors to realize one officer had more complaints lodged against him than others. *Id.* at 48:18-25, 49:1-3.

**Response: Admit.**

234.    There was no policy requiring supervisory review of employees if a certain number of inmate complaints were filed against them. *Id.* at 47:3-121.

**Response: Admit.**

235.    There was no practice of supervisors intervening if there were high numbers of complaints made against employees. *Id.* at 47:22-25, 48:1.

**Response: Admit as to inmate complaints.**

236.    Even if a CO had a high number of inmate complaints filed against him, there was no policy, practice, or procedure for consequences or notation in his personnel file. *Id.* at 49:17-25, 49:1-2.

**Response: Admit.**

### *COs Allegedly Failed to Respond to Inmate Medical Needs*

237.    At the time of Mr. Qandah's incarceration, if an inmate in a housing unit at SCCJ believed he needed medical assistance, the inmate had to ask the correctional officer on duty for a medical request form. Exh. 24 at 43:19-25, 50:8-10.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state.**

238.    There was no other way for inmates to access the medical unit besides by asking a correctional officer for a medical request form or telling the correctional officer they needed to see a nurse. *Id.* at 43:19-25, 53:20-25, 54:1-5.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state.**

### *Alleged Inadequate training*

239.    Nurse Echele testified that the burden is not on the inmate to explicitly request the form – if an inmate verbally shares that they have medical symptoms, the officer should give them the form and explain how to access medical assistance. *Id.* at 69:12-25, 70-1-2.

**Response: Defendants object to Mr. Qandah's characterization of the cited testimony, as the cited testimony refers only to providing the form, not referring to any explanation on how to access medical assistance.**

240.    Nurse Echele testified that even though completing the forms is preferred, once an inmate complains of medical symptoms, it is an obligation of the officer to help the inmate complete the process of being connected with medical help. *Id.* at 70:21-25, 71:1-4.

**Response: Defendants object to Mr. Qandah's characterization of the cited testimony, as within the cited testimony, Nurse Echele only agreed that "there is some obligation of the officer to give them the form and kind of help complete that process."**

241.    Nurse Echele testified that if an inmate had not gotten medication they were supposed to get, the only recourse for this was for the inmate to ask the officer to call and check on their medication. *Id.* at 81:12-25, 82:1-7.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony, as within the cited testimony, Nurse Echele is testifying into a situation in which an inmate requires a prescription which the SCCJ does not have in stock; that if the inmate is confused about whether or not they were supposed to have the prescription, they will ask an officer about it; and that the office will either give the inmate a medical request form or call medical to check on the situation. Exh.24 at 81:12-13, 82:1-7.**

242.    After the inmate hands the medical request form back, the correctional officers read the medical request. *Id.* at 51:2-9.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state.**

243.    Nurse Echele testified that Officers are supposed to look for "emergency comments" from inmates. *Id.* at 46:12-23.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state; it does not state "emergency comments" anywhere, as quoted by Mr. Qandah.**

244.    St. Charles County practice and policy also creates an expectation that correctional officers listen to inmates' verbal requests or description of symptoms. Exh. 33 at 87:23-25, 88:1-8.

**Response: Admit.**

245.    St. Charles County practice and policy is that if correctional officers see an inmate who is in need of medical attention, correctional officers should get the correct medical and emergency attention to that inmate whether or not the inmate completed a form. Exh. 39 at 86:3-13.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony.**

246.    Under St. Charles County policy and practice, correctional officers are expected to call medical directly on behalf of an inmate in certain situations, such as when an inmate has chest pains, is bleeding, has injured himself in the recreation yard, if an inmate appears to be so sick that he is not leaving his cell, or if an inmate is experiencing severe and debilitating pain. *Id.* at 31:10-25, 32:1-10; Exh. 33 at 104:5-25, 105:1-18, 106:11-18.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony.**

247.    Nurse Echele testified that officers are supposed to identify emergency symptoms, such as an inmate who has passed out, appears unresponsive, is vomiting uncontrollably, is weak, has seizure activity, or slips and falls. Exh. 24 at 62:25, 63:1-10.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state.**

248.    Nurse Echele testified that if an inmate is stuck in bed, not eating or drinking, vomiting, a correctional officer should notify someone that the inmate was in need of medical help. *Id.* at 86:7-14.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony; Nurse Echele testified that she "would expect" a correctional officer to notify someone in this situation.**

249.    The post orders given to officers in the housing unit do not instruct correctional officers to monitor inmates for concerning symptoms and then notify medical. Exh. 46, Post Order: Housing Unit, Def. 001270 - Def. 001274.

