UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ALLAEDDIN QANDAH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:20CV53 JCH |
| | ) |
| ST. CHARLES COUNTY, MISSOURI, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment on Plaintiff's First Amended Complaint, filed May 22, 2020. (ECF No. 25). The motion is fully briefed and ready for disposition.

**BACKGROUND**

Plaintiff Allaeddin Qandah, a naturalized citizen of Jordanian descent and devout Muslim, was jailed in the St. Charles County Jail ("SCCJ") from March 3, 2014, to February 6, 2015. (Plaintiff Allaeddin Qandah's Statement of Additional Material Facts in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Additional Facts"), ¶¶ 1, 3, 8). While in SCCJ, Plaintiff participated in Ramadan, prayed openly, and had a Qur'an. (*Id.*, ¶ 4). Plaintiff eventually pled guilty to charges of non-violent felonies, and the court suspended execution of his sentence pending completion of probation, which Plaintiff successfully completed in 2017. (*Id.*, ¶¶ 5-7).

Plaintiff spent a good deal of his time at SCCJ in administrative segregation. (*See* Plaintiff's Additional Facts, ¶9 and Defendants' response thereto). Plaintiff claims that he

experienced more restrictive conditions of confinement than other inmates on administrative segregation. (Plaintiff's Additional Facts, ¶ 11). He further claims that throughout his detention SCCJ officers called him "terrorist," "camel jockey,", and "ISIS," and told him "if you don't like the laws here, go back to where you came from." (*Id.*, ¶ 12). Plaintiff submitted grievances on SCCJ's concern forms, and while Defendant Michael McKee[1] acknowledged receiving the complaints, he testified that they "could never be substantiated." (*Id.*, ¶¶ 13, 15). Defendants acknowledge McKee did not like Plaintiff, but maintain it was because Plaintiff threatened to kill staff and blow up officers' cars. (*See* Defendants' Response to Plaintiff's Additional Facts, ¶ 22).[2] At one point, based on "the incidents regarding [Plaintiff] being out of his cell and the reports from today", McKee sent an email requesting that a Certified Peace Officer complete a criminal warrant application for escape. (Plaintiff's Additional Facts, ¶ 24, citing ECF No. 54-10, McKee Emails). McKee further instructed that Plaintiff only be allowed out of his cell by himself[3], and requested permission to speak against Plaintiff at his sentencing hearing. (*Id.*, ¶¶ 23, 25).

During his time at SCCJ, Plaintiff knew that other inmates had heard he was a "snitch", and suspected he was in physical danger because of that. (Plaintiff's Additional Facts, ¶ 35).[4] Defendant Jeffrey Cast testified in conformance with Plaintiff's fears, stating both that he knew

---

[1] At all times relevant to Plaintiff's Complaint, Defendant McKee was the operations lieutenant at the jail. (Plaintiff's Additional Facts, ¶ 17).
[2] McKee testified he still was required to protect Plaintiff, despite his personal feelings towards him. (*See* Defendants' Response to Plaintiff's Additional Facts, ¶ 22).
[3] Defendant Jeffrey Cast testified that "[e]verybody in the jail was aware that Qandah was to be out [in the day room] by himself." (*See* ECF No. 54-8, Cast Dep. at 150:10-17).
[4] Plaintiff alleges SCCJ correctional officers referred to him as a snitch to other inmates. (Plaintiff's Additional Facts, ¶ 34). Defendants deny this, acknowledging only that other inmates referred to Plaintiff as such. (Defendants' Response to Plaintiff's Additional Facts, ¶ 34).

inmates regarded Plaintiff as a snitch, and that inmates identified as snitches were at risk of attacks by other inmates. (*Id.*, ¶¶ 36, 37).

On or about December 8, 2014, Kionte Ballinger was moved into Unit J, where Plaintiff was being housed. (Plaintiff's Additional Facts, ¶ 42). Ballinger testified that after a corrections officer informed him Plaintiff was a snitch, he decided he was going to "take matters into [his] own hands", meaning he "decided [he] was gonna go and beat him up pretty much." (*See* ECF No. 54-15, Ballinger Dep. at 15:13-15, 17:8-16). Ballinger knew at the time that it was a major rule violation to access someone else's cell, a "zero tolerance, not-allowed-at-all type of thing." (Plaintiff's Additional Facts, ¶ 48, quoting Ballinger Dep. at 18:9). He testified he therefore waited to talk to Defendant Cast about opening Plaintiff's cell and allowing Ballinger access, because he had seen Cast violate the policies and protocols of SCCJ in the past. (*Id.*, ¶¶ 49-50, citing Ballinger Dep. at 19:1-5, 20:4-13). On December 15, 2014, Ballinger told Cast he wanted to talk to Plaintiff so he could "get some info from him." (Ballinger Dep. at 20:14-18). According to Ballinger Cast did not respond orally; he just "looked at [Ballinger] and gave [him] a slight grin, like a smirk or something." (*Id.* at 22:6-12). Ballinger interpreted Cast's smirk to mean Cast understood Ballinger was planning to attack Plaintiff for being a snitch. (*Id.* at 22:15-23:2).[5] Ballinger testified he then sat in front of Plaintiff's cell, and almost immediately Cast hit