**Response: Objections, Post Orders refer to routine scheduled and unscheduled duties that must be accomplished throughout the shift and would not address the matters which Mr. Qandah asserts.**

250.    Officer Graebner testified that he believed even an inmate in persistent pain would still have to ask for and fill out a medical form. Exh. 6 at 86:8-13.

**Response: Admit.**

251.    Correctional officers have had inadequate, if any, training on how to recognize emergency or concerning health symptoms. Exh. 24 at 47:15-25, 48:1; Exh. 33 at 21:21-25, 22:1; Exh. 39 at 76:18-24.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony and that the Statement calls for a legal conclusion.**

252.    Nurse Echele testified she does not know who would have told the correctional officers that recognizing emergency or concerning health symptoms and notifying medical was an expectation. Exh. 24 at 82:15-19.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state.**

253.    Nurse Echele testified that the non-mental health-related medical training COs receive is first aid. *Id.* at 20:22-25, 21:1-3.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony. Nurse Echele was testifying specifically to the training of Suicide Prevention Officers (SPOs) and not COs. Further, within the cited testimony, she mentions mental health training, first aid, and "additional training." Exh. 24 at 20:16-25, 21:1-12.**

254.    Defendant Cast testified he has received no training beyond first aid, CPR, or blood borne pathogens related to identifying when he should help an inmate contact the medical department immediately for care. Exh. 8 at 25:21-24, 28:16-18.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

255.    Officer Gillet testified that the only non-mental health-related medical training he received was CPR and first aid instruction. Exh. 45, Gillet Dep. at 15:8-11.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

256.    Officer Graebner testified that he received no training on discerning whether inmates had the capacity to fill out medical request forms. Exh.6 at 143:24, 144:1-4.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

257.    Nurse Echele testified that officers do not receive training on spotting symptoms that should prompt referrals to medical; officers are expected to use "common sense" to discern if inmates are experiencing serious symptoms or "something that can wait." Exh. 24 at 46:24-25, 47:1-11, 48:9-12.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony. Nurse Echele testified that "If [the officers] do have training, it's not from the medical department. So, I don't know, they could have their in-field training." Nurse Echele did testify that the officers would use common sense so that "If they witness something serious, then they know it's something that cannot wait."**

258.    No one has ever asked Nurse Echele to provide training for officers on how correctional officers can recognize emergency or concerning health symptoms. *Id.* at 48:6-8.

**Response: Admit.**

259.    Defendant McKee testified that he tells correctional officers, "You're not trained medical personnel. If an inmate comes up to you and says there's something going on, notify a nurse and let the medical staff make the determination of whether something is or is not wrong with them, that then you pushed it up and you've done your due responsibility. Exh. 21 at 228:25, 229:1-13.

**Response: Admit.**

260.    However, Defendant McKee testified, "Whether an employee does that or not, that would be a question for the individual employee." Exh. 21 at 228:25, 229:1-13.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

261.    Mr. Baumgartner testified that correctional officers would likely not intervene if an inmate seemed unresponsive:

> Q: "Outside of usual sleep hours, is there a particular amount of time where an officer should note that an inmate has not moved and perhaps raise some alarm."
>
> A: "Typically not through a typical shift, no. Sometimes people sleep all day. As long as you can tell they're breathing and there isn't any, you know, any physical thing that you notice that's happening at that time. Now, if they haven't eaten or anything like that, all three meals or two meals, that's something that you would pass on to the next shift or the next supervisor so that they can keep an eye on it as well. If they haven't come out of their cell for two days or if they haven't moved for two full shifts, that would be something that would be passed down to have somebody take a look at."