---

[5] Cast testified that Ballinger asked to retrieve his shampoo and lotion from Plaintiff, and that Plaintiff agreed he would return it before Cast allowed Ballinger entrance to Plaintiff's cell. (*See* ECF No. 26-5, Cast Dep. at 244:8-19). Cast further asserted he believed Ballinger's intentions were simply to retrieve his stuff, and that he never thought Ballinger intended to assault Plaintiff. (*Id.* at 244:20-22, 245:18-24). Finally, although Cast testified Plaintiff and Ballinger were talking for approximately twenty minutes before he opened the door, Ballinger testified that claim was "very much so inaccurate", and Cast had no explanation as to why his incident report did not mention the alleged conversation. (Plaintiff's Additional Facts, ¶¶ 86-89).

the button and opened the door. (*Id.* at 23:5-9).[6] As soon as the door opened, Ballinger charged and attacked Plaintiff, who had just begun to pray. (Plaintiff's Additional Facts, ¶¶ 56, 57). Ballinger tackled Plaintiff to bring him to the ground, during which time Plaintiff's head hit the metal toilet stool. (*Id.*, ¶¶ 58, 59). Ballinger was able to land several more punches, including to Plaintiff's face and jaw, before Plaintiff wrestled Ballinger into a headlock. (*Id.*, ¶¶ 61, 62). According to Plaintiff, other correctional officers had to order Cast to open Plaintiff's cell door and allow them to intervene in the fight, and Cast was still smirking when the other officers separated Plaintiff and Ballinger. (*Id.*, ¶¶ 64, 65). Plaintiff claims that immediately after the incident he heard Corporal Krankel, one of Cast's supervisors, yell, "Inmates are not allowed to pass anything. Why would you open his door even if that was the case?" (*Id.*,¶ 66, quoting ECF No. 54-5, Qandah Dep. at 103:22-104:1).

Director Larry Crawford asked the St. Charles Sheriff's Department to investigate Plaintiff's assault. (Plaintiff's Additional Facts, ¶ 68). Sgt. Mike Marshall, the supervisor of the Crimes Against Persons Unit in the Sheriff's Department, interviewed both Plaintiff and Ballinger. (*Id.*, ¶¶ 69, 71). Marshall testified that Ballinger said "he asked the person in the control room to pop the door so he could 'holler at dude,' by which Sgt. Marshall understood he meant talk to Mr. Qandah." (*Id.*, ¶ 72). Marshall further reviewed the incident report Cast wrote after the assault, in which Cast asserted as follows:

> At 1900 hours I let Mr. Ballinger out of his cell for his two hour out time. At 1915 hours Mr. Ballinger spoke to Mr. Qandah through his cell door then came to the transfer box and stated that Mr. Qandah was letting him borrow some soap. Upon the door to Mr. Qandah's cell opening I hit the maintain button to stop the door from opening more than six inches. The

---

[6] Cast acknowledged during his deposition that it violated SCCJ policy for an officer to open one inmate's cell at the request of another inmate, or to allow an inmate to enter the cell of another inmate. (*See* Cast Dep. at 86:20-87:2). He testified that his violation of the policy warranted the discipline he received. (*Id.* at 87:3-7).

> door did not respond and kept opening at which time Mr. Ballinger entered the cell to assault Mr. Qandah at which time I called a 10-10 over the radio.

(Plaintiff's Additional Facts, ¶¶ 76, 77, quoting ECF No. 54-17, P. 11).[7] Marshall testified that he went to Unit J to see how the doors opened and closed and if they were functioning properly, and found there had been no maintenance performed and the doors were functioning as designed. (*Id.*, ¶¶ 80, 81). Marshall further testified there is an opening in the door to allow for the passage of items back and forth, and that in his opinion, had Cast not opened the door there would have been no assault. (*Id.*, ¶¶ 82, 83).