Exh. 33 at 99:10-24.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state.**

*COs allegedly refusing to help inmates access medical care*

262.    From 2010 through 2017, St. Charles County did not have policies, protocols, and

practices in place to fully retain, record and track inmate complaints of being denied medical care. Exh. 27.

**Response: Admit.**

263.     Officer Graebner and Nurse Echele both testified they have heard inmates complain that officers refused to give them a medical request form. Exh. 24 at 44:25-45:1-3; Exh. 6 at 47:14-19.

**Response: Defendants object to this Statement as inadmissible hearsay and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken. Defendants further object to Mr. Qandah's mischaracterization of Officer Graebner's testimony which does not speak to complaints of officers refusing to give medical request forms, but rather that the inmate hadn't received one.**

264.     Mr. Baumgartner testified:

Q. Have you ever heard complaints from inmates that they asked for a concern form and they weren't given a concern form?

A. I have. I specifically know that I have heard an inmate say that before.

Q. Do you know what was done about -- to remedy that situation?

A. No, I do not.

Q. Have you ever heard of an officer getting, you know, any kind of discipline, reprimand, talking, counseling for not giving inmates concern forms or medical request forms when asked?

A. No.

Exh. 33 at 59:25, 60:1-13.

**Response: Defendants object to this Statement as inadmissible hearsay and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

266. Mr. Baumgartner testified that inmates can seek out more helpful officers if others refuse to provide medical request forms. *Id.* at 83:8-14.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony, which pertains to help with the use of the kiosk and not to providing medical request forms. Exh. 33 at 83:8-14.**

266. Because St. Charles County treats the medical department as an entity separate from its security function, supervisors on the security side do not regularly investigate complaints related to medical care or include such complaints in inmates' paper files. *Id.* at 91:20-25, 92:1-18, 93:21-25, 94:1-23, 95:3-14.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

267. Nurse Echele testified she is aware of times that inmates went to medical reporting that they had been submitting concerns and needed to have been seen by a doctor sooner.  Exh. 24 at 61:22-5, 62:1-2.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

268. Defendant McKee testified that the most frequent complaint he hears from inmates' loved ones and attorneys is that inmates are not able to get medical attention. Exh. 21 at 68:1-11.

**Response: Admit.**

269.     Nurse Echele testified that in her understanding, officers are not allowed to refuse to give medical request forms to inmates. Exh. 24 at 44:15-19.

**Response: Admit.**

270.     Nurse Echele testified that she is unaware of any time an officer has been disciplined by the facility for not bringing an inmate down for medical care. *Id.* at 89:17-25, 90:1-11.

**Response: Objection, Nurse Echele's testimony is outside the scope of her knowledge and is therefore inadmissible and immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

271.     Nurse Echele testified she is aware of at least one case where a security supervisor decided that an inmate should not go down to medical even after the inmate made a request. *Id.* at 131:18-22.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state. Defendants further object as this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

272.     Nurse Echele testified that in her knowledge, there is no written policy preventing a correctional supervisor from doing so. *Id.* at 132:4-25, 133:1-6.

**Response: Defendants object as it is unclear and vague as to what is meant by "doing so." Defendants further object to Mr. Qandah's mischaracterization of the cited testimony, which pertains to help with the use of the kiosk and not to providing medical request forms.**

273.     Nurse Echele testified inmates complained to her about being able to access medical care. *Id.* at 141:17-20.

**Response: Defendants object as the cited testimony plainly does not state what Mr. Qandah purports it to state.**

274.     Nurse Echele also testified that, in the 10 years she has been working at SCCJ, she cannot think of a complaint from an inmate that she thought was well-founded. *Id.* at 136:10-25, 137:1-4.

**Response: Defendants object to Mr. Qandah's mischaracterization of the cited testimony Objection. Defendants further object that this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

275.     Nurse Echele further testified that, because of this, she has never identified any issues with the protocol for how inmates request or access medical care. *Id.* at 136:10-25, 137:1-4.