Plaintiff claims that after the altercation, he asked to be taken to a hospital to get an x-ray for the pain in his jaw, but his request was not honored. (Plaintiff's Additional Facts, ¶¶ 109, 110). Furthermore, he did not have an appointment with the doctor the following day, nor did he receive an x-ray from the Mobilex unit contracted by SCCJ. (*Id.*, ¶¶ 111, 113). Plaintiff alleges that he submitted between six and nine complaints relating to his medical care to Defendant McKee, but received no response. (*Id.*, ¶ 119). According to Plaintiff, the pain in his jaw was so severe that he had to request liquid food in the weeks following the attack, and he still experiences pain in his jaw to this day. (*Id.*, ¶¶ 124, 125).

Plaintiff filed his original Complaint in this matter on January 31, 2018. (*See* Case No. 4:18CV171 JCH, ECF No. 1).[8] In his First Amended Complaint, filed January 13, 2020, Plaintiff lodges the following causes of action: Fourteenth Amendment Claim for Deliberate Indifference Resulting in Punishment to Pretrial Detainee Cognizable under 42 U.S.C. § 1983

---

[7] Marshall testified his efforts to interview Cast were unsuccessful. (Plaintiff's Additional Facts, ¶ 78).

[8] Plaintiff originally filed his Complaint with co-Plaintiff Eric Smith. On January 13, 2020, the Court severed the two cases, finding the claims and parties were distinct as to each individual Plaintiff, and that separating the claims would expedite the litigation process by limiting the scope of inquiry to events related to the individual claims of each Plaintiff. (ECF No. 10).

against Defendant Cast (Count I); Fourteenth Amendment Claim for Deprivation of Medical Care Amounting to Cruel and Unusual Punishment Cognizable under 42 U.S.C. § 1983 against Defendant McKee (Count II); and Municipal Liability *Monell*[9] Claim against Defendant St. Charles County for Failure to Supervise, Train, Investigate Complaints, and Discipline (Count VI).  (ECF No. 4).[10]

As noted above, Defendants filed the instant Motion for Summary Judgment on Plaintiff's First Amended Complaint on May 22, 2020, claiming there exist no genuine issues of material fact, and they are entitled to judgment as a matter of law on all counts of Plaintiff's First Amended Complaint.  (ECF No. 25).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The substantive law determines which facts are critical and which are irrelevant.  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id*.

A moving party always bears the burden of informing the Court of the basis of its motion.  *Celotex*, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material

---

[9] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
[10] Counts III, IV, and V assert claims on behalf of Plaintiff's former co-Plaintiff, Eric Smith.  Said claims are being addressed in Case No. 4:18CV171 JCH.

fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id*. at 249.

## DISCUSSION

### I.     Qualified Immunity

United States District Judge Rodney W. Sippel of this Court recently provided a detailed analysis of the doctrine of qualified immunity, which the Court quotes at length here:

> Qualified immunity protects a government official from liability "unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).
>
> To determine whether an official is entitled to qualified immunity, the Court asks the following two-part question: (1) whether the facts alleged, viewed in the light most favorable to the plaintiff, show that the defendant violated a constitutional or statutory right, and (2) whether the right at issue was clearly established at the time of the offending conduct. *Brown v City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court may decide which determination to make first, *Pearson v. Callahan*, 555 U.S. 223, 235-36 (2009), and "the defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012).
>
> "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he

> is doing violates that right." *Mathers v. Wright*, 636 F.3d 396, 399 (8th Cir. 2011) (internal quotation marks and citation omitted). "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012) (internal quotations marks and citation omitted). "The unlawfulness must merely be apparent in light of preexisting law, and officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Nelson v. Correctional Medical Services*, 583 F.3d 522, 531 (8th Cir. 2009) (internal quotation marks and citation omitted).

*Smalley v. Gamache*, No. 4:10CV319 RWS, 2013 WL 1149146, at *2 (E.D. Mo. Mar. 19, 2013) (footnote omitted).

### A. Officer Cast

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."[11] *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations omitted). In particular, "prison officials have a duty…to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (internal quotation marks and citations omitted).

> It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious"….For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm….
>
> The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth

---

[11] Because Plaintiff was a pretrial detainee at the time of the alleged incident, his § 1983 claims are analyzed not under the Eighth Amendment, but rather under the Fourteenth Amendment's Due Process Clause. *See Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). "This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Id.* (citation omitted).

> Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety…

*Id.* at 834 (internal citations and footnote omitted).

Viewing the facts in the light most favorable to Plaintiff, the Court finds a genuine issue of material fact remains with respect to whether Defendant Cast exhibited deliberate indifference to a substantial risk of serious harm to Plaintiff. If Plaintiff's version of events is to be believed, Defendant Cast knew that inmates regarded Plaintiff as a snitch, and that inmates identified as snitches were at risk of attacks by other inmates. Cast nevertheless allowed inmate Ballinger to access Plaintiff's cell, despite his knowledge that it violated SCCJ policy for an officer to open one inmate's cell at the request of another inmate, or to allow an inmate to enter the cell of another inmate. While Cast testified to a different version of events during his deposition, this discrepancy merely raises a fact question inappropriate for determination on summary judgment. The Court finds a reasonable jury could credit Plaintiff's account, and conclude that Cast exhibited deliberate indifference to Plaintiff's safety. Thus, because Plaintiff has raised a genuine issue of material fact about whether Defendant Cast violated a constitutional right, Defendants' Motion for Summary Judgment on the issue of qualified immunity must be denied. *See Henderson*, 439 F.3d at 503-04 (internal quotation marks and citations omitted) ("[W]e agree with the district court that genuine issues of material fact exist as to whether a reasonable officer…would have known his actions violated [plaintiff's] right….We need look no further than both parties' sharply conflicting accounts of the circumstances….to find a material factual

dispute…While the jury may credit [defendant's] testimony and disbelieve [plaintiff's] testimony at trial, it is not our function to remove the credibility assessment from the jury.").[12]

### B. Officer McKee

As stated above, in Count II of his First Amended Complaint Plaintiff alleges McKee violated his civil rights pursuant to 42 U.S.C. § 1983, when he exhibited deliberate indifference to Plaintiff's serious medical needs. (Compl., ¶¶ 64-72). Defendant McKee maintains he is protected from Plaintiff's claim by qualified immunity. (Memorandum of Defendants in Support of their Motion for Summary Judgment on Plaintiff's First Amended Complaint ("Defendants' Memo in Support"), PP. 9-12).

As stated above, under Eighth Circuit law, "[q]ualified immunity protects government officials performing discretionary functions from liability for damages so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Eighth Circuit further has held that, "[t]he Eighth Amendment requires prison officials to provide humane conditions of confinement, and one condition of confinement is the medical attention given to a prisoner." *Aswegan v. Henry*, 49 F.3d 461, 463-64 (8th Cir. 1995) (internal quotation marks and citations omitted). "To succeed on a claim of deprivation of medical care in violation of the Eighth Amendment, plaintiff must prove that defendants were deliberately indifferent to his serious medical needs." *Moots v. Lombardi*, No. 4:02CV1886 CEJ, 2005 WL 4541944, at *5 (E.D. Mo. Feb. 10, 2005) (citing *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)).

---

[12] As further support for its finding that a fact question remains, the Court notes Plaintiff presents substantial evidence, albeit disputed, regarding Defendant Cast's alleged animosity towards Muslims, people of color and inmates at SCCJ. (*See* Plaintiff's Additional Facts, ¶¶ 275-316).

There is both an objective and subjective component to a claim of deliberate indifference. "A plaintiff must demonstrate (1) that [he] suffered objectively serious medical needs[13] and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001) (internal quotation marks and citation omitted). A prison official acts with the requisite deliberate indifference when that official, "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

In their Motion for Summary Judgment, Defendants allege Plaintiff fails to establish that he suffered from a serious medical condition, or that any such condition would have been obvious to a layperson. (Defendants' Memo in Support, P. 10). Defendants continue to assert that Plaintiff was not denied care, as he was under the care of a psychiatrist and a mental health counselor, and further received treatment for any physical injuries he may have suffered. (*Id.*, PP. 10-11). Finally, Defendants claim "a prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that delays adversely affected his prognosis" (*Id.*, P. 11, citing *Holden*, 663 F.3d at 342), and there is no credible evidence in the record indicating that McKee's alleged failure to respond to Plaintiff's medical concerns adversely affected Plaintiff's prognosis.

---

[13] Under Eighth Circuit law, "[a] serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (internal quotation marks and citation omitted). Defendants need not understand the specific medical condition afflicting Plaintiff to understand that it is serious, however; instead, symptoms such as falling down, becoming unresponsive, and being unable to answer questions should be obvious to a layperson as indications of a serious medical problem. *See Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016).