**Response: Defendants deny and object to Mr. Qandah's mischaracterization of the cited testimony. Nurse Echele specifically referred to taking action in "documentation" and mentioned, without going into specifics, discussing different suggestions with directors in impromptu meetings. At no point does Nurse Echele testify that "she has never identified any issues with the protocol for how inmates request or access medical care," as Mr. Qandah purports.**

### *Defendant Cast's Alleged Animosity Towards Muslims and People of Color*

276.     Defendant Cast regularly posted content on Facebook indicating a bias against Muslims and a bizarre obsession with Islam. *See* Exh. 44.

**Response: Defendants object to the characterization and conclusion that Mr. Cast "regularly posted content on Facebook indicating a bias against Muslims and a bizarre obsession with Islam," and such should be struck, accordingly. Defendants further object as this paragraph does not contain any material facts and does not help prove any material facts, and is therefore irrelevant and should be struck.**

277.    On March 24, 2013, Defendant Cast shared a meme criticizing Muslim prayer. *See id.* at 1

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

278.    On April 11, 2013, Defendant Cast shared a meme comparing judging all Muslims for 9/11 and condemning all gun owners because of mass shooters. *See id.* at 2.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

279.    On April 12, 2013, Defendant Cast shared a cartoon that read, "The Qur'an says that Jesus was a Muslim. And that's funny, because I don't recall Jesus raping, hating, or killing anyone" with another comment reading, "THE QUR'AN IS A FAKE BOOK, A LIE AND IS NOT A PEACEFUL RELIGION." *See id.* at 3.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

280.    On September 11, 2013, Defendant Cast posted a meme showing a crowd of bikers

with the caption, "800,000 BIKERS ARE ON THE ROAD TO CONFRONT ONE MILLION MUSLIMS IN WASHINGTON 'LIKE' AND 'SHARE' IF YOU BACK THE BIKERS." *See id.* at 4.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

281.    On December 10, 2013, Defendant Cast shared a meme with a photo of an angry rabid dog, reading, "I am sick and tired of answering questions about my dog! Yes he mauled 6 people wearing Obama t-shirts, 4 people wearing Pelosi t-shirts, 2 other democrats, 9 teenagers with pants hanging past their crack, 3 flag burners, and a Pakistani taxi driver. For the last time … the dog is not for sale !!! No, I do not approve of his licking his ass, but he says it helps get "the bad taste" out of his mouth." *See id.* at 5.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

282.    On December 12, 2013, Defendant Cast shared a meme suggesting that all Muslims "cling to guns and religion." *See id.* at 6.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

283.    On July 1, 2014, Defendant Cast shared an inflammatory video about mosques. *See id.* at 7.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

284.    On September 2, 2014,  Defendant Cast shared a video about Islamic Jihadists purportedly wanting to "take over the world."  *See id.* at 8.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

285.    On December 16 and 17, 2014, the two days after the attack on Mr. Qandah, Defendant Cast posted articles about Taliban gunmen and the person who took down Bin Laden. *See id.* at 9.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

286.    On January 13, 2015, he shared a post from Judge Jeanine Pirro discussing a "reverse crusade" and a "Christian genocide."  *See id.* at 10.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

287.    On May 31, 2016, Defendant Cast shared an inflammatory meme objecting to purported American relief for "200,000 muslims." *See id.* at 11.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

288.    On July 15, 2016, Defendant Cast wrote a post condemning the entirety of Islam for a terrorist attack in the United Kingdom. *See id.* at 12.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

289.    On December 1, 2016, Defendant Cast shared a post warning of the death of "a billion infidels." *See id.* at 13.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

290.    On February 11, 2017, Defendant Cast shared a meme reading, "A Muslim can murder 50 homosexuals, and Liberals still defend the religion, but a Christian who refuses to bake a homosexual's wedding cake endures nationwide shaming on behalf of their religion" and a meme reading, "Muslims: Death to America!  American Liberals: Let them in!" *See id.* at 14.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

291.    On January 20, 2018, Defendant Cast shared a meme reading, "EUROPEAN CHRISTIANS BUILD THIS NATION THEY DIDN'T COME TO BITCH, COLLECTIVE WELFARE, WAGE JIHAD, AND REPLACE THE AMERICAN CONSTITUTION WITH

SHARIA LAW." *See id.* at 15.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