In his response, Plaintiff first notes that during the attack, his head hit the metal toilet stool hard enough to make a sound. (Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opp."), P. 13, citing Plaintiff's Additional Facts, ¶¶ 58-59). Plaintiff continues to assert Ballinger was able to land several more punches, including to Plaintiff's face and jaw. (*Id.*, citing Plaintiff's Additional Facts, ¶ 61). According to Plaintiff, despite the pain and trauma to his head, SCCJ staff refused his multiple requests to be seen by a doctor, and did not take him to a hospital to get an x-ray. (*Id.*, citing Plaintiff's Additional Facts, ¶¶ 108-125). With respect to McKee, Plaintiff alleges that he submitted between six and nine complaints relating to his medical care to Defendant McKee, but received no response. (*Id.*, P. 14, citing Plaintiff's Additional Facts, ¶¶ 119-121). Plaintiff asserts McKee personally directed that limitations be placed on his medical care, and according to Plaintiff, the pain in his jaw was so severe that he had to request liquid food in the weeks following the attack and he still experiences pain in his jaw to this day. (*Id.*, PP. 13-14, citing Plaintiff's Additional Facts, ¶¶ 114-125).

Upon consideration of the foregoing, the Court finds a genuine issue of material fact remains with respect to whether Defendant McKee exhibited deliberate indifference to Plaintiff's serious medical need. In other words, the Court finds a reasonable factfinder could conclude McKee knew of, but deliberately disregarded, a serious medical need when he allegedly ignored Plaintiff's requests for medical assistance. *See Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989) (citations omitted) ("Delay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature."); *see also Dadd v. Anoka County*, 827 F.3d 749, 755-56 (8th Cir. 2016).

Defendants' Motion for Summary Judgment on Count II of Plaintiff's First Amended Complaint will therefore be denied.[14]

## II. Municipal Liability

For § 1983 liability to attach to a governmental entity, a plaintiff must show that a constitutional violation resulted from (1) an official policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise. *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018). In their Motion for Summary Judgment, Defendants first claim St. Charles County is entitled to summary judgment as Plaintiff has failed to show a deprivation of his constitutional rights in the first instance. (Defendants' Memo in Support, P. 12). As noted above, however, the Court finds genuine issues of material fact remains as to whether Defendants Cast and/or McKee violated Plaintiff's constitutional rights, and so this portion of Defendants' motion must be denied.

Defendants next assert that Plaintiff fails to plead facts identifying an official policy, or a widespread custom or practice, that directly caused the violation of his Eighth Amendment rights. In his First Amended Complaint, Plaintiff alleges "[i]t is and has been Defendant St. Charles County's policy, practice, and custom to inadequately train and supervise SCCJ officers in order to maintain safe conditions." (Compl., ¶ 90). To state a viable § 1983 claim against the County for failure to train and supervise, Plaintiff must plead facts sufficient to show that (1) the County's officer training and supervision practices were inadequate; (2) the County was deliberately indifferent to the rights of others in adopting these training and supervision practices, and the County's failure to train and supervise was a result of deliberate and conscious choices it

---

[14] The Court has no problem finding that the constitutional right at issue was clearly established at the time of the allegedly offending conduct, and so McKee is not entitled to qualified immunity on Plaintiff's claim.

made; and (3) the County's alleged training and supervision deficiencies caused Plaintiff's constitutional deprivation. *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013). Ultimately, Plaintiff must prove that the County "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018) (internal quotation marks and citation omitted). Plaintiff may establish County notice of a deficiency in its procedures in one of two ways:

> First, notice may be implied where failure to train officers or employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious….The second avenue for asserting a failure to train claim arises where the need for additional training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its employees' responses to a regularly recurring situation are insufficient to protect the constitutional rights of its citizens.

*Thelma D. By and Through Delores A. v. Board Of Educ. Of City of St. Louis*, 934 F.2d 929, 934-35 (8th Cir. 1991) (citations omitted).