292.    On May 11, 2019, Defendant Cast wrote a post suggesting that Muslim refugees were "the enemy." *See id.* at 16.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

293.    On June 22, 2019, Defendant Cast shared a Facebook post about Muslims enslaving "white Europeans" between the 1500s and 1800s. *See id.* at 17.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

294.    On an unknown date, Defendant Cast shared a Facebook post with a long, incoherent rant claiming that Islam is not a religion and that Muslims advocate the overthrow of the United States government. *See id.* at 18.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

295.    On an unknown date, Defendant Cast shared a Facebook post with a picture implying that all Muslims want "Death to America." *See id.* at 19.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

***Defendant Cast's Alleged Animosity Towards People of Color***

296.    Defendant Cast also regularly posted memes or other comments about problems with other races and white superiority. *See* Exh. 44.

**Response: Defendants object to the characterization and conclusion that Mr. Cast "regularly posted memes or other comments about problems with other races and white superiority," and such should be struck, accordingly. Defendants further object as this paragraph does not contain any material facts and does not help prove any material facts, and is therefore irrelevant and should be struck.**

297.    On August 17, 2014, Defendant Cast shared an article with the title "Former NBA Star: Why Al Sharpton is a coon'"*See id.* at 2.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

298.    On November 24, 2014, Defendant Cast shared an article titled "Former Marine Brutally Beaten as Revenge for Ferguson; Told Waffle House 'Not Safe for Whites.'" *See id.* at 21.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

299.    On November 13, 2014, Defendant Cast wrote, "Way beyond sick and fucking

tired. A white life in this country is worthless. Is that piece of shit Obama is speaking to her family today? Didn't think so. Where is Jesse and all the other assholes at. Hell, at the very least, announce what they are doing.  But, no, you won't hear a thing. More gangstas need to die in a hurry." *See id.* at 22.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

300.    On November 18, 2014, Defendant Cast shared a blog post that lauded the Ku Klux Klan for arriving in Ferguson to support "Their 'Hero' Cop Who Shot Brown." *See id.* at 23.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

301.    On November 23, 2014, Defendant Cast shared an article headlined "Black Woman Brutality Attacks White Woman For Being a 'White Bitch in the Hood.'" *See id.* at 24.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

302.    In comments to that post, a friend of his asked, "Why do you only seem to share stories involving black criminals? Just curious." *See id.* at 25.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

303.    Cast responded to the comment, claiming that the media refuses to report "black on

white crime." *See id.* at 25-26.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

304.    On December 1, 2014, Defendant Cast shared two articles headlined "Media Blackout: 12-Year Old Unarmed White Boy Shot to Death by Black Suspect" and "Have you heard the mainstream media screaming about the white cop killed by a black career criminal a few days ago?" *See id.* at 27.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

305.    On July 9, 2016, Defendant Cast shared a Facebook meme, stating "There is no 'War on Blacks.' There is only pushback against the violent criminal culture of people who have no respect for others and believe that they should be able to act however and do whatever they want without consequences." *See id.* at 28.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

306.    On August 29, 2016, Defendant Cast commented on a Chicago news article stating "Headlines should read 3 black males murder white great grandmother by beating and burning her to death!" *See id.* at 29.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the**

Court's resolution of Defendants' Motion and therefore should be stricken.

307.    On April 8, 2019, Defendant Cast posted a meme of a smiling man in a sombrero with the word "Mexico" on it with the caption "I knew I was in love with her as soon as I SODOMIZE!" *See id.* at 30.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

308.    Defendant Cast joined a private Facebook group called "Shit Show" where members regularly posted virulently racist memes. *See id.* at 31-36.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

309.    A post on the "Shit Show" group included a photo of Bill Cosby with the caption, "I thought I was going to Cancun … but my lawyer said you're going to the Can, Coon." *See id.* at 31.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

310.    A post on the "Shit Show" group included a photo of a white man looking at a black man with the caption, "When you watch how slow they work and you wonder why anyone would want one as a slave." *See id.* at 32.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the**

Court's resolution of Defendants' Motion and therefore should be stricken.