As noted above, Plaintiff's First Amended Complaint alleges "[i]t is and has been Defendant St. Charles County's policy, practice, and custom to inadequately train and supervise SCCJ officers in order to maintain safe conditions." (Compl., ¶ 90). With respect to correctional officer misconduct, Plaintiff notes the Court has deemed admitted the fact that from 2010 through 2017, St. Charles County did not have policies, protocols, and practices in place to retain, record or track fully inmate complaints made against correctional staff. (*See* ECF No. 47, Sanctions Order). As a result, Plaintiff maintains there was no way for jail supervisors to assess which officers were accruing high numbers of complaints. (Plaintiff's Additional Facts, ¶ 232). Plaintiff concludes that through these failures, St. Charles County deliberately established a system wherein the leaders of the facility turned a blind eye to inmates' complaints and allegations of wrongdoing against correctional officers. (Plaintiff's Opp., P. 18, citing *S.L. ex*

*rel. Lenderman v. St. Louis Metro. Police Dept. Bd. of Com'rs*, No. 4:10CV2163 CEJ, 2012 WL 3564030, at *10 (E.D. Mo. Aug. 17, 2012) (internal citation omitted) (finding deliberate indifference in an "insulating barrier which prevents notice of complaints from reaching the [c]ommissioner [d]efendants" because supervisors did not inform the commissioners of employee wrongdoing "even in summary form of the number and subject of [internal affairs] investigations."); *Rohrbough v. Hall*, No. 4:07CV996 ERW, 2008 WL 4722742, at *13 (E.D. Mo. Oct. 23, 2008) (holding that a reasonable jury could find that employee misconduct was an "obvious consequence of" the commissioners' inaction—turning a "blind eye" rather than inquiring into complaints)).

Plaintiff provides evidence that although St. Charles County policy mandates that all incidents where officers use force on inmates, or where inmates are hurt by other inmates, be thoroughly documented and reviewed, in reality such review did not always happen[15], and that even when investigations did take place (and the use of unreasonable force or other unacceptable action was found), the officers often were not disciplined and the transgression was not referenced in their performance reviews.[16] (*See* Plaintiff's Opp., P. 20; *see also* Plaintiff's Additional Facts, ¶ 135 (citing ECF.No. 54-9, Crawford Dep. at 83:25-84:1) ("Director Crawford testified, 'The use of force happened pretty regularly. Investigations, not so much.'").[17]

---

[15] Defendant McKee, the operations lieutenant at the jail, testified that during his 30 plus years with St. Charles County, he could remember only four investigations into uses of force. (*See* Plaintiff's Additional Facts, ¶ 139).

[16] According to Plaintiff, the investigations did not include interviewing inmates, either those subjected to the force, those utilizing it, or those witnessing it, and any misconduct reviews that were completed were not kept in the offending officers' personnel files. (See Plaintiff's Opp., P. 21; Plaintiff's Additional Facts, ¶¶ 67, 99, 134).

[17] Plaintiff asserts there are instances of Defendant Cast himself engaging in uses of force and other bad behavior with little oversight and no discipline. (*See* Plaintiff's Additional Facts, ¶¶ 165-172).

With respect to the provision of medical care, Plaintiff alleges, "Defendant County has ratified the unsafe treatment of detainees by failing to respond to allegations of medical deprivation or harm to detainees and inmates." (Compl., ¶ 93). Plaintiff elaborates that although St. Charles County expects correctional officers to identify medical symptoms and call medical directly in extreme cases, Defendants admit officers receive limited to no training on how to recognize emergency or concerning health symptoms. (Plaintiff's Additional Facts, ¶¶ 245-50). Furthermore, the Court has deemed admitted that from 2010 through 2017, St. Charles County did not have policies, protocols or procedures in place to retain, record and track fully inmate complaints of being denied medical care. (*See* ECF No. 47, Sanctions Order).[18]

Upon consideration, the Court finds that with these allegations Plaintiff presents evidence from which a reasonable jury could conclude Defendant County had notice of a pattern of unconstitutional acts committed by correctional officers with respect to both condoning or overlooking the use of force by inmates on other inmates, and denying proper medical care. Plaintiff further presents evidence that Defendant County adopted deficient supervision and training practices with deliberate indifference to the constitutional rights of others, that these training practices were the product of the County's deliberate and conscious choices, and that the practices proximately caused Plaintiff's injury. Defendants' Motion for Summary Judgment on Plaintiff's *Monell* claim will therefore be denied.

---

[18] Defendant. McKee testified that the most frequent complaint he hears from inmates' loved ones and attorneys is that inmates are not able to receive medical attention. (Plaintiff's Additional Facts, ¶ 267, citing ECF No. 56-2, McKee II Dep. at 68:1-11).

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED that** Defendants' Motion for Summary Judgment on Plaintiff's First Amended Complaint (ECF No. 25) is **DENIED**.


Dated this 3rd Day of March, 2021.


                                                /s/ Jean C. Hamilton
                                                UNITED STATES DISTRICT JUDGE