311.    A post on the "Shit Show" group included a drawing of a white mother holding her daughter's head down in a bathtub with the caption, "When your daughters first crush is a little negro boy." *See id.* at 33.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

312.    A post on the "Shit Show" group included a photo of a woman in a hijab with the caption, "I'd hit this shit harder than her brother hit the world trade center." *See id.* at 34.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

313.    A post on the "Shit Show" group included a photo of a mock book entitled "Chilton's Tractor Repair Manual" with a photo of a white man whipping a black man in what appears to be a field. *See id.* at 36.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

314.    Defendant Cast only left the group in February 2019, long after viewing most of these posts. Exh. 8 at 218:9-11.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

***Defendant Cast's Alleged Animosity Towards Inmates at SCCJ***

315.    Defendant Cast also referenced his job at SCCJ in several public Facebook posts. *See* Exh. 44.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

316.    On December 14, 2012, he described inmates at SCCJ as "sick assholes." *See id.* at 37.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

317.    On January 10, 2017, Defendant Cast wrote on Facebook, "Being right next to Ferguson, I have talked to a bunch of BLM idiots and they all think Michael Brown should not been shot and Officer Wilson was as wrong even though there's a mountain of evidence that says Wilson was in the right.  Don't forget I work at the St. Charles County jail and I deal with idiots on a regular basis." *See id.* at 38.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

***Defendant Cast's Alleged Endorsement of Extrajudicial Murder and Police Abusing Citizens***

318.    Even though he is a corrections officer and aspires to be a policeman, Defendant Cast also routinely glorified extrajudicial murder and physical abuse, showing that he has no regard for justice or the constitutional rights of citizens. *See* Exh. 44.

**Response: Defendants object to the characterization and conclusion that Mr. Cast "routinely glorified extrajudicial murder and physical abuse, showing that he has no regard for justice or the constitutional rights of citizens," and such should be struck, accordingly. Defendants further object as this paragraph does not contain any material facts and does not help prove any material facts, and is therefore irrelevant and should be struck. Defendants admit that Mr. Cast is a corrections officer.**

319.    On November 16, 2011, Defendant Cast offered his services to "put a bullet in the face" of an accused murderer. *See id.* at 39.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

320.    On October 21, 2012, Defendant Cast posted a picture of a revolver pointed at the reader with the caption "The last thing a child molester should see." *See id.* at 40.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

321.    On December 18, 2012, Defendant Cast posted a picture of a police officer using a TASER with the caption "I prefer to think of it as 'helping someone express themselves creatively through modern electric interpretative dance.'" *See id.* at 41.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

322.    On December 9, 2013, Defendant Cast shared a meme stating "How many cops

does it take to throw a pedophile down the stairs? None. He Fell." *See id.* at 42.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

323.    On March 31, 2015, Defendant Cast commented on a post, stating that the post's author should "call me and I Will [sic] come up there and kick the Shit [sic] out of the dad. They don't know me and I Will [sic] tell him that this will happen every time I'm in town." *See id.* at 43.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

324.    On March 23, 2016, Defendant Cast shared a picture of the World Trade Center exploding with the caption "DONT [sic] GIVE A SHIT HOW TERRORISTS ARE INTERROGATED!" *See id.* at 44.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

325.    On December 8, 2016, Defendant Cast commented on a post stating, "Took a man down in the middle of the street in front of the bar I owned after he assaulted the Chief of Police. Almost had him choked out when the calvary showed up. Exciting New Years Eve." *See id.* at 45.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

326.    On July 28, 2017, Defendant Cast commented on his own post stating "I have asked a [sic] officer 'need help' when he replied yes I put the offender on the ground and the officer had to tell me to stop from choking him out lol. I was a lil excited." *See id.* at 46.

**Response: Defendants object to this statement as repetitive and onerous, as it has already been stated in Statement 167 above.**

*Defendant Cast's Alleged Animosity Towards Undocumented Persons*

327.    Defendant Cast has also made numerous posts indicating an unhealthy obsession with "illegal aliens," including his mistaken belief that undocumented persons are entitled to "a job, a driver's license, food stamps, a place to live, health care, child benefits, education and tax free business income." *See id.* at 47-50.

**Defendants object to the characterization and conclusions that Mr. Cast "also made numerous posts indicating an unhealthy obsession with 'illegal aliens,' including his mistaken belief that undocumented persons are entitled to 'a job, a driver's license, food stamps, a place to live, health care, child benefits, education and tax free business income.,' and such should be struck, accordingly. Defendants further object as this paragraph does not contain any material facts and does not help prove any material facts, and is therefore irrelevant and should be struck.**

328.    At the beginning of his employment, Defendant Cast signed his agreement to an Electronic Information Policy that states, "Any information available to the public generally, whether through blogs or social networking websites, etc., may prevent an employee from receiving promotion or subject an employee to disciplinary action."  Exh. 29, Cast Electronic Information Policy Certification.

**Response: Admit.**

329.    Defendant Cast was promoted on December 19, 2018. Exh. 30.

**Response: Admit.**

330.    Defendant Cast testified that he has had SCCJ supervisors as friends on Facebook since 2011 and that they would have known what was on his Facebook. Exh. 8, Cast Dep. Def. 003920.

**Response: Defendants object as this paragraph contains mere speculation as "they would have known what was on his Facebook," and that there is no evidence that any supervisors had known what was on Mr. Cast's Facebook account prior to the incident involving Mr. Qandah in this matter. Defendants further object as this paragraph does not contain any material facts and does not help prove any material facts, and is therefore irrelevant and should be struck.**

331.    Defendant Cast further testified that until this lawsuit was filed, "[n]o one ever said anything to me." Exh. 8 at 298:15-22.

**Response: Defendants deny and object to the mischaracterization of the evidence, as Mr. Cast stated, "No one ever said anything to me until this situation arose." Exh. 8 at 298:22-23. Defendants further object as this paragraph does not contain any material facts and does not help prove any material facts and is therefore irrelevant and should be struck.**

332.    Defendant Cast testified he has never received any discipline based on his social media posts. *Id.* at 298:8-10.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

333.    Defendant Cast's personnel file shows he was disciplined multiple times for

conduct not involving inmates, such as misuse of PTO or other attendance issues. Exh. 30.

**Response: Objection, this statement of fact is irrelevant to any issues relating to whether Defendants are entitled to judgment as a matter of law and is therefore immaterial to the Court's resolution of Defendants' Motion and therefore should be stricken.**

334.     Mr. Qandah's file contains complaint forms referencing that he has submitted many other concern forms on a similar topic, which were not responded to or saved in his DCN file. Exh. 41, Qandah Complaint Form Referencing Gaps.

**Response: Defendants admits that Mr. Qandah's file contains the Inmate Complaint Form in Exhibit 41, and that Mr. Qandah alleges within that form that it is the "6th concern form I turned in." Defendants deny that Mr. Qandah's complaint forms were not responded to or saved, as Defendants have produced 18 Inmate Complaint Forms which Mr. Qandah had submitted and were responded to. Exh. A, Inmate Concern/Request Forms.**

Respectfully submitted,
ST. CHARLES COUNTY COUNSELOR


/s/Drew A. Heffner
Drew A. Heffner, E.D. #54873MO
Associate County Counselor
100 North Third Street
St. Charles, Missouri 63301
Telephone:     636/949-7540
Facsimile:     636/949-7541
Email: dheffner@sccmo.org

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon:

James R. Wyrsch
Javad M. Khazaeli
Kiara N. Drake
911 Washington Avenue, Suite 211
St. Louis, MO 63101
(314) 288-0777
(314) 400-7701 (fax)
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com
kiara.drake@kwlawstl.com

Blake A. Strode
Michael-John Voss
Frances C. Lucas
John M. Waldron
Maureen Hanlon
440 N. 4th St., Suite 390
Saint Louis, MO 63102
855-724-2489 ext. 1021
314-925-1307 (fax)
bstrode@archcitydefenders.org
mjvoss@archcitydefenders.org
clucas@archcitydefenders.org
jwaldron@archcitydefenders.org
mhanlon@archctiydefenders.org

/s/Drew A. Heffner
Date: October 9, 2020